1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| VINEYARD INVESTIGATIONS,<br><br>Plaintiff,<br><br>v.<br><br>E. & J. GALLO WINERY,<br><br>Defendant. | Case No. 1:19-cv-01482-JLT-SKO<br><br>ORDER REGARDING<br>CLAIM CONSTRUCTION<br><br>ORDER DENYING PLAINTIFF'S MOTION<br>TO FILE SUPPLEMENTAL CLAIM<br>CONSTRUCTION BRIEF<br><br>(Docs. 68, 69, 70, 73, 76, 77, 79) |

Vineyard Investigations initiated this action for patent infringement against E. & J. Gallo Winery, asserting three patents that claim an invention related to the irrigation and delivery of various materials to plants, such as grapevines in a vineyard. On April 25, 2022, the parties submitted their joint claim construction and prehearing statement. (Doc. 68; Doc. 69.) The parties submitted several briefs in support of their respective constructions. (Docs. 70, 73, 76, 77, 79.) Pursuant to Local Rule 230(g), the Court finds the matter suitable for decision without oral argument. Accordingly, the Court **ADOPTS** the claim constructions as set forth below.

## I.    BACKGROUND

Dr. Paul W. Skinner founded Vineyard Investigations (formerly known as Terra Spase), which provides consulting and scientific expertise to the wine industry in California and worldwide. (Doc. 52 at 3, ¶ 5; *id.* at 4, ¶ 13.) Dr. Skinner, a soil scientist, grape grower, and

inventor, developed a technology related to automizing and improving management of certain aspects of vineyard agriculture. (*Id.* at 2, ¶ 2.) Dr. Skinner's invention involves systems and methods that compile information from several sources and provide exactly the amount and type of nutrition, water, canopy, vigor, insect and disease prevention to every vine. (*Id.* at 6, ¶ 20.) Dr. Skinner sought and obtained a portfolio of patents for this invention, which Vineyard Investigations now owns and manages. (*Id.* at 8, ¶ 22.) All of Vineyard Investigations' patents derive from and share a specification with the parent patent U.S. Patent No. 6,874,707, originally filed on May 31, 2001, and issued by the U.S. Patent and Trademark Office ("USPTO") on April 5, 2005. (*Id.* at 8, ¶ 23.) Vineyard Investigations asserts related three from its portfolio against E. & J. Gallo Winery—U.S. Patent Nos. 8,528,834, 6,947,810, and 10,645,881. (*Id.*)

The invention disclosed in the asserted patents allegedly provides grapevine growers and wine producers with a variety of benefits including reducing water consumption, increasing water use efficiency, improving sustainability of the vineyard, up to "50% improvement in low yielding areas over traditional management practices," providing "10% improvement in sugar and quality of grapes compared to traditional methods," providing "[g]ranular control" of the vines, and reducing equipment and labor costs. (Doc. 52 at 15, ¶ 38.) The following describes each of the asserted patents in more detail.

**A.    The '834 Patent**

The '834 Patent is entitled "Plant Growing System Using External Data and Having Sensors Associated with Plants" and issued from the USPTO on September 10, 2013. (Doc. 52 at 8, ¶ 24.) The '834 Patent describes and claims a "system for monitoring and managing plant growth" in which: "[c]ombinations of data from sensors local to a vineyard, and from optional remote stations and sensors, is combined with a control system to accurately control the dispensing of water and chemicals such as insecticides, disease prevention fungicides and fertilizers." (Doc. 70-2 at 2, Abstract.) Although Vineyard Investigations alleges the patent's system could apply to many different crops, the detailed applications in the specification focus on the advantages for growing grapevines in a vineyard. (Doc. 52 at 9, ¶ 25; Doc. 70-2 at 8-11.)

According to Vineyard Investigations, an example configuration of the '834 Patent

"contains various types of in-field sensors . . . and emitters . . . for dispensing water and other materials. In addition to real-time data from the in-field sensors, the controller [] of the example system also can receive and utilize external data from a number of sources." (Doc. 52 at 9, ¶ 26.) The source for "external data" may include "information from local networks or wide area networks, such as the Internet." (Doc. 70-2 at 10, 5:1-13.) "Examples of external data include weather data, crop growth models, growing degree days, [etc.]." (*Id.*) The external data may also "come from a remote station, sensor, agency, or other source" or "generated from software," such as modeling or crop development data. (*Id.*) The patent describes modeling techniques for processing the sensor and external data. (*Id.* at 10, 5:20-35.) After processing the input data, the '834 Patent describes using an automated system for determining what material the plants need and sending those materials to the plants through an irrigation-like system. (*See e.g.*, *id.* at 11, 7:20-59.) Vineyard Investigations asserts that the invention allows for "[p]roviding fine-grained variability" which "leads to improvements in yield and grape quality, because each vine receives a more accurate and effective application of nutrients." (Doc. 52 at 12, ¶ 29.)

Claim 1 represents the apparatus claims in the '834 Patent:

1. An apparatus for dispensing materials to vegetation, the apparatus comprising:

a conduit having a channel, wherein the channel is positioned in proximity to the vegetation;

an outlet coupled to the channel for conveying a material from the channel to the vegetation under the control of a central controller, wherein the central controller is responsive to external data for controlling material dispersing from one or more emitters in fixed proximity to the vegetation;

one or more sensors in fixed proximity to the vegetation, wherein each sensor is associated with one or more particular plan[t][1] in the vegetation, wherein signals from [the] sensors are transmitted to a central control system and are used to control conveyance of the material to the vegetation.

(Doc. 70-2 at 11-12.) The '834 Patent contains thirteen claims that are dependent to Claim 1. (*Id.* at 12.) The method claim (Claim 15) contains similar limitations and claim terms. (*Id.*)

///

---

[1] The modifications herein represent the parties' agreed constructions due to typographical errors that appear in the patent as originally issued. (*See* Doc. 68 at 3.)

3

1   **B.     The '810 Patent**

2           The '810 Patent is entitled "System for Automated Monitoring and Maintenance of Crops

3   Including Sensors and Emitters Associated with Plants" and issued from the USPTO on

4   September 20, 2005. (Doc. 70-1 at 2.) The '810 Patent shares a nearly identical specification with

5   the '834 Patent, but its claims focus on the use of in-field sensors that provide information inputs

6   to the automated control system. (*Id.* at 12-13; Doc. 52 at 12, ¶ 32.) The '810 Patent contains

7   thirty-six claims that recite more detailed types of in-field sensors, the materials provided to the

8   plants through the conduits, and the association of the plants, emitters, and sensors. (Doc. 70-1 at

9   12-13.) For example, Claim 1 describes a "system for automated application of insecticide,"

10  using, inter alia, an "insect sensor [that] includes a DNA sensor." (*Id.* at 12.) Other types of

11  sensors listed in the '810 Patent claims include a "protein sensor" (Claim 8), a "leaf wetness

12  sensor" (Claim 10), a "sensor for detecting at least one factor related to plant disease" (Claim 15),

13  and sensors related to detecting light (Claim 30). (*Id.* at 12-13.)

14  **C.     The '881 Patent**

15          The '881 Patent is entitled "Plant Growing System Using External Data" and issued from

16  the USPTO on May 12, 2020. (Doc. 70-3 at 2.) The '881 Patent issued after Vineyard

17  Investigations filed its initial compliant in this action. (*See* Doc. 1.) With leave from the Court,

18  Vineyard Investigations amended its complaint on October 22, 2021, to include the newly issued

19  patent. (Doc. 52.) The '881 Patent's specification shares significant overlap with the '834 and

20  '810 Patents; however, it also includes a includes an insert from a prior art reference referred to as

21  the "Williams Paper."[2] (Doc. 70-3 at 15-17.) Discussed in more detail below, the Williams Paper

22  describes an experiment conducted in two vineyards in the San Joaquin valley to evaluate various

23  irrigation treatments and describes a method for modeling certain data related to those irrigation

24  treatments. (*Id.*) The '881 Claims include methods and systems similar to that of the '834 and

25  '810 Patents but include an additional limitation that recites using "external data [that] is derived,

26

27  _____

28  [2] Larry E. Williams, et al., Irrigation of Thompson Seedless Table Grapes: Utilization of Crop Coefficients
    Developed at the Kearney Center for use at Other Locations in the San Joaquin Valley, 27 Viticulture Research
    Report (1998-99).

at least in part, using a model including potential data." (*Id.* at 17, e.g., Claim 1.)

**D.      Gallo's Alleged Infringement and Procedural Background**

Gallo allegedly infringes the asserted patents by using its Variable Rate Irrigation systems and its "systems for using remotely sensed (e.g., satellite) data in the modeling, scheduling, and control of irrigation." (Doc. 52 at 2, ¶ 3.) According to the complaint, Gallo partnered with IBM to build and deploy "an infringing variable rate irrigation system" from 2012 through at least 2015. (*Id.* at 16, ¶ 42.) Gallo's system allegedly practices each aspect of "Dr. Skinner's inventions, including emitters, controllers, and sensors for managing variable rate irrigation." (*Id.*) Gallo also allegedly uses external data to derive crop coefficients as information inputs into the system. (*Id.* at 17-19, ¶ 44.)

According to Vineyard Investigations, a licensing agent contacted Gallo as early as April 2010 regarding Dr. Skinner's patented invention. (Doc. 52 at 16, ¶ 41.) The parties exchanged several communications and meetings from 2016 to 2018 regarding Vineyard Investigations' patent portfolio and Gallo's allegedly infringing systems. (*Id.* at 16-22, ¶¶ 41-49.) Ultimately, however, Gallo declined to take a license. (*Id.* at 21-22, ¶ 49.)

Vineyard Investigations filed a complaint for patent infringement against Gallo on October 18, 2019. (Doc. 1.) Gallo filed a motion to dismiss on the grounds that the asserted patents were patent ineligible under 35 U.S.C. § 101. (Doc. 13.) Under the *Alice/Mayo* standard, the Court denied the motion, finding the patents were not directed to an abstract idea, and even if they were, Vineyard Investigations' complaint and the asserted patents contained a sufficiently "inventive concept" at the pleading stage. (*See generally* Doc. 31.) As mentioned previously, Vineyard Investigations subsequently amended the complaint to include the '881 Patent after its issuance.[3] The parties have conducted claim construction discovery and filed various briefs regarding the terms they wish the Court to construe. (Docs. 68, 69, 70, 73, 76, 77.) Vineyard Investigations also motioned to file a supplemental brief, which Gallo opposes. (Doc. 79; Doc.

---

[3] Although not addressed in this order, the Court acknowledges that Vineyard Investigations' motion to dismiss a counterclaim asserted by Gallo remains pending. (Doc. 55.) Due to the on-going judicial emergency in this district and considerable backlog, the Court has prioritized the parties' claim construction motion, given the necessity of a Court ruling on this matter for the case to proceed. (*See* Doc. 92; Doc. 93.)

81.) The Court has reviewed the parties' briefing and supporting documents and issues the following order on the claim construction issues.

## II.    MOTION FOR SUPPLEMENTAL BRIEFING

The scheduling order of this case permitted each party to submit two briefs regarding claim construction. (Doc. 41 at 4.) Following Gallo's sur-reply, Vineyard Investigations requested to file a supplemental sur-sur-reply arguing that Gallo impermissibly submitted new evidence and expert declaration testimony that it had not previously disclosed during claim construction discovery. (Doc. 79 at 4.) Vineyard Investigations claims that its supplemental brief only responds to the new evidence. (*Id.*) Gallo objects to the Court considering the supplemental sur-sur-reply because, in part, Gallo's sur-reply did not set forth any new arguments and because the proposed sur-sur-reply responds to arguments Gallo previously made in its initial brief. (Doc. 81 at 2.) As set forth in more detail below, the Court does not find that the allegedly newly submitted arguments or evidence by Gallo are dispositive to any issue or that Vineyard Investigations' sur-sur-reply materially differs from the arguments that appear in its opening and reply briefs. Accordingly, the Court **DENIES** Vineyard Investigations' request to file a sur-sur-reply.

## III.    LEGAL STANDARDS

A patent must "describe the exact scope of an invention and its manufacture to secure to the patentee all to which he is entitled and to apprise the public of what is still open to them." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 373 (1996) (internal quotations omitted). A patent application must contain a "specification" and at least one drawing. 35 U.S.C. § 111(a)(2). There are two distinct parts of a patent specification. The first is a detailed "written description of the invention and of the manner and process of making and using it" that must set forth "in such full, clear, concise, and exact terms as to enable any person skilled in the art ... to make and use the same." 35 U.S.C. § 112(a). Second, a patent "specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112(b). The claims define the scope of a patent, *Markman*, 517 U.S. at 373, but "do not set forth the invention in all of the detail required by the written description." *Lava Trading, Inc. v. Sonic Trading Mgmt., LLC*, No. 03 CIV. 842 (TPG),

1  2004 WL 1145833, at *3 (S.D.N.Y. May 20, 2004).

2      "When the parties raise an actual dispute regarding the proper scope of these claims, the

3  court, not the jury, must resolve that dispute." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech.*

4  *Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008). Terms contained in claims "are generally given their

5  ordinary and customary meaning." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582

6  (Fed. Cir. 1996). "[T]he ordinary and customary meaning of a claim term is the meaning that the

7  term would have to a person of ordinary skill in the art [("POSA")] in question at the time of the

8  invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005); *Multiform Desiccants,*

9  *Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998) ("[The POSA] is deemed to read the

10  words used in the patent documents with an understanding of their meaning in the field, and to

11  have knowledge of any special meaning and usage in the field."). To ascribe a claim term's

12  ordinary and customary meaning, courts first look to and primarily rely on intrinsic evidence,

13  which includes the claims themselves, the written description, and the patent's prosecution

14  history. *Endo Pharms., Inc. v. Actavis LLC*, 922 F.3d 1365, 1370-71 (Fed. Cir. 2019); *see also*

15  *Phillips*, 415 F.3d at 1312 ("Because the patentee is required to 'define precisely what his

16  invention is,' the Court explained, it is 'unjust to the public, as well as an evasion of the law, to

17  construe it in a manner different from the plain import of its terms.'" (quoting *White v. Dunbar*,

18  119 U.S. 47, 52 (1886))).

19      First, the context in which the disputed claim term appears is highly instructive to its

20  construction. *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003); *see also*

21  *Phillips*, 415 F.3d at 1314 (explaining that the claim term "steel baffles . . . strongly implies that

22  the term "baffles" does not inherently mean objects made of steel")). "Where commonly

23  understood words are accorded their ordinary meaning in the patent, the court need not construe

24  them for the jury." *Medversant Techs., L.L.C. v. Morrisey Assocs., Inc.*, No. CV 09-05031 MMM

25  FFMX, 2011 WL 9527718, at *19 (C.D. Cal. Aug. 5, 2011) (citing, *inter alia*, *Biotec Biologische*

26  *Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341, 1349 (Fed. Cir. 2001).

27  Courts should construe claim terms consistently throughout the patent. *Phil-Insul Corp. v. Airlite*

28  *Plastics Co.*, 854 F.3d 1344, 1359 (Fed. Cir. 2017). Furthermore, "[c]laims must be interpreted

1  with an eye toward giving effect to all terms in the claim." *Becton, Dickinson & Co. v. Tyco*

2  *Healthcare Grp.*, LP, 616 F.3d 1249, 1257 (Fed. Cir. 2010) (internal quotations omitted).

3      Second, the patent's specification, containing the written description, is usually dispositive

4  and is the single best guide to determine the meaning of a disputed term. *Vitronics*, 90 F.3d at

5  1582. When the specification explains and defines a term without ambiguity or incompleteness,

6  "there is no need to search further for the meaning of the term." *Sinorgchem Co. v. ITC*, 511 F.3d

7  1132, 1138 (Fed. Cir. 2007). However, courts should refrain from reading limitations or preferred

8  embodiments of the specification into a claim when the claim language is broader than the

9  preferred embodiments. *Bradium Techs. LLC v. Iancu*, 923 F.3d 1032, 1049 (Fed. Cir. 2019);

10  *Phillips*, 415 F.3d at 1323. "[T]here is a fine line between reading a claim *in light of* the written

11  description and reading a limitation into the claim from the written description." *Howmedica*

12  *Osteonics Corp. v. Zimmer, Inc.*, 822 F.3d 1312, 1322 (Fed. Cir. 2016) (emphasis in original). A

13  patentee may act as his own "lexicographer" by setting forth his own definition for a claim term

14  in the specification. *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir.

15  2012). To deviate from the ordinary meaning, the patentee must "clearly express an intent to

16  define the term," *GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir.

17  2014), and the definition must appear "with reasonable clarity, deliberateness, and precision."

18  *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998).

19      Third, "the prosecution history can often inform the meaning of the claim language by

20  demonstrating how the inventor understood the invention and whether the inventor limited the

21  invention in the course of prosecution, making the claim scope narrower than it would otherwise

22  be." *Phillips*, 415 F.3d at 1317. "Vague or ambiguous" statements by the patentee during

23  prosecution do not suffice to "qualify as a disavowal of claim scope." *Omega Eng'g, Inc, v.*

24  *Raytek Corp.*, 334 F.3d 1314, 1325 (Fed. Cir. 2003). The patentee must make a "clear and

25  unmistakable" disclaimer. *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1286 (Fed.

26  Cir. 2005). For example, "an applicant's argument that a prior art reference is distinguishable on a

27  particular ground can serve as a disclaimer of claim scope . . ." *Am. Piledriving Equip., Inc. v.*

28  *Geoquip, Inc.*, 637 F.3d 1324, 1336 (Fed. Cir. 2011).

In sum, the Court applies a "heavy presumption that claims carry their full ordinary and customary meaning, unless the patentee unequivocally imparted a novel meaning to those terms or expressly relinquished claim scope during prosecution." *Omega Eng'g*, 334 F.3d at 1323 (internal quotations and citations omitted). "In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term." *Vitronics*, 90 F.3d at 1583. However, when the intrinsic evidence reveals an ambiguity in a disputed term, the Court may consult extrinsic evidence such as expert testimony, inventory testimony, dictionaries, and learned treatises. *Intel Corp. v. VIA Techs.*, 319 F.3d 1357, 1367 (Fed. Cir. 2003). Contradictory extrinsic evidence, however, should not weigh more strongly than persuasive intrinsic evidence. *Immunex Corp. v. Sanofi-Aventis U.S. LLC*, 977 F.3d 1212, 1221-22 (Fed. Cir. 2020).

## IV.    DISCUSSION

On April 25, 2022, the parties submitted their joint claim construction and prehearing statement. (Doc. 68.) Pursuant to Local Patent Rule 4-3(a),[4] the parties set forth agreed-upon claim constructions for five terms. (*Id.* at 3.) The Court adopts those constructions as listed in the parties' joint statement. The parties also identified the full list of disputed patent terms, their respective constructions, and supporting evidence Pursuant to Patent Rule 4-3(b). (*Id.* at 3-4; Doc. 69.) In accordance with Rule 4-3(c), the parties selected ten most significant terms for the Court to construe. They jointly identified three terms/category of terms: the "associating"/"associated" with terms; the "receiving"/"transmit" signals; and "potential data." (Doc. 68 at 4-5.) Vineyard Investigations separately identified three terms: "emitting means for mitting the material onto the plants"; "sensing means for sensing a condition of growth of the plants"; "control system means for receiving signals from a sensor." (*Id.*) Gallo identified four terms/category of terms: "in [fixed] proximity to"; "in response to"/"responsive to"; and "control system coupled to [the emitters/one or more sensors]." (*Id.* at 5-6.) In Gallo's briefing in support of claim construction, it narrowed the disputed terms to six terms/categories. (Doc. 77 at 5 n.1.) The follow table contains the six disputed terms for construction and the parties' relevant constructions:

---

[4] As set forth in the initial scheduling order, the parties agreed to follow the Local Patent Rules of the Northern District of California for this case. (Doc. 41 at 3.)

| | **Disputed Claim Term** | **Vineyard's Construction** | **Gallo's Construction** |
|---|---|---|---|
| 1. | "external data" | Plain and ordinary meaning | Indefinite |
| 2. | "potential data" | "[D]ata relating to the predicted, expected, or typical growth, transpiration or evaporation, such as growth models, potential evapotranspiration, leaf water potential, or crop coefficients" | Indefinite |
| 3. | "in [fixed] proximity to" | Plain and ordinary meaning | Indefinite |
| 4. | the "associat[ion]" terms<br><br>e.g., "sensor(s)/emitter(s) associated with" plant(s) | Plain and ordinary meaning | e.g., senor(s)/emitter(s) "linked with" particular plant/plants, so as to permit selective delivery of material and irrigation control with respect to the particular plant/plants, and not merely to a field, region, or plot |
| 5. | "control system **coupled to** one or more of the sensors for receiving a signal from the sensors | Plain and ordinary meaning | control system **connected** to one or more of the sensors **via wire or cable for communication** to allow receiving a signal from the sensors |
| | "control system coupled to the emitters for controlling the emission of the material" | Plain and ordinary meaning | control system **connected** to the emitters **via wire or cable for communication** to allow **independent control of the emission of material from each emitter** |
| 6. | "transmitted to"<br><br>"receiving a signal from" / "receive signals from" / "is received from"<br><br>"in response to"/"responsive to"<br><br>"controlling material dispensing" / "used to control conveyance of the material to the vegetation" | Plain and ordinary meaning | The claimed functions are performed without manual entry or human intervention |

1  (Doc. 69; Doc. 73.) Because Gallo no longer challenges Vineyard Investigations' proposed

2  construction for the three terms it identified in the joint statement (*see* Doc. 77 at 5 n.1.), the

3  Court adopts Vineyard Investigations' proposed construction for these terms. (*See* Doc. 69 at 73-

4  83.) As to the remaining terms not listed in the table above but identified as in dispute, Gallo

5  reserved its right assert its non-infringement and invalidity arguments but no longer asserts a

6  certain construction. (Doc. 77 at 5 n.1.) Vineyard Investigations' proposed construction for these

7  terms are their plain and ordinary meanings. (Doc. 69.) Therefore, the Court makes no

8  determination regarding their meaning or scope beyond a plain and ordinary meaning.

9  Accordingly, the discussion below focuses on the six terms/phrases listed in the table above.

10  **A.      Terms Challenged as Indefinite**

11         Gallo asserts that three claim terms fail for a lack of definiteness, "potential data,"

12  "external data," and "in [fixed] proximity to." (Doc. 73 at 9-19.) The Patent Act requires the

13  written description of a patent to "conclude with one or more claims particularly pointing out and

14  distinctly claiming the subject matter which the applicant regards as the invention." 35 U.S.C.

15  § 112, ¶ 2. "[A] patent must be precise enough to afford clear notice of what is claimed, thereby

16  'appris[ing] the public of what is still open to them.'" *Nautilus, Inc. v. Biosig Instrs., Inc.*, 572

17  U.S. 898, 909 (2014) (quoting *Markman*, 517 U.S. at 373). A patent's claim may fail to provide

18  sufficient definiteness if it does not "inform those skilled in the art about the scope of the

19  invention with reasonable certainty." *Id.* at 910. The primary purpose of the definiteness

20  requirement serves "to ensure that the claims are written in such a way that they give notice to the

21  public of the extent of the legal protection afforded by the patent" so that interested parties can

22  determine whether they infringe. *All Dental Prodx, LLC v. Advantage Dental Prods.*, 309 F.3d

23  774, 779-80 (Fed. Cir. 2002). Because patents are not directed at lawyers or lay members of the

24  public, whether a claim provides "reasonable certainty" of the scope of the claimed invention is

25  viewed from the perspective of a POSA. *Nautilus*, 572 U.S. at 910. To determine whether a

26  POSA would reasonably understand the scope of the claim, the "general principles of claim

27  construction apply." *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1346 (Fed. Cir. 2007), *overruled on*

28  *other grounds by Nautilus*, 572 U.S. at 908-10. Accordingly, evaluating an indefiniteness

1    challenge "involves consideration of primarily the intrinsic evidence, viz., the claim language, the

2    specification, and the prosecution history." *Enzo Bichem, Inc. v. Applera Corp.*, 599 F.3d 1325,

3    1332 (Fed. Cir. 2010) (internal quotations omitted).

4         The reasonable certainty standard "'mandates clarity, while recognizing that absolute

5    precision is unattainable.'" *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1347

6    (Fed. Cir. 2022) (quoting *Nautilus*, 572 U.S. at 910). The claims must provide "objective

7    boundaries" but the "'patentee need not define his invention with mathematical precision.'" *Id.*

8    (quoting *Guangdong Alison Hi-Tech Co. v. Int'l Trade Comm'n*, 936 F.3d 1353, 1359 (Fed. Cir.

9    2019)). Descriptive words or terms of degree do not necessarily render the claim indefinite, even

10   if it results in a broad claim scope. *Id.* For example, the specification and context of other claim

11   terms may provide "a general guideline and examples sufficient to enable a person of ordinary

12   skill in the art to determine [the scope of the claims]." *In re Marosi*, 710 F.2d 799, 803 (Fed. Cir.

13   1983). The specification's failure to explicitly define a term does not necessarily result in a

14   finding of indefiniteness. *IQASR LLC v. Wendt Corp.*, 825 F. App'x 900, 904 (Fed. Cir. 2020).

15   However, inconsistencies in claim usage among the claims and written description may create

16   sufficient uncertainty as to the term's meaning. *TVnGO, Ltd. v. LG Electrs., Inc.*, 861 F. App'x

17   453, 457-60 (Fed. Cir. 2021) (holding claim terms indefinite in part because the dependent claim

18   terms used "the disputed phrase in a way that contradicts the independent claims"). The patent

19   challenger has "the burden of proving indefiniteness by clear and convincing evidence." *BASF*

20   *Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017).

21        1.   "External Data"

22        Gallo argues the term "external data" is indefinite because the specification fails to

23   sufficiently describe what the "external data" is external *to*, i.e., to the control system itself, or the

24   irrigated vineyard. (Doc. 73 at 14-16.) Vineyard Investigations maintains that the patent provides

25   a sufficient description and examples of external data that it should receive its plain and ordinary

26   meaning. (Doc. 76 at 7-8.) "External data" appears in numerous places within the claims of the

27   '834 and '881 Patents: '834 Patent, Claims 1, 7-15 and '881 Patent, Claims 1,6-10, 14-17, 21-24,

28   37-44, 46-48. (Doc. 70-2 at 11-12; Doc. 70-3 at 17-18.) The '834 Patent's independent claims use

"external data" in the context of explaining an informational input into the central controller for controlling and dispensing material through the emitters to the plants. (*See, e.g.*, Doc. 70-2 at 11-12, (Claim 1 disclosing "an outlet coupled to the channel for conveying a material from the channel to the vegetation under the control of a central controller, wherein the central controller is responsive to the *external data*[5] for controlling material dispensing from one or more emitters in fixed proximity to the vegetation").) The dependent claims list examples of what may be included in the external data. The examples given in the dependent claims include weather data, crop growth model, growing degree days information, evapotranspiration coefficient, degree day insect model, disease risk model, crop nutrition requirements, and crop development data. (*Id.* at 12, Claims 7-14.)

In the independent claims of the '881 Patent, "external data" similarly appears in the context of information received by the control system in relation to the emitters providing materials to the plants. (Doc. 70-3 at 17-18 (*see e.g.*, Claim 1 disclosing "a control system coupled to the emitters for controlling the mission of the material to the plant area in response to *external data* associated with growing the plants").) The term also appears in another claim element which discloses that the "external data is received from a geographically remote source over a wide digital network and wherein the external data is derived, at least in part, using a model including potential data." (*Id.* at 17, Claim 1.) Mirroring the '834 Patent, the dependent claims of the '881 Patent disclose the same examples of what may be included in the external data. (*Id.* at 18, Claims 16, 37-44.) Two dependent claims of the '881 Patent further recite limitations wherein "the external data is *derived*, at least in part, [from one or more light sensors/by detecting an amount of shade generated by at least one plant/by detecting how much sunlight one or more plants are obtaining]." (*Id.*, Claims 46-48.)

Both patents' specifications provide the same explanation of the term:

External data is received by control system 200 via external data sources 206. Such data sources can include information from local networks or wide area networks such as the Internet. Examples of external data include weather data, crop growth models, growing degree days, ET, and ET (evapotranspiration coefficients), degree

---

[5] Unless otherwise noted, all italics herein does not appear in the original text and is added for emphasis.

13

day insect models, disease risk models, irrigation requirements, crop nutrition requirements, crop development data, etc. The external data can come from a remote station, sensor, agency, or other source. The external data can also be generated by software (e.g., modeling, forecasting or analysis programs) that is located locally to the control system or which is remote from the control system. External data can be entered manually by the user or operator of the control system, or can be received automatically by the control system via a communication link or network such as the Internet. In general, data processing and acquisition can be performed in any geographic location and used in any manner known in the art to facilitate the operation of the system of the present invention.

(Doc. 70-2 at 10, 5:1-19.)

Despite the express guidance from the specifications, Gallo maintains the patents inconsistently use "external data" such that a POSA could not determine whether the data received must be external to the control system itself or to the irrigated vineyard. (Doc. 73 at 14-16.) Gallo points to the information in the summary of the invention, saying the specification "distinguishes between 'data from sensors local to a vineyard' and data 'from optional remote stations and sensors.'" (Doc. 73 at 15.) From this "dichotomy," Gallo concludes that a POSA would understand "external" to mean remote and external to the vineyard. (*Id.*) Vineyard Investigations seemingly concedes that the patent distinguishes between these two sources of data and does not argue that "external data" includes data from within the vineyard. (Doc. 76 at 7 ("As Gallo acknowledges, the patents distinguish between external data and data from sensors local to the field. . .").)

Nonetheless, Gallo argues that inconsistencies within the patent hinder the understanding that the data is external to the vineyard. (Doc. 73 at 15-16.) Gallo relies on dependent Claims 46, 47, and 48 of the '881 Patent to contend that patent discloses external data to encompass data that comes from sensors inside the vineyard. (*Id.*) These claims disclose that external data is "derived from" either light sensors, detecting the amount of shade generated by a plant, or detecting the sunlight that plant/s are obtaining. (Doc. 70-3 at 18.) The plain meaning of these dependent claims indicates that the light data comes from within a vineyard and localized to the plants therein. Vineyard Investigations argues that sunlight and shade detecting "can be accomplished remotely by means of a drone, satellite, or other method." (Doc. 76 at 7.) However, Vineyard Investigations has not provided any intrinsic or extrinsic evidence to show that a POSA would

14

have understood detecting sunlight or shade by these means.

Even assuming these three dependent claims refer to data gathered *within* the vineyard, "external data" appears in a different context within these claims than it does in the other dependent claims or in the general description of external data in the specification. Although terms used consistently must receive a consistent meaning, when the same term appears in a different context, the term may carry a different meaning. *See Epcon Gas Systems, Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1031 (Fed. Cir. 2002) (holding that where a claim term is used "in two contexts with a subtle but significant difference" the term "should not necessarily be interpreted to have the same meaning in both phrases"). Each of the other relevant dependent claims from the '834 and '881 Patents describe what is "included" in the external data, not from where/what the external data is "derived." (Doc. 70-2 at 12, Claims 7-14; Doc. 70-3 at 18, Claims 16, 37-44.) The examples of what "external data" includes comprise information determined from another source, and many of the examples represent computations of multiple types of data. For example, weather data likely comes from a local weather station. Furthermore, the Williams Paper describes the crop coefficients as coming from the Kearney AG Center. (Doc. 70-3 at 15, 10:11-14.) Crop coefficients include integrated data of the "effects of characteristics that distinguish field crops from the reference grass crop." (Doc. 74-8 at 10.) The examples of models in the dependent claims, e.g., degree day insect model, disease risk model, also implicate data received from a software. (*See* Doc. 70-2 at 10, 5:4-12.) These examples do not reflect data readily observed or sensed on the vineyard.

Conversely, dependent Claims 46, 47, and 48 of the '881 Patent provide examples of the sources from which the external data is *derived*, i.e., what components make up the external data, which includes sunlight and shade observable on the vineyard. (Doc. 70-3 at 18.) Following the description of the "external data," the specification discloses using "sensor data" as part of a "sophisticated analysis to control irrigation and application of other chemicals or materials." (*Id.* at 13, 5:34-36.) This disclosure contemplates combining vineyard-based sensor data with other types of data within the control system. Therefore, the specification seemingly anticipates deriving external data, at least in part, from the sensors located within the vineyard.

15

1    The plain language of the independent claims in the '881 Patent further bolster the

2    conclusion that from where "external data" derives differs from what "external data" includes.

3    For example, Claim 1 explains that "external data is derived, at least in part, using a modeling

4    including potential data," indicating that external data is at least partly derived from "potential

5    data." (Doc. 70-3 at 17.) As Gallo itself contends, external data and potential data must have

6    different meanings. (*See* Doc. 73 at 10.) Thus, the source from where external data derives, i.e.,

7    modeling and potential data, should not be assumed to have the same meaning as what external

8    data *is*. Albeit a subtle distinction, the Court finds this distinction mitigates the allegedly

9    inconsistent use of "external data" in the patents.

10    The Court further finds that a POSA could discern the meaning of "external data" with

11    reasonable certainty. The specification gives general guidance that the data sources come from

12    information external to the vineyard and provides numerous examples to explain the types of

13    agriculturally relevant data that the term encompasses. *In re Marosi*, 710 F.2d at 803 (holding the

14    intrinsic evidence provided "a general guideline and examples sufficient to enable a person of

15    ordinary skill in the art to determine [the scope of the claims]"); *Iridescent Networks, Inc. v.

16    AT&T Mobility, LLC*, 933 F.3d 1345, 1351 (Fed. Cir. 2019). Because the patents contain

17    examples and general guidance to determine meaning of "external data," this case is

18    distinguishable from the cases cited by Gallo. In both *TVnGo Ltd. (BVI) v. LG Elecs. Inc.*, 861 F.

19    App'x 453, 457-59 (Fed. Cir. 2021) and *Infinity Computer Prod., Inc. v. Oki Data Americas, Inc.*,

20    987 F.3d 1053, 1056 (Fed. Cir. 2021), the patent specification provided no definition of the

21    disputed claim terms. Moreover, in *Berkheimer v. HP Inc.*, the specification used the term

22    "minimal redundancy" in some places to mean "minimize redundant objects" and in other places

23    to "*eliminate* redundancy" and patent provided only one relevant example. 881 F.3d 1360, 1363-

24    64 (Fed. Cir. 2018). Therefore, the degree of explanation in these cases provided much less

25    guidance for a POSA to determine the scope of the claimed invention.

26    Finally, Gallo argues "external data" is indefinite because the specification does not

27    explain whether the data is external to the control system. (Doc. 73 at 15-16.) The specification

28    explicitly explains that the external data may come from software local to the system or from a

16

remote source. (Doc. 70-2 at 10, 5:8-13 ("The external data can also be generated by software (e.g., modeling, forecasting or analysis programs) that is located locally to the control system or which is remote from the control system.").) Gallo contends that this disclosure contradicts Figure 1, which allegedly depicts "external data" coming from outside the control system, allegedly conflicting with the disclosure that the software may be local to the control system. (Doc. 73 at 15-16.) Gallo's attempt to insert ambiguity into the specification's clear disclosure is unavailing. Figure 1 merely represents an embodiment of the invention where external data is received from a source outside the control system, (e.g., weather data coming from a local weather station), but nothing requires a patentee to provide a figure for every embodiment the invention claims. *Valve Corp. v. Ironburg Inventions Ltd.*, 8 F.4th 1364, 1381 (Fed. Cir. 2021) (rejecting the argument to limit claim interpretation to the embodiments shown in the patent's figures where the plain meaning of the claim term did not include that limitation).

Gallo also contends that the specification's explanation does not cure the allegedly inconsistent use of "external data" because "located locally to the control system or which is remote" somehow suggests that "'locally to' means 'geographically near' rather than 'within the control system.'" (Doc. 77 at 8.) Gallo contends that this suggested meaning conflicts with the normal usage of local "to describe software that is located on a computer system." (*Id.*) Despite Gallo's allegations, neither Vineyard Investigations' arguments nor the patent seems to imply that "locally" means "geographically near" in the context of software on the control system. Tellingly, Gallo's expert did not proffer an opinion supporting this argument, nor did its expert opine that a POSA would not reasonably understand the scope of external data.

In summary, the Court does not find that Gallo has presented clear and convincing evidence that any of the alleged inconsistencies with respect to "external data" would render it not reasonably certain to a POSA. Accordingly, the Court construes the term as its plain and ordinary meaning.

### 2. "Potential Data"

Gallo contends the term "potential data" is indefinite because the intrinsic evidence fails to provide sufficient guidance of the term's meaning, and it is not a term of art. (Doc. 73 at 9-13.)

1    Vineyard Investigations maintains the term is known in the art and proposes the following

2    definition to clarify the term for the jury: "data relating to the predicted, expected, or typical

3    growth, transpiration or evaporation, such as growth models, potential evapotranspiration, leaf

4    water potential, or crop coefficients." (Doc. 70 at 20-22.) "Potential data" appears only in the

5    '881 Patent. Independent claims 1, 10, and 17 use the term in relation to external data received by

6    the system. (Doc. 70-3 at 17-18 (e.g., "wherein the external data is received from a

7    geographically remote source over a wide-area digital network, and wherein the external data is

8    derived, at least in part using a model including *potential data*").) The term also appears in a

9    dependent claim, which gives an example of "potential data." Dependent Claim 29 states

10   "wherein potential data includes potential evapotranspiration data." *Id.* at 18.

11          The '881 Patent specification does not expressly define the phrase "potential data";

12   however, the word "potential" appears in the specification as "potential ET" (where "ET" refers

13   to evapotranspiration) and in "leaf water potential." These phrases appear within the Williams

14   Paper insert included in the written description. The Williams Paper describes an experiment

15   conducted to evaluate the effects of certain irrigation amounts on grapevines and to validate the

16   seasonal crop coefficients, developed by the Kearney Ag Center. (Doc. 70-3 at 15, 9:6-9.) The

17   Williams experiment used potential ET data that it obtained from weather stations and crop

18   coefficients to calculate the "estimated ET." (*Id.* at 15, 9:12-20, 10:11-19.) The experimenters

19   used the estimated ET to determine the amount of water needed for irrigation. (*Id.*) Experimental

20   vines received a certain fraction of the estimated ET (i.e., 0.5, 0.75, 1.25, and 1.5). (*Id.*) The

21   experimenters measured and analyzed the effect on the grapevines through several categories of

22   data: the amount of water *actually* applied ("in line water meters"); berry weight; soluble solids

23   and titrate acidity in the grapes themselves; the number of clusters of fruit; packable and cull

24   yields by weight; and midday leaf water potential, measured throughout the experiment to

25   determine the vines level of water stress. (*Id.* at 15, 10:22-44; *id.* at 16, 12:6-12, 52-55.)

26          Turning to the prosecution history for context, the term "potential data" did not appear in

27   claims as initially submitted to the USPTO in the '881 Patent application. The applicant added

28   "potential data" after the patent examiner rejected the claims, in part over the prior art reference

1    Maclay (U.S. Patent No. 3,991,939). (Doc. 70-12 at 82-83.) The examiner explained that Maclay

2    discloses "the external data including irrigation and weather data," as related to '881 Patent's

3    moisture detection sensor. (*Id.* at 83.) In response, the applicant amended the claims to include the

4    following underlined portion: "wherein the external data is <u>received</u> ~~sent~~ from a geographically

5    remote source over a <u>wide-area</u> digital network, <u>and where the external data is derived, at least in</u>

6    <u>part, using a model including potential data</u>." (*Id.* at 31 (underlined portions depict newly added

7    limitations).) The amendment also added the previously described Williams Paper into the '881

8    Patent's specification. In arguments supporting the amendment, the applicant explained that the

9    "use of potential data, such as potential evapotranspiration data, is described in detail in the

10   Williams Paper." (*Id.* at 38.)

11          Vineyard Investigations maintains that the Williams Paper, incorporated as part of the

12   '881 Patent's specification and specifically referenced in the prosecution history, explains how to

13   derive external data from potential data because it discloses how to calculate the estimated ET

14   from the crop coefficients and potential ET. (Doc. 70 at 21.) It also contends that specification

15   gives more examples to help define "potential data" because it discloses, "'examples of external

16   data include weather data, crop growth models, growing degree days, $ET_O$ and $ET_C$

17   (evapotranspiration coefficients).'" (*Id.* (quoting '881 Patent, 5:13-26, 8:56-63).) Vineyard further

18   asserts that the extrinsic evidence shows that persons of skill in the art were familiar with the

19   terms potential evapotranspiration, $ET_O$ and $ET_C$. (*Id.* at 21 (citing an undated article entitled

20   FAO Irrigation and Drainage Paper (Doc. 70-13)).) Gallo does not contest that in light of the

21   specification and prosecution history that "potential data" includes potential ET. According to

22   Gallo, the primary issue with respect to indefiniteness concerns the scope of what "potential data"

23   includes beyond potential ET. (Doc. 73 at 9-13.)

24          The context of the '881 Patent claims demonstrate that "potential data" has a meaning at

25   least somewhat distinguishable from "external data." *See Chicago Bd. Options Exchange, Inc. v.*

26   *Int'l Securities Exchange, LLC*, 677 F.3d 1361, 1369 (Fed. Cir. 2012) (explaining the "general

27   presumption that different terms have different meanings"). The plain language of the claims

28   indicates that "external data" is derived, at least in part, from "potential data." (Doc. 70-3 at 17,

1    Claim 1.) The types of data may share some overlap, but the plain language indicates some

2    distinction in the scope of data encompassed by each term. Additionally, "potential data" must

3    refer to a broader category of data than simply potential ET, because dependent Claim 29

4    separately claims potential ET. *AK Steel Corp. v. Sollac & Ugine*, 344 F.3d 1234, 1242 (Fed. Cir.

5    2003) ("Under the doctrine of claim differentiation, dependent claims are presumed to be of

6    narrower scope than the independent claims from which they depend."); *see also Phillips*, 415

7    F.3d at 1315 ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a

8    presumption that the limitation in question is not present in the independent claim.").[6] Thus, the

9    issue turns on whether "potential data" refers to a reasonably certain category of data that

10   includes, but is not limited to, potential ET, but does not merely overlap with the definition of

11   "external data."

12        Gallo maintains the boundaries of this category is not reasonably certain because, to a

13   POSA at the time of the invention, the term "potential" carried multiple meanings and referred to

14   different types of data. (Doc. 73 at 10-11.) Gallo's expert, Dr. Allen, declared that a POSA

15   understood "potential" could refer to "the likelihood of *possible or hypothetical* scenarios (as in

16   the phrase 'potential data uncertainties'), the maximal rate of evaporation under *optimal*

17   conditions (as in 'potential evapotranspiration'), or the *potential energy* of water (as in 'leaf-

18   water potential'). (*Id.* (emphasis in original); Doc. 74 at 7-8, ¶¶ 28-29.) A widely used textbook

19   from 2000 highlights these multiple definitions by explaining the difference between using

20   "potential" to refer to the "maximum possible rate" or the potential "energy state of water." (Doc.

21   74-7 at 24.) "Unfortunately, the same word is used in the literature for two such widely differing

22   meanings." (*Id.*)

23

_____

24   [6] To the extent Vineyard Investigations' proposed supplemental sur-sur-reply suggests limiting "potential data" to
     mean only potential ET, as Gallo states in its objection (Doc. 77 at 2), such a limiting instruction would fail for lack

25   of claim differentiation. For similar reasons, Gallo's alleged admission during the *inter partes* review proceedings is
     irrelevant. Vineyard Investigations argues that Gallo's prior statements made in the *inter partes* review of the '881

26   Patent preclude them from now asserting an indefiniteness challenge because they stated a POSA would know that
     "Williams teaches deriving external data (e.g., $ET_c$) using a model [] including potential data (e.g., $ET_o$)." (Doc. 70 at

27   22; Doc. 70-9 at 39.) This alleged admission does not bear on whether a POSA would understand the boundaries of
     "potential data" because it merely describes one example, that is already encompassed in the dependent claim. For

28   the reasons discussed above, "potential data" cannot be limited only to $ET_o$ (i.e., potential ET) because of the doctrine
     of claim differentiation.

1    The examples that Vineyard Investigations relies upon in specification to describe
2    "potential data" (i.e., leaf water potential and potential ET), also seemingly fall in two different
3    categories of data. (*See* Doc. 76 at 5.) The Williams Paper refers to the leaf water potential which
4    was a data point that experimenters collected to measure the plant's water stress. (Doc. 70-3 at 16,
5    12:6-11, 12:46-55.) Conversely, in the Williams Paper, experimenters derived potential ET, from
6    outside sources (i.e., the weather stations) and used it as an input to calculate the estimated ET.
7    (*Id.* at 15, 10:15-20.) The similarities between leaf water potential and potential ET, as a single
8    category of data, do not seem readily apparent. On one hand, leaf water potential is a measurable
9    quantity of the plants in the vineyard. (*See id.* at 16, 12:6-11 (explaining how the experimenters
10    measured the leaf water potential for each irrigation treatment within the vineyard).) On the other
11    hand, potential ET was gathered from an external source, i.e., the local weather stations, and is "a
12    climatic characteristic of each *location*," not particular plants. (Doc. 74-7 at 21.)

13    The examples in Vineyard Investigations' proposed construction raise additional
14    inconsistencies. In addition to potential ET and leaf water potential, its proposed construction
15    includes growth models and crop coefficients. The dependent claims of the '881 Patent treat these
16    types of data differently. Crop growth model appears in a dependent claim explaining what
17    "*external data*" includes. (Doc. 70-3 at 17-18, Claims 16, 37.) Crop coefficients appear in a claim
18    describing what a "*model*" includes. (*Id.*, Claim 32.) Potential ET appears in a claim describing
19    what "*potential data*" includes. (*Id.*, Claim 29.) Leaf water potential does not appear in a
20    dependent claim. Arguably, the terms "external data," "model," and "potential data" all generally
21    relate to information combined and used by the control system to control irrigation and output of
22    the materials through the emitters. Moreover, because "external data" includes potential data, the
23    example listed in Claim 16 and 37 *could* overlap with types of "potential data." However, Claim
24    1 indicates that a "model" (i.e., crop coefficients") differs from the "potential data" (i.e., potential
25    ET), included within the model. The patent's distinction among the dependent claims that define
26    types of external data, potential data, and models creates a discrepancy among the examples that
27    Vineyard Investigations proposes as all representing "potential data," because differing terms
28    presumptively carry differing meanings. *See Chicago Bd. Options Exchange*, 677 F.3d at 1369.

1      In some cases, dependent claims may help inform the meaning of a term that otherwise

2  lacks a readily known definition from the specification or extrinsic evidence. *Niazi*, 30 F.4th at

3  1349 (holding the meaning of the independent claim limitation that the catheter must have "shape

4  memory" and "sufficient" stiffness not indefinite in part because the dependent claims provided

5  exemplary resilient materials for the outer catheter). However, the inconsistencies among the

6  dependent claims in the '881 Patent raise more issues of ambiguity than they resolve. Because the

7  intrinsic evidence lacks a general guideline or sufficient examples of what "potential data"

8  includes beyond potential ET, and because Vineyard Investigations has not shown any extrinsic

9  evidence clarifying "potential data" as a term of art, the Court finds a POSA would not

10  understand the objective boundaries of the term with reasonable certainty. Accordingly, the Court

11  finds "potential data" is indefinite.

12      3.   "In [Fixed] Proximity To

13      The terms "in proximity to" and "in fixed proximity to" appear in the asserted patents'

14  claims to describe the location of the claimed conduit channels, emitters, and sensors associated

15  with the respective plants. (*See, e.g.*, Doc. 70-2, Claim 1 ("a conduit channel having a channel,

16  wherein the channel is positioned *in proximity* to the vegetation . . . one or more sensors *in fixed*

17  *proximity* to the vegetation . . .").) The phrase "in [fixed] proximity to" appears in nearly every

18  independent claim of the asserted patents and therefore, is incorporated into most dependent

19  claims.[7] Gallo argues the terms "in proximity to" and "in fixed proximity to" are indefinite

20  because they are terms of degree and lack "objective boundaries" to define the claim scope. (Doc.

21  73 at 16-19.) Vineyard Investigations disagrees that "proximity" is a term of degree and contends

22  the critical term within the phrase is "fixed" which adequately describes "how proximate is

23  proximate." (Doc. 70 at 24.)

24      Terms of degree refer to qualitative or relative descriptors, such as terms that require a

25

26

27

28

[7] Although not addressed by either party, Claim 1 of the '810 Patent does not include the disputed phrase. In a similar position within the claim as where the "in proximity to" limitation appears, Claim 1 of the '810 Patent describes "an insect senor *positioned adjacent to the plant* . . ." (Doc. 70-1 at 12 (*compare with* Claim 2 of the '810 Patent "a plurality of sensors, wherein each sensor is associated with, and *in fixed proximity to*, on of the plants").) Because neither party raises arguments based on this difference in Claim 1, the Court need not address it further.

1   "comparison against some baseline." *Liberty Ammunition, Inc. v. United States*, 835 F.3d 1388,

2   1396 (Fed. Cir. 2016) (holding "reduced area of contact" is a term of degree). Words that refer to

3   length and distance in general terms often constitute terms of degree. *See GE Lighting Sols., LLC*

4   *v. Lights of Am., Inc.*, 663 F. App'x 938, 940 (Fed. Cir. 2016) ("'Elongated' is undoubtedly a

5   term of degree."); *UUSI, LLC v. United States*, 131 Fed. Cl. 244, 259 (2017) (holding "remote" is

6   a term of degree because it is "a relative term of measurement rather than an objective term of

7   measurement"). Terms of degree are not "inherently indefinite," but they must "'provide

8   objective boundaries for those of skill in the art' when read in light of the specification and the

9   prosecution history." *Liberty Ammunition*, 835 F.3d at 1396 (quoting *Interval Licensing LLC v.*

10  *AOL, Inc.*, 766 F.3d 1364, 1370-71 (Fed. Cir. 2014)). However, terms of degree do not require "a

11  precise numerical measurement," where a POSA could determine what falls within the claim

12  scope based on "exemplary values disclosed in the intrinsic evidence." *Enzo Biochem, Inc. v.*

13  *Applera Corp.*, 599 F.3d 1325, 1335-36 (Fed. Cir. 2010), *overruled on other grounds by Nautilus*,

14  572 U.S. at 908-10 (determining that "not interfering substantially" was not indefinite where the

15  intrinsic evidence gave examples of noninterfering structures and criteria for selection); *Interval*

16  *Licensing*, 766 F.3d at 1370 ("Claim language employing terms of degree has long been found

17  definite where it provided enough certainty to one of skill in the art when read in the context of

18  the invention."). The patent's specification must provide "some standard for measuring that

19  degree such that the claim language provides enough certainty to one of skill in the art when read

20  in the context of the invention." *GE Lighting Sols.*, 663 F. App'x at 940 (internal quotations and

21  citations omitted).

22       The Court agrees that "proximity" constitutes a term of degree. *See Transdata, Inc. v.*

23  *Centerpoint Energy Houston Electric LLC*, 2016 WL 3172791, *3 (E.D. Tex. 2016) (construing

24  the term "proximate" as a term of degree, describing "the closeness of various components of the

25  claimed electric meters"). However, the Court finds that the intrinsic evidence provides ample

26  guidance that defines the objective boundaries of the disputed term. In multiple places, the patent

27  specification describes the proximity of the conduit channels, sensors, and emitters in relation to

28  the plant(s) to which they are associated. For example, the summary of the invention explains that

sensors "are attached to the conduit so that the placement of sensors can occur simultaneously with the laying of the conduit" which "ensures correct placement and spacing of the sensors with respect to each plant, or plant area, to be monitored." (Doc. 70-1 at 9, 3:27-31.) The specification reiterates multiple times that the emitters and sensors are placed at regular intervals and spaced in accordance with the spacing of the vines. (*E.g.*, *id.* at 9, 4:27-30 ("Each emitter is present at a regularly spaced interval on the conduit in accordance with the spacing of the vines, as desired.").) The specification provides further guidance for the location and approximate distances of the emitters and sensors by disclosing that "[t]ypical vine spacing is between 36" and 96"" and that the materials coming from emitters can be dispensed "either above the plants, overhead, on the ground or even below the ground," as known previously in the art. (*Id.* at 9, 4:30-34.) Sensors are similarly attached "at regular intervals corresponding to the vineyard layout." (*Id.* at 9, 4:53-55.) The specification explains that a preferred embodiment the conduit channels are flexible to allow them "to be bent to follow paths among rows, as desired" or with "stiff piping" but with means to join piping sections to "achieve bends." (*Id.* at 11, 7:29-34.)

Figure 1 exemplifies these disclosures by depicting the location of the channels, emitters, and sensors in relation to the grapevines. The conduit channels (120) run through the rows of grape vines (140, 142, 144). (Doc. 70-1 at 9, 3:65-67, 4:10-14.) The emitters (150, 152, 154, 156), shown as small black circles, appear within the grapevine plants (130, 132, 134, 136), shown as large transparent circles, and on the conduit channels. (*Id.* at 9, 3:65-67, 4:25-27.) The sensors (160, 162, 164, 166), shown as small transparent diamonds, appear in between the grapevine plants and on the conduit channels. (*Id.* at 9, 43-45.) Figure 1, reproduced below, depicts the relative location of each of the inventive elements:



Fig. 1

(*Id.* at 3.)

The specification also gives several specific examples of the proximity and placement of the conduit channels, the emitters, and sensors. For instance, the patent discloses using the existing trellis in the vineyard to suspend the conduit that houses the channels, sensors, and emitters. (*Id.* at 9, 4:38-42.) Further examples include placing the conduit "on the ground, e.g., near the base of the vines; or even to be buried below ground." (*Id.*) A preferred embodiment also includes using "under vine canopy drippers for nutrient and irrigation dispensing and uses above vine spraying with sprinklers or misters for fungicide and insecticide dispensing as well as for cooling." (*Id.* at 9, 34-38.) Given these examples and the general guidance explained above, the specification's many disclosures would inform a person of skill in the art with reasonable

1  certainty that "proximity" requires a certain nearness to the associated plants and vines as to allow

2  the conduit channels, sensors, and emitters to appropriately function in reaching those plants.

3  Thus, the Court finds the disputed terms are not indefinite.

4      As an alternative to a finding of indefiniteness, Gallo urges the court to adopt the

5  following construction: "'stationary and adjacent to, or close enough to sense information

6  specifically from, or deliver material specifically to,' the given plant, plants, or vegetation, or

7  group." (Doc. 69 at 1, ¶ 1.)[8] Vineyard Investigations maintains the disputed term needs no

8  construction beyond the plain and ordinary meaning. (Doc. 70 at 24.) Although not entirely

9  explicit from the parties' briefing, the competing constructions primarily diverge to the extent that

10  Vineyard Investigations argues that "in [fixed] proximity" also includes a disclosure in the

11  specification explaining that sensors can be "arbitrarily set at any point in the vineyard" and thus,

12  not sufficiently close to a particular plant[s] from which it gathers data. (*See* Doc. 76 at 8; Doc. 77

13  at 8.)

14      Critically, the patent specification describes two types of sensors: those fixed to a conduit,

15  spaced at intervals corresponding to a plant[s] and "additional sensors" that may be placed

16  "arbitrarily" within the vineyard. (Doc. 70-1 at 9-10, 4:43-58, 5:46-51.) The first set of sensors,

17  discussed at length above, primarily function to gather data related to the plant or vine to which it

18  is in proximity. For example, these sensors can measure the sunlight that "passes through the

19  grape leaves," the leaf wetness, the temperature, the presence of insects. (*Id.* at 9, 4:45-52.)

20  Conversely, the "additional sensors . . . are not affixed to [the] conduit," but rather "can be

21  arbitrarily set at any point in the vineyard, either above or below vines or the ground." (*Id.* at 10,

22  5:46-51.) These "additional sensors" detect soil nutrients and moisture. (*Id.*) The specification

23  notes that these sensors "may be needed in a different location than can be provided by the

24

25  _____

26  [8] The Court acknowledges that in Gallo's briefing it seems to propose a slightly different construction: "the sensors and emitters are placed at regular intervals alongside the plants at distances close enough to provide materials specifically to, and obtain information specifically about, the given plant or plants with which they are associated."

27  (Doc. 73 at 18.) This proposed definition, however, does not indicate to how to define "proximity" with regards to the conduit channels which are not at regular intervals but rather run the length of the vineyard rows. Accordingly, the Court focuses on Gallo's more explicitly proposed construction in disputed terms table (Doc. 69) because it applies more broadly to the disputed term as used in all contexts.

28

conduit." (*Id.*) Several independent claims of the '810 Patent reflect the distinction between the two types of sensors by including two sets of sensors in the claims' limitations, one which is simply associated with a plurality of plants and one which is "in fixed proximity" to the plants. (*See, e.g.*, *id.* at 13, Claim 24 (describing a method that includes "associating one or more sensors with each of the plurality of plants; [and] associating one or more sensors and emitters with each of the plurality of plants so that each plant has associated sensors and emitters *in fixed proximity* to the plant").) Therefore, the patent claims and corresponding description in the specification make clear that the "additional sensors," set arbitrarily within the vineyard, are not limited by the "in [fixed] proximity to" limitation. Accordingly, the "in [fixed] proximity to" definition should not also include "arbitrarily set at any point in the vineyard."

Having concluded "the additional sensors" are not encompassed in the "in [fixed] proximity to" limitation, Vineyard Investigations' remaining arguments regarding the plain and ordinary meaning of "proximity" do not differ materially from Gallo's proposed construction. Vineyard Investigations concedes that the "functional demands" of the sensors and emitters require them to be "placed within a particularly range of the plants in order for it to work properly," and a POSA would understand the required range based on the sensors used. (Doc. 76 at 8.) Gallo's proposed construction similarly defines "proximity" as "close enough to sense information specifically from, or deliver material specifically to,' the given plant, plants, or vegetation, or group." (Doc. 69 at 1.) As discussed above, this proposed definition mirrors the guidance and examples provided by the intrinsic evidence. Accordingly, the Court finds this the portion of Gallo's proposed construction related to "proximity" appropriate and useful to provide objective boundaries for this term of degree.[9]

To the extent that Vineyard Investigation argues that "fixed" is the operative term such that "proximity" does not require further instruction,[10] the Court does not find this argument

---

[9] Gallo also argues the construction is necessary because Vineyard Investigations has asserted that Gallo's "sensors mounted on large towers far from any specific plants are in 'fixed proximity' to one or more plants." (Doc. 73 at 18.) The Court does not address the merits of this argument because sufficient evidence already exists to support Gallo's construction. For clarity, the Court makes no opinion as to the sufficiency of Vineyard Investigation's infringement allegations.

[10] Vineyard Investigations framed this argument as opposition to the indefiniteness claim. Because the Court

1    persuasive. Vineyard Investigation relies on the prosecution histories of the '810 Patent and the

2    '834 Patent to show the applicant amended certain claim terms to include "fixed" to overcome

3    rejections over several prior art references. (Doc. 70 at 24.) While true, the intrinsic evidence does

4    not support Vineyard Investigation's implication that the presence of "fixed" negates the need for

5    the construction of "proximity" or otherwise subsumes the definition of "proximity" within

6    "fixed." During prosecution of the '810 Patent, the applicant first amended the claims to include

7    "proximity," explaining this addition as how the sensors are "localized to the plant level." (Doc.

8    70-10 at 68, 73.) After a subsequent rejection by the USPTO, the applicant then added "fixed" to

9    distinguish the invention from the prior art that used "sensors and emitters that are mobilized by

10   vehicles such as a trailer [] or tractor []." (*Id.* at 51.) This prosecution history indicates that

11   "fixed" and "proximity" have distinct definitions. The claims themselves also reflect this

12   distinction by using "in proximity to" in some limitations and "in *fixed* proximity to" in other

13   limitations. The negative implication in the "in proximity to" limitations suggests that proximity

14   is not necessarily fixed, i.e., nonmobile. *See Phillips*, 415 F.3d at 1313 ("[T]he claim in this case

15   refers to 'steel baffles,' which strongly implies that the term 'baffles' does not inherently mean

16   objects made of steel."). Because the Court should construe claims to give meaning to each word,

17   it should not assume that "in proximity to" and "in fixed proximity to" have the same meaning.

18   *See CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co.*, 224 F.3d 1308, 1317 (Fed. Cir.

19   2000) ("In the absence of any evidence to the contrary, we must presume that the use of different

20   terms in the claims connotes different meanings.").

21          With respect to construing "fixed," Gallo proposes "stationary." (Doc. 69 at 1.) However,

22   Gallo's briefing does not contain an argument to support this construction or how it provides

23   information helpful to the jury beyond the plain and ordinary meaning of "fixed." Because a

24   heavy presumption exists in favor of the plain and ordinary meaning, the Court does not adopt the

25   "stationary portion" of Gallo's construction.

26          In summary, the Court finds that "proximity" is not indefinite but that Gallo's proposed

27   _____

28   determines the disputed term is not indefinite for the reasons stated above, it need not address this argument in the
     indefiniteness context.

1    construction—"close enough to sense information specifically from, or deliver material

2    specifically to the given plant, plants, or vegetation, or group"—provides objective boundaries for

3    this term of degree.

4    **B.      "Associat[ion]" Terms**

5           The disputed "associat[ion]" terms consist of several iterations of similar claim

6    limitations. In general, these limitations inform the association between the sensors and emitters

7    with the plants. For example, Claims 20, 24, 28, 33 of the '810 Patent claim "associating one or

8    more sensors and emitters with each of the plurality of plants so that each plant has associated

9    sensors and emitters. . ." (Doc. 70-1 at 13.) Vineyard Investigations maintains that these terms

10   need no construction beyond their plain and ordinary meaning. (Doc. 70 at 16-19.) Although

11   separated into four sub-categories of the "associate[ion]" terms, Gallo's propose constructions for

12   each sub-category essentially share two added limitations that do not appear in the claims

13   themselves: (1) construing "associat[ing]/[ed]" to mean "link[ing]/[ed]" to the sensors and

14   emitters "so as to permit selective delivery of material and irrigation control with respect to the

15   particular plant/plants" and (2) construing the number or group of associated plants to not include

16   association to "a field, region, or plot." (Doc. 73 at 19-22.) The Court addresses each additional

17   limitation of Gallo's construction in turn.

18          1.   "Associate[ion]" as "link[ed] . . ."

19          Vineyard Investigations maintains that the plain and ordinary meaning sufficiently defines

20   the disputed term, and that "association" has a commonly understood meaning. (Doc. 70 at 17-

21   18.) Conversely, Gallo's urges the Court to construe "associate[ing]/[ed]" as requiring a "link"

22   that permits "selective delivery of material and irrigation control with respect to the particular

23   plant(s)." (Doc. 73 at 19.) Gallo argues the invention requires "keeping information traceable to

24   individual plants and allowing selective delivery to [individual] plants." (Doc. 73 at 22.) Gallo

25   further argues this construction does not contradict the plain meaning of the patents because a

26   single sensor/emitter "could be grouped with . . . multiple plants" while maintaining the

27   individual plant level of granularity. (*Id.*) Vineyard Investigations argues that the claims "*permit*

28   such granularity in control, but they do not *require* it." (Doc. 76 at 10.) The plain reading of the

1   claims does not require "one and only one" sensor to be associated with "one of the plants." (*Id.*)

2          A plain reading of the disputed terms within the context of the claims and intrinsic

3   evidence supports Vineyard Investigations' argument. For example, Claim 2 of the '810 Patent

4   recites "a plurality of sensors, wherein each sensor is associated with, and in fixed proximity to,

5   one of the plants." (Doc. 70-1 at 12.) The limitation reads broadly enough to interpret that the

6   "each sensor" may be associated with *only* the "one of the plants" or that "each sensor" may be

7   associated with one or more plants. (*Id.*) In explaining these limitations during prosecution, the

8   applicant explicitly stated that "*an* emitter or sensor can be grouped with more than one plant."

9   (Doc. 70-10 at 73.) Similarly, the patent does not require that each plant only have one associated

10  sensor/emitter, as exemplified in Claim 3, dependent to Claim 2, which recites a system wherein

11  "one or more sensors [are] associated with *the given plant*." (Doc. 70-1 at 12.) Claim 3 explicitly

12  describes a system that includes one or more sensors associated with a single plant. To the extent

13  Gallo argues to the contrary, its reference to various claims in the '881 Patent and '810 Patent that

14  recite the sensors or emitted must be associated with "one of the plants," "each of the plants," or

15  "each plant," does not contradict this plain meaning. (*See* Doc. 73 at 21-22.) The plain reading of

16  these claims indicates an association with a singular plant, but this does not restrict that same

17  sensor from being associated with another "one plant." In fact, Gallo admits that "a single sensor

18  can track information about multiple plants." (Doc. 77 at 10.)

19         Gallo also argues that the terms "each" and "one" require selectively delivery of materials

20  to and control of the individual plant or plants. (Doc. 73 at 20-22.) The invention undoubtedly

21  includes such individualized control; however, separate claim elements expressly recite this

22  aspect of the invention. Taking again Claim 2 as an example, the last claim element recites, "a

23  control system for controlling emission of the material to a particular plant via the particular

24  plant's associated emitter in response to a signal from the particular plant's associated sensor."

25  (Doc. 70-1 at 12.) This element describes a selective delivery process of emitting material with

26  individualized control to particular plants. Adopting Gallo's construction to further limit

27  "associate[ing]/[ed]" would render this element superfluous. *Merck & Co. v. Teva Pharms. USA,*

28  *Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the

1    terms of the claim is preferred over one that does not do so.") Moreover, the control of emitting

2    material to the individualized plant does not appear in all limitations. For example, Claim 1 of the

3    '834 Patent describes sensing data from "one of more particular plants in the vegetation" and

4    using the central control system to "control conveyance of the material to the *vegetation*." (Doc.

5    70-2 at 12.) The distinction among the different claims and the explicit limitations related to the

6    controlling and delivery of materials to the plants indicates Gallo's proposed instruction is

7    unnecessary and may cause more confusion than it clarifies.

8         Gallo seemingly argues that even if the disputed term may be interpreted more broadly,

9    Vineyard Investigations disclaimed this scope by statements made during the *inter partes* review.

10   "[A]n applicant's repeated and consistent remarks during prosecution can define a claim term by

11   demonstrating how the inventor the invention." *Personalized Media Comm'ns, LLC v. Apple Inc.*,

12   952 F.3d 1336, 1340 (Fed. Cir. 2020). A patent applicant may disclaim a certain scope of the

13   claims through statements made to the USPTO during the patent's prosecution or during an *inter*

14   *partes* review. *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1306 (Fed. Cir.

15   2007); *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1362 (Fed. Cir. 2017). "To operate as a

16   disclaimer, the statement in the prosecution history must be clear and unambiguous, and

17   constitute a clear disavowal of scope." *Verizon Servs.*, 503 F.3d at 1306-09 (holding the court

18   erred by not limiting the disputed term "localized wireless gateway system" to exclude systems

19   with a range greater than a "few feet" because during prosecution the applicant distinguished

20   "local wireless" from wider-ranging wireless in the prior art as systems that work within a "few

21   feet"); *but see In re Lockwood*, 679 F. App'x 1021, 1027 (Fed. Cir. 2017) (holding statements

22   such as "may" and "for example" do not constitute a clear and unambiguous waiver). In isolation,

23   a statement may appear to disclaim a certain scope, but "the prosecution history as a whole may

24   demonstrate that the patentee committed no clear and unmistakable disclaimer." *Ecolab, Inc. v.*

25   *FMC Corp.*, 569 F.3d 1335, 1342 (Fed. Cir.), *amended on reh'g in part*, 366 F. App'x 154 (Fed.

26   Cir. 2009).

27        Gallo contends Vineyard Investigations disclaimed the scope of "association" during the

28   reexamination of the '834 Patent because it stated:

1
2
3

> The required association is one that enables fine-grained control of the irrigation system . . . It is not enough that a sensor be fixed with respect to one or more plants, there must be an association or link that permits selection and control with respect to the particular plants (or groups of them).

4  (Doc. 73 at 20; Doc. 75-3 at 13.) Viewed in the full context of Vineyard Investigations' argument

5  during reexamination, this statement rebuts why a prior art reference did not anticipate the claims

6  because the prior art disclosed the *proximity* element of the invention. (Doc. 75-3 at 13-14.)

7  Reciting previous statements by the Patent Trials and Appeals Board during the *inter partes*

8  review of the '834 Patent, Vineyard Investigations explained that "association with" and "in fixed

9  proximity to" are "separate requirements" and that "mere disclosure of proximity," as in the prior

10  art reference, "does not also disclose the required association." (*Id.*; Doc. 70-8 at 17.) Vineyard

11  Investigations further explained that the association enables "fine-grained control of the irrigation

12  system," and the "association or link" must allow the system to have "selection and control with

13  respect to particular plants (or groups of them)." (Doc. 75-3 at 14.)

14      Gallo's proposed instruction, however, is narrower than Vineyard Investigations' prior

15  statements because it requires "selective delivery of material" and "irrigation control" which

16  imposes additional limitations not found in any of the prior statements. Gallo's construction

17  further limits the association to a particular plant or plants without contemplating a "group of

18  plants," as explicitly reserved in Vineyard Investigations' prior statements. Moreover, Vineyard

19  Investigations' statements largely reflect what is already disclosed in the patent specification. The

20  specification describes the invention as providing "more finely-grained monitoring and control . .

21  . [and] delivery of chemicals, water, and other materials can be made to only the exposed plants."

22  (Doc. 70-1 at 10, 5:61-64.; *see also id.* at 11, 8:33-34 ("The delivery of materials can be more

23  precisely directed to where it is needed.").) As discussed above, other claim limitations more

24  clearly explain the type of association, link, selectivity, and control that the system has through

25  the sensors and emitters. Viewing the full context of the alleged disclaimer, Vineyard

26  Investigations' prior statements are seemingly aimed more at the distinction between proximity,

27  as in distance, and association, as the link provided by the entire invention. Its statements do not

28  appear to clearly and unambiguously limit the claim scope of "association." *ViaTech Techs. Inc.*

1   *v. Microsoft Corp.*, 733 F. App'x 542, 548-49 (Fed. Cir. 2018) (holding the district court erred by

2   construing "associated with" too narrowly where the term was used to explain the relationship

3   between a database and a digital content file but where other claim language suggested a broader

4   reading the "association"). Accordingly, the Court finds Gallo has not submitted sufficient

5   evidence to add its proposed limitation and depart from the plain and ordinary meaning.

6       2.  Exclusion of "field, region, or plot"

7       Within the "associate[ion]" terms, Gallo also seeks a construction that would limit the

8   number of plants with which the sensors/emitters are associated to exclude association with

9   merely a "field, region, or plot." (Doc. 73 at 20-21.) The claims refer to the plant(s) with which

10  they are associated in several ways, including a "plurality of plants", "one or more particular

11  plants", a "particular plant," and "one of the plants." (*See, e.g.*, Doc. 70-1 at 12-13, Claims 2, 20;

12  Doc. 70-2 at 11-12, Claim 1.) These disputed terms consist of commonly understood words for

13  which the jury typically does not need a construction. *Biotec Biologische*, 249 F.3d at 1349. The

14  claims' varied language indicates a distinction among the number of plants associated in claims

15  containing, for example, "one of the plants" versus "one or more plants," where the later plainly

16  includes multiple plants. Various claims also plainly indicate an association with a single plant: "a

17  particular plant," "one of the plants," the "given plant." The patent specification supports these

18  distinctions and the respective singular and plural interpretations, because it describes the

19  summary of the invention as allowing the placement of "sensors with respect to each plant, or

20  plant area."[11] (Doc. 70-1 at 9, 3:30-31.)

21      Gallo, nonetheless, argues its additional limitation that excludes an association with

22  "merely a field, region, or plot" is necessary because the applicant disclaimed this claim scope.

23  (Doc. 73 at 20-21.) Vineyard Investigations, itself or through its predecessor in interest to the

24  patents, made several statements to the USPTO during the prosecution, reexamination

25  proceedings, and *inter partes* review proceedings that relate to the number of plants that may be

26

27  [11] Although unclear, at times Gallo seems to argue that the terms are further limited to a single plant. Gallo's brief seemingly argues that because some claims include "one of the plants" the invention cannot include more than one

28  plant. Gallo's argument contradicts well-settled claim construction guidelines which presume different phrases have different meanings. *See Chicago Bd. Options Exchange*, 677 F.3d at 1369.

1   associated with the sensors/emitters. During the '810 Patent's prosecution, the examiner rejected

2   several claims as anticipated or obvious in light of the prior art reference "Hall." (Doc. 70-10 at

3   81-82.) The applicant amended the claims and explained that Hall does not disclose or render

4   obvious the claimed invention because the invention uses a "localized approach" for dispensing

5   materials and associates sensors/emitters to "a particular plant." (*Id.* at 73.) The applicant noted

6   that "an emitter or sensor can be grouped with more than one plant." (*Id.*) Conversely, Hall's

7   system uses "indirect sensors" to detect information regarding a "homogenous area." (*Id.*) The

8   Hall invention gathers data relating to "percent soil moisture," "ground temperature," "pH" and

9   "nitrate ion concentrate" which are not localized to a particular plant. (*Id.*) Hall further describes a

10  "homogenous agricultural area" as, for example, a "one-acre area" or a "field." (*Id.* at 73-74.)

11  Subsequently, the applicant amended the claims to include association with a "plurality of plants"

12  in several independent claims, which were permitted by the USPTO without objection. (*Id.* at 44-

13  49, 19.) During the reexamination of the '834 patent, Vineyard Investigations similarly

14  distinguished several prior art references from the claimed invention by explaining the prior art

15  discloses "only the use of sensor outputs for irrigation control at the level of the entire field,

16  region, or plot—rather than the 'plant level (or plant group level) of granularity' that is the object

17  of the invention." (Doc. 75-3 at 20.)

18        Vineyard Investigations' arguments in its claim construction briefing seemingly do not

19  dispute that it disclaimed the invention from operating "at the level of an entire field or vineyard."

20  (Doc. 76 at 9.) In response, Gallo argues that Vineyard Investigation's concession of "field or

21  vineyard" is too narrow because it ignores the disclaimers of "region," "plot," "area," or "zone,"

22  of land. (Doc. 77 at 10.) Gallo's argument specifically references an additional alleged disclaimer

23  that occurred during the *inter partes* review of the '810 Patent wherein Vineyard Investigations

24  allegedly disclaimed "root zone." (*Id.* at 11; Doc. 73 at 20.) Gallo portrays "root zone" as a "zone

25  of plants." (Doc. 77 at 11.) However, when read in the full context of Vineyard Investigations'

26  statement in the '810 Patent *inter partes* review briefing, it explained that "root zone" in the prior

27  art referred to "soil depth" or related to "characteristics of the soil—rather than anything

28  associated with the roots or trees." (Doc. 70-9 at 52-53.) In its *inter partes* brief, Vineyard

1   Investigations further explained that the prior art does not associate with plants or "groups of

2   plants," the same distinction made repeatedly in other prior statements as outlined above. (*Id.*)

3       The critical distinction that Vineyard Investigations makes throughout its prior statements

4   is that the invention requires an association to *plant(s)* rather than to portions of *land*. Its prior

5   statements repeatedly make clear that it does not limit the association to single plant because the

6   association may be to a "group of plants" or multiple plants.[12] The Court finds Vineyard

7   Investigations' statements and the amendment of the '810 Patent to overcome a prior art reference

8   constitute a clear disclaimer of the claim scope to exclude association of sensors/emitters with an

9   entire field, region, or plot of land. *See Personalized Media Commc'ns*, 952 F.3d at 1345-46

10  (holding the applicant's statements during prosecution limited the type of information processed

11  by the invention to exclude analog information because the applicant amended the claims to

12  include "encrypted digital" limitation and argued the prior art did not teach encryption of an

13  entirely digital signal). However, only certain of the "associate[ion]" terms require construction to

14  avoid interpreting the limitations to include a field, region, or plot of land. Those limitations

15  directed a singular plant (i.e., "one of the plants" or "a/the particular plant") cannot reasonably be

16  interpreted to include multiple plants, much less any portion of land. The limitations directed at

17  multiple plants (i.e., "plurality of plants" and "one or more particular plants") also seemingly

18  require an association with plants rather than land. Nonetheless, given the clear disclaimers by

19  Vineyard Investigations in its prior statements and the possibility of interpreting "plurality" or

20  "one or more" too broadly, the Court imposes the additional limitation **"but not merely a field,**

21  **region, or plot of land"** to those claim terms.

22  **C.   "Coupled To" Terms**

23      The disputed "coupled to" terms refer to two sets of limitations: "control system *coupled*

24  *to* one or more of the sensors for receiving a signal from the sensors" ('810 Patent, Claims 2, 6,

25  10, 15); and "control system *coupled to* the emitters for controlling the emission of the material"

26

27  ───────────────

    [12] Vineyard Investigations argues that the Patent Trial and Appeal Board found "plant area" to fall within the scope
    of its claims; however, they provide no factual citation for this assertion. (Doc. 70 at 18.) Without a factual reference

28  and having not found support to include "plant area" based on the Court's own review of the record, Vineyard
    Investigations' argument does not alter the Court's conclusion.

('881 Patent, Claim 1). For both sets of limitations, Gallo argues that "coupled to" must be limited to "via a wire or cable for communication." (Doc. 73 at 22.) For Claim 1 of the '881 Patent, Gallo also contends the "controlling the emission of the materials" phrase must be construed as "to allow independent control of the emission of material from each emitter."[13] (*Id.*)

### 1.   Whether the Terms Include Wireless Connection

Gallo urges the Court to construe "coupled to" to exclude wireless communications because the intrinsic evidence allegedly fails to disclose this type of embodiment and because a POSA would allegedly not understand the plain and ordinary meaning of the term to include a wireless connection based on the context. (Doc. 73 at 23-25.) Vineyard Investigations maintains that the plain and ordinary meaning of "coupled to" and the patents' specification is sufficiently broad to encompass wireless connections. (Doc. 70 at 27-29.)

The parties cite to various portions of the specification to support their respective arguments. The specification discloses, "sensor and control cable 282 includes wires, fiber, optic cables, etc. for communication with the sensors, valves and other devices along conduit 270." (Doc. 70-1 at 10, 6:44-47.) Vineyard Investigations emphasizes the "etc." to argue that one of skill in the art would understand this to include wireless connections. (Doc. 70 at 27.) Conversely, Gallo contends that because the preceding examples only include physical connections, a POSA would not interpret "etc." to include wireless. (Doc. 73 at 24.) The Court agrees that, standing alone, the "etc." gives little guidance to a POSA that the "coupled to" connection implicates a wireless one.

Vineyard Investigations also relies on the specification's several references to "relays, digital networks, remote data and control, and data received wirelessly" to suggest a disclosure of wireless connections. (Doc. 70 at 27-28.) However, theses disclosures in the specification about digital networks and wirelessly received data relate to descriptions of external data or controlling the central computer system. (*See, e.g.*, Doc. 70-1 at 10, 5:9-21 (explaining external data sources

---

[13] Although Gallo's proposed construction for the '810 Patents also includes "to allow receiving a signal for a sensors," this does not materially differ from the original claim language: "for receiving a signal from the sensors." (Doc. 70 at 27.) Moreover, Gallo sets forth no separate argument for this portion of the construction. Accordingly, for the '810 Patents, the Court focuses only on the construction for "coupled to."

1    can include "information from local networks or wide area networks such as the Internet" or can

2    be "generated by software . . . that is located locally to the control system or which is remote from

3    the control system."); *id.* at 11, 7:55-57 ("Alternatively, computer [] can be controlled via the

4    Internet, or other network or communication link, by a remote source, such as a service

5    supplier."); *id.* at 11, 7:57-64 (disclosing that "monitoring of the entire system" may use "satellite

6    imagery, ground and satellite weather data"). Therefore, these portions of the specification

7    provide little guidance for how the sensors and emitters located within the vineyard may include a

8    wireless connection.

9         Finally, Vineyard Investigations cites to the following description related to sensor data:

10         The output signals from sensors is [sic] received by sensing unit 204 and **relayed
           to** control system 200. Sensing unit 204 can be, for example, a **transducer** for
11         converting an analog signal to a digital signal. If the sensors, themselves, are
           outputting digital information then sensing unit 204 can act to **multiplex**, **buffer**,
12         or otherwise **manipulate** or **pre-process** the data before sending the data to control
           system 200. In some embodiments, sensing unit 204 may not be necessary.

13

14    (Doc. 70 at 27-28 (citing '810 Patent at 5:1-8).) According to Vineyard Investigations, the

15    emphasized words above suggest that a "coupled to" connection may include a wireless one,

16    particularly given the specification's explicit disclosure that "data processing and acquisition can

17    be performed in any geographic location and used in any manner known in the art to facilitate the

18    operation of the system of the present invention."[14] (*Id.* (citing '810 Patent at 5:25-28).) Gallo

19    maintains that these disclosures also fail to suggest a wireless connection because the emphasized

20    terms are "entirely consistent" with physical connections, such as wires and cables. (Doc. 73 at

21    24.) Critically, however, Gallo does not argue the terms are *inconsistent* with a wireless

22    connection.

23         Nonetheless, Gallo maintains that the intrinsic evidence does not contain "a single

24    reference" showing an embodiment of "transferring signals [with sensors/emitters] wirelessly

25    without a physical medium." (Doc. 73 at 24.) Gallo relies on, *Ruckus Wireless, Inc. v. Innovative*

26

27    [14] The Court acknowledges that this quote comes from a paragraph related to external data. However, the context of
      the sentence, beginning with "in general" and using broad terms such as applying to the whole "operation of the
28    system of the present invention" suggest that this disclosure applies broadly to the whole invention including the
      gathering of sensor data and operating emitters.

*Wireless Solutions, LLC*, 824 F.3d 999 (Fed. Cir. 2016), to argue that this deficiency in the specification warrants its limiting instruction. (*Id.* at 25.) In *Ruckus*, the Federal Circuit addressed the interpretation of "communications path" and whether this term may include a wireless connection. *Ruckus*, 824 F.3d at 1001-02. The patent at issue describes "an approach by which a computer may communicate with a [local area network] over the long distances covered by telephone lines." *Id.* The patents only describe a connection of two modems over "physical wires," but the claims more broadly recite that the two modems are connected via a "communications path." *Id.* The defendant argued that "communications path" does not have a plain and ordinary meaning to a person of skill in the art and the patent's "core feature" was a solution to a problem arising from long-distance communication over wires. *Id.* at 1003. The Federal Circuit agreed. *Id.* It reasoned that the intrinsic evidence not only lacks an implication of wireless communications, but it also "militates powerfully against" that understanding for several reasons. *Id.* First, the title of the patent—"Communicating Information Packets *Via Telephone Lines*"—demonstrated that the invention be limited to wired communication. *Id.* (emphasis in original). Second, the specification described the invention as one "particularly concerned" with "two wire lines such as telephone subscriber lines." *Id.* Third, even where the specification clarified that the "full breadth of the invention is not limited to the expressed embodiments, it declares that the patents may also reach any *wired* connection." *Id.* (emphasis in original). Because the patent "discourage[s]" a wireless connection, not limiting the term to wired communication would risk invalidity for a lack of written description. *Id.* at 1004.

In contrast to *Ruckus*, nothing in Vineyard Investigations' patents discourages or so strongly militates against construing "coupled to" to exclude a wireless connection. Unlike the *Ruckus* patent, the core of the invention focuses on combining sensor data, from associated with plants or groups of plants, with data from other sources (external data and optionally remote sensor data) to provide increased control of the irrigation and material delivered to the plants. (*See, e.g.*, Doc. 70-1 at 9, Summary of the Invention.) The inventive aspect of these patents does not depend as closely on the wired or wireless nature of how the information from the sensors is transmitted. *See Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1373-75 (Fed. Cir. 2014)

1   (holding "datalink" not limited to wired connections, even though the patent did not disclose an

2   alternative embodiment using a wireless datalink but the specification did not indicate that the

3   "wired connection is important, essential, [or] necessary"). Moreover, as discussed above, the

4   specification contemplates "data processing and acquisition" in any means known in the art.

5   (Doc. 70-1 at 10, 5:25-28.) Gallo has not argued that wireless connections were not contemplated

6   or known in the art at the time of the invention, merely that the "typical means" to connect

7   sensors and irrigation valves to a control system was through a wire or cable. (Doc. 74 at 17,

8   ¶ 61.) In fact, Dr. Allen admits that "other methods for communication, like radio transmission,

9   existed" even though they were not widely adopted.[15] *Id.*

10      The intrinsic record of this case compares more closely with that considered by the court

11   in *Estech Sys., Inc. v. Target Corp.*, No. 220CV00122JRGRSP, 2021 WL 1090747, at **10-11

12   (E.D. Tex. Mar. 21, 2021). In *Estech*, the court held that "coupled" was not limited to a wired

13   connection. *Id.* Even though the specification described using Ethernet as an exemplary

14   embodiment, intrinsic evidence from a related patent described an embodiment using a "digital

15   cross-point matrix" as a means to couple the devices. *Id.* (citing U.S. Patent 6,067,349 3:67-4:1.)

16   The court explained that the defendants had not proved that "wireless connections were not

17   contemplated in that art" at the time of the invention. Even if they had, "'[t]he law does not

18   require than applicant describe in his specification every conceivable and possible future

19   embodiment of his invention.'" *Id.* (quoting *SuperGuide Corp. v. DirecTV Enters.*, 358 F.3d 870,

20   878-81 (Fed. Cir. 2004)). Likewise, here, the Court finds the disclosures in the specification and

21   the extrinsic evidence from Dr. Allen explaining wireless connections were known in the art at

22   the time of the invention militate against imposing a limitation on the claim language that the

23   patent itself does not expressly contemplate. *See Dealertrack, Inc v. Huber*, 674 F.3d 1315, 1327

24   (Fed. Cir. 2012) ("[I]t is improper to read limitations from a preferred embodiment described in

25   the specification—even if it is the only embodiment—into the claims absent a clear indication in

26

27   ───────────────

28   [15] The Court notes that nothing in Dr. Allen's supplemental report (Doc. 77-1) contradicts this conclusion because it merely provides examples of experiments and knowledge in the industry related to wired connections. Dr. Allen does not suggest these were the only available methods at the time of the invention.

the intrinsic record that the patentee intended the claims to be so limited." (internal quotations and citations omitted)); *see also Kinik Co. v. Int'l Trade Comm'n.*, 362 F.3d 1359, 1364 (Fed. Cir. 2004) ("[W]hen the specification describes the invention in broad terms, accompanied by specific examples or embodiments, the claims are generally not restricted to the specific examples or the preferred embodiments unless that scope was limited during prosecution."). Accordingly, the Court does not adopt Gallo's proposed construction to limit "coupled to" to via a wire or cable.

    2. <u>Whether the Terms Must Allow Independent Control of Each Emitter</u>

    Gallo argues the phrase "control system coupled to the emitters for controlling the emission of the material" from Claim 1 of the '881 Patent must be construed as "control system connected to the emitters via wire or cable for communication to allow independent control of the emission of material from each emitter." (Doc. 73 at 25-27.) Vineyard Investigations maintains the phrase needs no construction beyond the plain and ordinary meaning. (Doc. 70 at 27.)

    The parties primarily rely on the specification to support their arguments. The specification discloses at least two types of emitters. In one embodiment, the "[e]mitter includes a valve mechanism that can select materials in any of the channels." (Doc. 70-3 at 13-14, 6:65-7:17.) An "inlet" permits the emitter "to select materials (e.g., water) in [the] cavity." (*Id.*) "An emitter can use a computer-controlled valve-in-head system with multiple valves, as needed." (*Id.*) The emitters in this embodiment are "independently controllable by the control system." (*Id.*) The "independently controllable" embodiment allows the system to flood the channel and cavity with the material and "the dispensing can subsequently be controlled by the control system." (*Id.*) The specification gives an alternative embodiment using "passive" emitters, such as "simple through-holes sprinkler heads." (*Id.*) In the "passive" embodiment, the emitters are "always on for dispensing" and controlled through a "flow control" that includes a "selective pump station for pumping materials into selected channels." (*Id.*) The specification also notes that "[o]ther variations are possible." (*Id.*)

    Gallo acknowledges the specification provides for both the "independently controllable" embodiment and the "passive" embodiment but maintains that the claim language implicates only the "independently controllable" embodiment. (Doc. 73 at 26.) Gallo argues that the term

1    "coupling" requires the "independently controllable" embodiment because only this configuration

2    "relies on communication connections between the control system and the emitters." (*Id.*)

3    According to Gallo, the claim limitation requiring "each emitter is associated with and in fixed

4    proximity to one of the plants" further demonstrates the necessity of "independently controllable"

5    because it "allow[s] each emitter to deliver material as needed to each one of the plants on an

6    individual basis." (*Id.*) Gallo relies entirely on expert opinion for these interpretations. However,

7    extrinsic evidence typically should not be used to contradict clear intrinsic evidence. *Vitronics*, 90

8    F.3d at 1583 ("In those cases where the public record unambiguously describes the scope of the

9    patented invention, reliance on any extrinsic evidence is improper.") Nothing in the plain

10   language of Claim 1 indicates how the "passive" embodiment must be excluded. Although Claim

11   1 requires "each emitter is associated with . . . one of the plants," Claim 1 describes the

12   "*controlling* the emission of material to the *plant area*," not to the individual plant. (Doc. 70-3 at

13   17, Claim 1.) Gallo and its expert do not address this distinction or why the "passive"

14   embodiment cannot achieve control of emitting material to the plant area. The explicit intrinsic

15   evidence that contemplates both embodiments and insufficient extrinsic evidence in the form of

16   expert opinion to the contrary suggest that Gallo's proposed limitation inappropriately limits the

17   claim language to a single embodiment. *Electro Med. Sys., S.A. v. Cooper Life Sci., Inc.*, 34 F.3d

18   1048, 1054 (Fed. Cir. 1994) ("Thus, although the specifications may well indicate that certain

19   embodiments are preferred, particular embodiments appearing in a specification will not be read

20   into the claims when the claim language is broader than such embodiments.")

21          Gallo's reliance on the previously proposed claims in the prosecution history of the '881

22   Patent is also unpersuasive. Gallo argues that the distinction between the "independently

23   controllable" embodiment and the "passive" embodiment is reflected through two claims that the

24   applicant initially proposed but then amended during prosecution. (Doc. 73 at 26-27.) Claim 16

25   initially recited "a flow control system coupled between the control system and the conduit for

26   allowing the control system to control the flow of water to the plant in response to the sensor."

27   (Doc. 74-4 at 28.) Claim 16's language regarding "flow control" allegedly corresponds to the

28   "passive" embodiment. (Doc. 77 at 22, ¶¶ 86-87.) Claim 3 initially recited a "a valve for

controlling the dispensing of a liquid type; and a computer coupled to the valve for automating

control of the valve." (Doc. 74-4 at 27.) Claim 3's language allegedly corresponds to the

"independently controllable" embodiment. (Doc. 77 at 22, ¶ 85.)

Claim 16 and Claim 3 did not issue as initially proposed. Gallo seems to point to these

claims as an interpretative tool for construing the as-issued claim language but provides no

authority for how previously submitted but subsequently abandoned claim language may be used

in this manner. More importantly, the as-issued claim that Gallo seeks to construe does not

contain the same terms used in the previous claims—i.e., "valve" or "flow"—to distinguish

between the "independently coupled" and the "passive" systems. Rather, Claim 1 simply states:

"a control system coupled to the emitters for controlling the emission of the material to the plant

area in response external data associated with the growing plants. . ." (Doc. 70-3 at 17, Claim 1.)

The change from the previously submitted more specific language to the broader language

indicates, if anything, a wider claim scope rather than a narrower one. As discussed at length

above, the specification does not limit "emitters" to only "valves" or to only "flow" "sprinkler

heads." It expressly permits both embodiments. Given that the specification supports both a

passive "flow" system and an "independently controlled" system, and nothing in the intrinsic

evidence shows that the language of Claim 1 is limited to only one of those embodiments, the

Court finds that Gallo has not overcome the "heavy presumption" to accord the plain and ordinary

meaning to "coupled to." *See Omega Engineering*, 334 F.3d at 1323; *see also Vitronics, Inc.*, 90

F.3d at 1583.

Accordingly, for the reasons discussed above, the "coupled to" terms that appear in the

'810 Patent and '881 Patent receive their plain and ordinary meaning.

**D.** **"Receiving," "Transmitting," "In Response To," "Controlling" Terms**

The final category of claims for construction includes several terms and phrases—

"transmitted to," "receiving a signal from," "receive signals from," "is received from,"

"controlling material dispensing," and "used to control conveyance of the material to the

vegetation." (Doc. 73 at 27.) Gallo maintains that each of these tasks are performed

"automatically" and "without manual entry or human intervention." (*Id.*) Vineyard Investigations

1    maintains that the intrinsic evidence contemplates these tasks both as automatic and with human

2    intervention, and thus, the terms need no construction beyond their plain and ordinary meanings.

3    (Doc. 70 at 19-20; Doc. 76 at 12-13.)

4            First, Gallo argues these tasks require automatic performance because the specification

5    distinguishes between "external data that is '***entered manually*** by the user or operator of the

6    control system' and external data that is '***received automatically*** by the control system ***via a***

7    ***communication link or network*** such as the Internet.'" (Doc. 73 at 27 (citing '881 Patent, 5:26-

8    30) (emphasis in original).) Based on this "dichotomy," Gallo alleges a POSA would understand

9    that "a control system 'receiving' a signal from a data source" means an "automatic receipt of

10   information via a communication link or network without manual entry." (*Id.*) Gallo provides no

11   further argument or factual reference to support its contention. A party cannot merely rely on

12   attorney argument about what a POSA would understand to support a proposed construction that

13   rebuts clear intrinsic evidence. *See Elbit Sys. Of Am., LLC v. Thales Visionix, Inc.*, 881 F.3d 1354,

14   1359 (Fed. Cir. 2018) (explaining that an assertion of what a POSA would understand, without

15   factual support, "cannot rebut other admitted evidence" because "'attorney argument is not

16   evidence.'" (quoting *Icon Health & Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1043 (Fed. Cir.

17   2017)). Moreover, the Court sees nothing in the plain language of "receiving a signal from a data

18   source" that necessarily requires that data source be a communication link or network, thus

19   presumably implicating the automatic embodiment described in the specification. Because the

20   specification describes embodiments that include both automatic and manual entry, it would be

21   improper to limit the claims to a single embodiment without clear indication of such exclusion.

22   *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276-77 (Fed. Cir. 2008) (explaining that courts

23   "normally do not interpret claim terms in a way that excludes embodiments disclosed in the

24   specification" unless "those embodiments are clearly disclaimed in the specification").

25           Second, Gallo argues the specification disavows or disclaims a claim scope that includes

26   human intervention because it consistently "disparages" the use of human intervention. (Doc. 73

27   at 27-30.) "The standard for disavowal of claim scope is [] exacting." *Thorner v. Sony Comput.*

28   *Entm't Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012). Disavowal requires that "the

1    specification make[ ] clear that the invention does not include a particular feature." *SciMed Life*

2    *Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001). To find

3    disavowal, the specification must be "both so clear as to show reasonable clarity and

4    deliberateness, and so unmistakable as to be unambiguous evidence of disclaimer." *Dealertrack*,

5    674 F.3d at 1322 (internal quotations omitted).

6         Gallo cites various instances in the specification that generally describe the benefits of

7    automation in the invention and disadvantages caused by human participation in the irrigation

8    processes of past systems. (Doc. 73 at 27-28.) For example, Gallo cites to the abstract that

9    describes the patented invention as "a system for automating the growing of crops" and to the

10   background section of the specification which explains the irrigation process "requires much

11   human participation and is prone to errors and inefficiencies." (*Id.* (citing '881 Patent, 1:55-57).)

12   Although these and the other examples cited by Gallo repeatedly describe the importance of

13   automation and the invention's focus on automating portions of the irrigation process, nothing

14   cited in the record suggests that the inventor anticipated his invention to include *no* human

15   participation. Even the statement from the specification that "[n]o human intervention is

16   necessary" does not require the *elimination* of all human intervention from every step of the

17   patented system in every embodiment. In direct contrast, the specification explicitly contemplates

18   maintaining human participation in at least some embodiments and for at least some tasks of the

19   invention. In addition to the exemplary embodiment of manual entry for inputting external data

20   described above, the specification also provides an embodiment of human participation during the

21   task of dispensing material to the plants. (Doc. 70-1 at 11, 7:39-43 ("A *user* can configure

22   dispensing of each chemical at predetermined times and for specified amounts. Another option is

23   for sensor data to automatically trigger dispensation.").) None of the statements in the

24   specification that generally promote the benefits of automation contradict an embodiment that

25   maintains human participation during some aspects of the system for certain embodiments.

26        The inclusion of the human participation embodiments also distinguishes these patents

27   from those considered in the cases relied upon by Gallo. For example, in *Rembrandt Patent*

28   *Innovations, LLC v. Apple, Inc.*, the Federal Circuit found the specification's disparagement of

44

1  human intervention disavowed a non-automated embodiment because it contained "not a single

2  reference to recovery with human intervention," and the disparagement was "clear, repetitive, and

3  *uniform*" in nature. 716 F. App'x 965, 970-72 (Fed. Cir. 2017) (emphasis added). The

4  specification contained a single embodiment, which contemplated only using automation. *Id.*

5  Similarly, the patents at issue in, *Ormco Corp. v. Align Technology, Inc.* and *Openwave Systems,*

6  *Inc. v. Apple Inc.*, also did not contain any reference or exemplary embodiment that would

7  implicate the allegedly disavowed claim scope. *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307,

8  1313 (Fed. Cir. 2007) (construing the disputed term to exclude non-automation because

9  "[n]owhere does the specification suggest or even allow for human adjustment of the computer-

10  calculated tooth finish positions"); *Openwave Sys., Inc. v. Apple Inc.*, 808 F.3d 509, 514-16 (Fed.

11  Cir. 2015) (holding "mobile device" does not include a separate "computer module" because the

12  patent contained only one embodiment which expressly stated the mobile device did not include a

13  separate computer module, the patent disparaged prior art methods that included one, and the

14  patent consistently distinguished the invention from prior art because it does not include a

15  separate processor).

16     The conflicting statements in the specification that, one the one hand disparage human

17  intervention but one the other hand expressly incorporate human participation into exemplary

18  embodiments, undermine the clarity and deliberateness of the alleged disavowal of this claim

19  scope. *Oatey*, 514 F.3d at 1276 ("We normally do not interpret claim terms in a way that excludes

20  embodiments disclosed in the specification."). Because specification disavowal requires an

21  "exacting standard" of clarity, the Court does not find the evidence supports Gallo's proposed

22  limiting construction. *Thorner*, 669 F.3d at 1366. For the same reasons, Gallo's references to

23  Vineyard Investigations' statements in the complaint and in response to the § 101 motion to

24  dismiss do not support claim scope disclaimer. (Doc. 73 at 28-29.) These statements primarily

25  reiterate those already found in the specification and similarly only discuss automation on a

26  general level, not with respect to any particular feature of the invention. Accordingly, the disputed

27  "transmitted to," "receiving a signal from," "receive signals from," "is received from,"

28  "controlling material dispensing," and "used to control conveyance of the material to the

vegetation" receive their plain and ordinary meanings.

## V.   ORDER

For the reasons set forth above, the Court **ORDERS**:

1.     Vineyard Investigations' motion to submit a supplemental sur-sur-reply (Doc. 79)

is **DENIED**.

2.     The claim terms are construed as follows:

| Claim Term | Construction |
|---|---|
| "emitting means for emitting the material onto the plants," | Function: "emitting materials onto the plants"<br><br>Structure: "one or more emitters is in fixed proximity to and associated with each of the plants" |
| "sensing means for sensing a condition of growth of the plants" | Function: "sensing a condition of growth of the plants"<br><br>Structure: "one or more sensors is in fixed proximity to and associated with each of the plants" |
| "control system means for receiving signals from a sensor associated with the particular plant and for controlling emission of the material to the particular plant via one or more emitters associated with the particular plant" | Function: "receiving signals from a sensor associated with the particular plant and controlling emission of the material to the particular plant via one or more emitters associated with the particular plant."<br><br>Structure: "control system 200" |
| "particular plan" | "particular plant" |
| "from me sensors" | "from the sensors" |
| "external data" | Plain and ordinary meaning |
| "potential data" | Indefinite |
| "in [fixed] proximity to" | Construing "proximity" to mean "close enough to sense information specifically from, or deliver material specifically to,' the given plant, plants, or vegetation, or group." |

| "associating one or more sensors and emitters with each of the plurality of plants so that each plant has associated sensors and emitters" | "associating one or more sensors and emitters with each of the plurality of plants, but not merely a field, region, or plot of land, so that each plant has associated sensors and emitters" |
|---|---|
| Sensor(s)/emitter(s) "associated with" plant | Plain and ordinary meaning |
| "the particular plant's associated emitter in response to a signal from the particular plant's associated sensor" | Plain and ordinary meaning |
| "each plant has associated sensors and emitters" | Plain and ordinary meaning |
| "each sensor is associated with one or more particular plan in the vegetation" | "each sensor is associated with one or more particular plant in the vegetation, but not merely a field region, or plot of land" |
| "coupled to" | Plain and ordinary meaning |
| "transmitted to"<br><br>"receiving a signal from"<br><br>"receive signals from"<br><br>"is received from"<br><br>"controlling material dispensing" | Plain and ordinary meaning |

3.      In accordance with the Court's previous order (Doc. 93 at 2-3), the parties **SHALL** confer and submit a jointly proposed schedule within 14 days.

IT IS SO ORDERED.

Dated:   **July 6, 2023**

UNITED STATES DISTRICT JUDGE