**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| VINEYARD INVESTIGATIONS, | Case No. 1:19-cv-01482-JLT-SKO |
| Plaintiff,<br>v. | ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT |
| E. & J. GALLO WINERY, | |
| Defendant. | (Docs. 172, 221) |

Vineyard Investigations alleges that the experimental irrigation systems used by E. & J. Gallo Winery infringe on three of Plaintiff's patents: U.S. Patent No. 8,528,834 (the "'834 Patent"), U.S. Patent No. 6,947,810 (the "'810 Patent"), and U.S. Patent No. 10,645,881 (the "'881 Patent"). Two motions for summary judgment are currently before the Court.

First, Defendant contends that Plaintiff has failed to raise a genuine dispute of material fact on the question of infringement. (Doc. 172.) Second, Defendant argues the asserted claims of the patents-in-suit are invalid under 35 U.S.C. § 101 for want of patent eligible subject matter. (Doc. 221.) For all the reasons set forth below, the Court **GRANTS** Defendant's motion for summary judgement for non-infringement and Defendant's supplemental motion for summary judgment for patent ineligibility.

## I.    BACKGROUND

### A.  The Asserted Patents

The patents-in-suit recite "[a] system for automating the growing of crops, such as grapevines[,]" where some "[c]ombinations of data from sensors local to a vineyard, and from

1

optional remote stations and sensors, is joined with a control system to accurately control the dispensing of water and chemicals such as insecticides, disease prevention fungicides and fertilizers." *See, e.g.*, '834 Patent Abstract. The asserted claims of the '834 Patent recite:

> 1. An apparatus for dispensing materials to vegetation, the apparatus comprising:
>
> a conduit having a channel, wherein the channel is positioned in proximity to the vegetation;
>
> an outlet coupled to the channel for conveying a material central controller, wherein the central controller is responsive to external data for controlling material dispensing from one or more emitters in fixed proximity to the vegetation;
>
> one or more sensors in fixed proximity to the vegetation, wherein each sensor is associated with one or more particular plan [*sic*] in the vegetation, wherein signals from me sensors [*sic*] are transmitted to a central control system and are used to control conveyance of the material to the Vegetation.
>
> 6. The apparatus of claim 1, wherein the vegetation includes grape vines.
>
> 7. The apparatus of claim 1, wherein the external data includes weather data.
>
> 10. The apparatus of claim 1, wherein the external data includes an evapotranspiration coefficient.
>
> 15. A method for dispensing materials to vegetation, wherein one or more sensors for sensing a growth condition of the one or more plants are in fixed proximity to the one or more plants, wherein each sensor is associated with one or more particular plan [*sic*] in the vegetation, the method comprising:
>
> obtaining external data for controlling material dispensing;
>
> using a controller to receive signals from at least one of the sensors;
>
> and using the controller to control dispensing of a material via the one or more emitters in response to the external data.

'834 Patent col. 8 l. 62–col. 9 l. 10, col. 9 ll. 24–27, col. 10 ll. 5–6, col. 10 ll. 15–26. The asserted claims of the '810 Patent recite:

> 2. A system for application of a material to a plurality of plants, the system comprising:
>
> a plurality of sensors, wherein each sensor is associated with, and in fixed proximity to, one of the plants;

2

a control system coupled to one or more of the sensors for receiving a signal from the sensors;

emitters for emitting the material to a plant, wherein each emitter is associated with, and in fixed proximity to, one of the plants; and

a control system for controlling emission of the material to a particular plant via the particular plant's associated emitter in response to a signal from the particular plant's associated sensor.

4. The system of claim 2, further comprising:

control circuitry located remotely from the plants.

20. A method for application of a material to a plurality of plants, wherein the material is emitted onto the plants via a plurality of emitters, the method comprising:

associating one or more sensors and emitters with each of the plurality of plants so that each plant has associated sensors and emitters in fixed proximity to the plant;

using a control system to receive signals from sensors associated with a given plant; and

using the control system to control the emission of the material onto the given plant via the emitters associated with the given plant.

22. The method of claim 20, wherein the control system includes control circuitry located remotely from the plants.

36. A system for application of a material to a plurality of plants, the system comprising[:]

emitting means for emitting the material onto the plants, wherein one or more emitters is in fixed proximity to and associated with each of the plants;

sensing means for sensing a condition of growth of the plants, wherein one or more sensors is in fixed proximity to and associated with each of the plants; and

control system means for receiving signals from a sensor associated with the particular plant and for controlling emission of the material to the particular plant via one or more emitters associated with the particular plant.

'810 Patent col. 9 ll. 28–42, col. 9 ll. 48–49, col. 11 ll. 9–24, col. 12 ll. 52–63. The asserted claims of the '881 Patent are only tangentially involved in the instant motion.

The specifications note that a variety of sensors—such as photodetectors, leaf wetness detectors, temperature sensors, "insect indicators," soil moisture sensors, infrared sensors, and pH

3

probes—may be used. *E.g.*, '834 Patent col. 4 ll. 38–45, col. 5 ll. 39–40, col. 4 ll. 54–55, col. 8 ll. 6–12. The specifications also states that the possible universe of "external data include weather data, crop growth models, growing degree days, ET, and ET (evapotranspiration coefficients), degree day insect models, disease risk models, irrigation requirements, crop nutrition requirements, crop development data, etc." *E.g.*, *id.* at col. 5 ll. 2–8. After obtaining sensor data and external data, the specifications make clear that "any type of control system can be used" to control irrigation and that "data processing and acquisition can be performed . . . and used in any manner known in the art." *E.g.*, *id.* at col. 4 ll. 54–55, col. 5 ll. 16–19. The specifications further explain that "the system can control application of materials according to methods described in academic papers" and that "[p]ublicly available data . . . can be used to provide rules and guidelines for controlling material dispensing according to the system of the present invention." *E.g.*, *id.* at col. 5 ll. 22–35.

### B. The Instant Action

Vineyard Investigations is a wine industry consulting company owned and operated by Dr. Paul Skinner, the named inventor of the asserted patents (collectively, "Plaintiff"). (Doc. 185 at 4.) E. & J. Gallo Winery is a prominent wine producer and distributor founded in Modesto, California in 1933. (Doc. 172-1 at 5.) Plaintiff contends that the variable rate irrigation systems used in several of Defendant's experimental vineyards infringe the asserted patents. (Doc. 185 at 4.) Defendant denies infringement and asserts that the patents-in-suit are invalid. (*See generally* Doc. 54.)

In the six-years since this case was filed, the Court decided a motion dismiss under 35 U.S.C. § 101 ("MTD Order"), (Doc. 31), decided a motion to dismiss for inequitable conduct, (Doc. 116), engaged in claim construction, (Doc. 94), and resolved numerous discovery and evidentiary disputes, (*e.g.*, Docs. 30, 146, 150). After the Court's claim construction order and the subsequent clarification thereof, (Docs. 94, 124), Defendant moved for summary judgment, arguing (i) that its irrigation systems do not infringe claims 1, 6, 7, 10, and 15 of the '834 Patent and claims 2, 4, 20, 22, and 36 of the '810 Patent (collectively, the "Asserted Claims"), and (ii) that claims 1–3, 5–6, 8–12, 14–15, 29–34, and 36–44 of the '881 Patent are invalid for

indefiniteness. (Doc. 172.) The parties' briefing on the pending motion for summary judgment for noninfringement hinted at—and indirectly discussed—several related issues such as patent ineligibility, anticipation, and obviousness. (*See* Doc. 215.) The Court consequently (1) requested further clarification from the parties on the issue of non-infringement and (2) granted Defendant permission to file a supplemental motion for summary judgment for patent ineligibility. (*Id.*) The Court appreciates the parties' extensive briefing regarding the former, (Docs. 217, 227, 228), and the latter, (Docs. 221, 231, 232).

## II.   LEGAL BACKGROUND

### A.  Rule 56 and Law of the Case

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is appropriate if the evidence and all reasonable inferences in the light most favorable to the nonmoving party "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). "To survive summary judgment, [P]laintiff must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations." *U.S. ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011) (citations omitted); *see also Genuine Enabling Tech. LLC v. Sony Grp. Corp.*, 167 F.4th 1196, 1202 (Fed. Cir. 2026) ("[T]he nonmoving party cannot defeat summary judgment 'with conclusory allegations, unsupported assertions, or only a scintilla of evidence.'" (quoting *Traxcell Techs., LLC v. Sprint Commc'ns Co. LP*, 15 F.4th 1121, 1127–28 (Fed. Cir. 2021))).

Moreover, it is widely accepted that district courts have the discretion to consider *sua sponte* a matter that is properly decided under Rule 56, provided that the Court gives the parties "notice and a reasonable time to respond." Fed. R. Civ. P. 56(f); *Celotex*, 477 U.S. at 326 ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her

evidence." (citations omitted)). This includes the discretion to make a *sua sponte* determination to reconsider a prior ruling. *See City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 888 (9th Cir. 2001); *In re Van Well Nursery Inc.*, No. 2025-131, 2025 WL 2621840, at *1 (Fed. Cir. Sept. 11, 2025) (citing *Santa Monica Baykeeper*, 254 F.3d at 888), which may implicate the law of the case doctrine.

In *Pinpoint, Inc. v. Amazon.com, Inc.*, Judge Posner, sitting by designation in the Northern District of Illinois, addressed the application of the law of the case doctrine in the context of claim construction. 369 F. Supp. 2d 995 (N.D. Ill. 2005). Judge Posner explained that "[t]he purpose of the doctrine is to provide some measure of stability in a litigation, insulating the litigation to a degree from the vagaries of the different judges (as well as from casual changes of mind when the same judge handles the case throughout) who may handle the case in succession." *Id.* at 998. But "there is no duty to adhere to the prior ruling if the second judge (or the same judge, on further reflection, when there has been no change[] of judge in midstream) is strongly convinced that the earlier ruling was incorrect." *Id.* (citations omitted). That was Judge Posner's conclusion in *Pinpoint* after he ordered the parties to "rebrief[] and reargue[] . . . the claim-construction issue." *Id.*

Within the Ninth Circuit,[1] "[t]he law of the case doctrine is 'wholly inapposite' to circumstances where a district court seeks to reconsider an order over which it has not been divested of jurisdiction." *See United States v. Smith*, 389 F.3d 944, 949 (9th Cir. 2004) (quoting *Santa Monica Baykeeper*, 254 F.3d at 888); *see also Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1042–43 (9th Cir. 2018) (holding that a district court erred in applying the law of the case doctrine when there was neither final judgment nor ruling by an appellate court). This "leaves the district court free to correct any errors or misunderstandings without having to find that its prior decision was 'clearly erroneous.'" *Askins*, 899 F.3d at 1043 (quoting *United States v.*

---

[1] "The 'law of the case' is 'a procedural matter not unique to patent law' to which [the Federal Circuit] appl[ies] 'the precedent of the regional circuit in which the case arose.'" *Omega Pats., LLC v. CalAmp Corp.*, 13 F.4th 1361, 1374 (Fed. Cir. 2021) (quoting *Exxon Corp. v. United States*, 931 F.2d 874, 877 n.4 (Fed. Cir. 1991)). The Federal Circuit also "review[s] a grant of summary judgment under the law of the regional circuit." *Wyeth & Cordis Corp. v. Abbott Lab'ys*, 720 F.3d 1380, 1383 (Fed. Cir. 2013) (citing *Grober v. Mako Prods., Inc.*, 686 F.3d 1335, 1344 (Fed. Cir. 2012)).

6

*Cuddy*, 147 F.3d 1111, 1114 (9th Cir. 1998)). "By contrast, where a *final* legal determination has been made by a higher court, or by the district court in the same or a related case, the law of the case doctrine allows the court to impose a heightened burden on the plaintiff—to show clear error, changed law, new evidence, changed circumstances, or manifest injustice." *Id.* (citing *Cuddy*, 147 F.3d at 1114) (emphasis added).

In a patent case arising out of the Eastern District of Washington, the Federal Circuit considered whether to overrule the district court's reconsideration of a summary judgment order. *Van Well Nursery Inc.*, 2025 WL 2621840, at *1. Pointing to the Ninth Circuit's opinion in *Santa Monica Baykeeper*, the Federal Circuit faulted the mandamus petitioner for failure to "show[] that the law of the case doctrine clearly and indisputably precluded the district court from reconsidering its summary judgment order." *Id.* (citing *Santa Monica Baykeeper*, 254 F.3d at 888).

This Court also has had the occasion to address a similar situation, albeit outside of the patent law context:

> Defendants argue that this Court cannot reconsider the legal conclusions set forth in its Motion to Dismiss Order because those legal conclusions are the law of the case. The law of the case doctrine, however, is not an absolute bar to revisiting issues of law. The law of the case doctrine merely expresses the practice of courts generally to refuse to reopen what has been decided, not to a limit on their power. The law of the case doctrine does not impinge on a district court's power to reconsider its own interlocutory order so long as the court has not been divested of jurisdiction over that order by commencement of appeal. Accordingly, this Court may reconsider its prior legal conclusions to the extent they are argued in this motion.

*Rocky Mountain Farmers Union v. Goldstene*, 843 F. Supp. 2d 1042, 1060 (E.D. Cal. 2011) (internal citations and quotation marks omitted), *aff'd sub nom. Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070 (9th Cir. 2013).

### B. Patent Eligibility

Section 101 of Title 35 provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35

U.S.C. § 101.[2] "The [Supreme] Court has long held that this provision contains an important implicit exception: laws of nature, natural phenomena, and abstract ideas are not patentable." *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 70 (2012) (cleaned up); *see also* DONALD S. CHISUM, CHISUM ON PATENTS § 1.02[4][c] (2024) (noting one historical view that "[t]he origin of the printed-matter doctrine is found in the long-standing rule that abstractions, mental theories or business methods are not patentable subject matter" (citation and quotation marks omitted)). Under the *Mayo/Alice* test, the Court must perform a two-step analysis to determine patent eligibility under § 101.

At step one, the Court "evaluates 'the focus of the claimed advance over the prior art to determine if the claim's character as a whole is directed to excluded subject matter.'" *Trinity Info Media, LLC v. Covalent, Inc.*, 72 F.4th 1355, 1361 (Fed. Cir. 2023) (quoting *PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310, 1315 (Fed. Cir. 2021)). This requires the Court to look at "whether the claims focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery." *Miller Mendel, Inc. v. City of Anna, Texas*, 107 F.4th 1345, 1352 (Fed. Cir. 2024) (citation and quotation marks omitted). This "inquiry must focus on the language of the Asserted Claims themselves, and the specification cannot be used to import details . . . [that] are not claimed." *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 769 (Fed. Cir. 2019) (cleaned up).

If the claims are directed to a patent-ineligible concept—such as a natural phenomenon or an abstract idea—the Court assesses, under step two of the *Alice* inquiry, the "elements of each

___

[2] Though the Constitution and the Patent Act both mention the word "discoveries," it has been interpreted to mean "an inventor's discoveries[,]" *i.e.*, inventions. *See In re Meyer*, 688 F.2d 789, 794 n.1 (C.C.P.A. 1982); *Gardner v. Herz*, 118 U.S. 180, 191 (1886) ("[U]nder article 1, § 8, subd. 8, of the constitution, a patentee 'must be an inventor, and he must have made a discovery'" (quoting *Thompson v. Boisselier*, 114 U.S. 1, 11 (1885))); *In re Kemper*, 14 F.Cas. 286, 287 (C.C.D.C. 1841) (No. 7,687) (Cranch, C.J.) (After "a careful perusal of the constitution and laws of the United States," "it is evident that the 'discoveries,' the use of which is to be secured, are the discoveries of inventors only. The applicant must invent, contrive, or produce something that did not exist before." (emphasis added)); Albert H. Walker, TEXT-BOOK OF THE PATENT LAWS OF THE UNITED STATES OF AMERICA § 2, at 2 (2d ed. 1889) ("The word 'discovery' does not have, either in the Constitution or the statute, its broadest signification. It means invention, in those documents, and in them it means nothing else.").

claim[,] both individually and as an ordered combination," to determine whether they possess an "inventive concept" that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 217–18 (2014) (citations, quotation marks, and footnote omitted) (final alteration in original). The non-abstract claim elements, however, "cannot simply be well-understood, routine, conventional activities previously known to the industry." *ChargePoint*, 920 F.3d at 773 (cleaned up).

### C. Anticipation and Obviousness

A patent claim is invalid as anticipated if "each and every element of the claim is expressly or inherently disclosed in a single prior art reference." *Guangdong Alison Hi-Tech Co. v. Int'l Trade Comm'n*, 936 F.3d 1353, 1363–64 (Fed. Cir. 2019) (citations and footnote omitted). "Anticipation is a question of fact that must be established by clear and convincing evidence." *Tessera, Inc. v. Int'l Trade Comm'n*, 646 F.3d 1357, 1366 (Fed. Cir. 2011) (citing *Sanofi-Synthelabo v. Apotex, Inc.*, 550 F.3d 1075, 1082 (Fed. Cir. 2008)).

Obviousness is a question of law, the resolution of which "necessarily entails several basic factual inquiries." *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 280 (1976) (citation omitted).[3] The former "flows from the [Supreme] Court's acknowledgement that the standard for patentability is 'basically constitutional.'" *ABS Glob.*, 914 F.3d at 1065 (quoting *Anderson's-Black Rock, Inc. v. Pavement Salvage Co.*, 396 U.S. 57, 62–63 (1969)). The latter include "the scope and content of the prior art," the "differences between the prior art and the claims at issue," and "the level of

---

[3] Before its codification in 1952, the obviousness standard used to be known as the constitutional standard of invention—they both ask whether it would have been within "the skill of the calling" of an ordinary artisan to arrive at the same idea as the patentee. *See Cuno Eng'g Corp. v. Automatic Devices Corp.*, 314 U.S. 84, 88–91 (1941) ("We cannot conclude that [the patentee's] *skill* in [combining two well-known elements] reached the level of inventive genius which the Constitution, Art. I, s 8, authorizes Congress to reward." (emphasis added)); *Id.* at 92 (rejecting "any relaxation of the rule of the *Hotchkiss* case"); *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 15 n.7 (1966) (clarifying that the "flash of creative genius" language in *Cuno* was "merely rhetorical embellishment of language going back to 1833," and that "*Cuno* merely rhetorically restated the requirement that the subject matter sought to be patented must be beyond the skill of the calling"); *ABS Glob., Inc. v. Inguran, LLC*, 914 F.3d 1054, 1064–65 (7th Cir. 2019) (Wood, C.J., joined by Barrett and Easterbrook, J.J.) (noting that "the Supreme Court recognized" "the bar against the patentability of obvious inventions" "as a constitutional 'absolute prerequisite to patentability' even before Congress codified the requirement in 1952" (quoting *Dann v. Johnston*, 425 U.S. 219, 225–26 (1976); additional citation omitted)).

ordinary skill in the pertinent art." *Graham*, 383 U.S. at 17. Several Supreme Court precedents help to guide the obviousness inquiry.

*Sakraida* involved a patent directed to "a water flush system to remove cow manure from the floor of a dairy barn." 425 U.S. at 274. The Supreme Court held the purported invention was obvious because it "simply arrange[d] old elements with each performing the same function it had been known to perform, although perhaps producing a more striking result than in previous combinations." *Id.* Such a combination patent would have been obvious to an ordinarily skilled artisan, *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 416–17 (2007), unless (i) it resulted in the creation of a "new or different function," *Anderson's-Black Rock*, 396 U.S. at 60, (ii) there is a showing of new or "synergistic result," *id.* at 61; *see also Reckendorfer v. Faber*, 92 U.S. 347, 356–57 (1875) (similar), or (iii) there is proof that the prior art "deter[red] any investigation into such a combination," *United States v. Adams*, 383 U.S. 39, 52 (1966); *see also Gen. Elec. Co. v. Raytheon Techs. Corp.*, 983 F.3d 1334, 1345 (Fed. Cir. 2020) ("A reference does not teach away if it merely expresses a general preference for an alternative invention but does not criticize, discredit, or otherwise discourage investigation into the invention claimed." (citation and quotation marks omitted) (alteration removed)). At bottom, the Supreme Court explained that "'Courts should scrutinize combination patent claims with a care *proportioned to the difficulty and improbability* of finding [*non-obviousness*] in an assembly of old elements.'" *Sakraida*, 425 U.S. at 281 (quoting *Great Atl. & Pac. Tea Co. v. Supermarket Equip. Corp.*, 340 U.S. 147, 152 (1950)) (emphases added).

In *Johnston*, the Supreme Court addressed a patent application directed to "a general purpose computer [that] is programmed to provide bank customers with an individualized and categorized breakdown of their transactions." 425 U.S. at 220–22. The Supreme Court noted that a skilled artisan would have been aware of "the nature of the extensive use of data processing systems in the banking industry" and a prior art reference which teaches the use of digital computers to track different types of expenses by department and type of expense. *Id.* at 228–29. The Supreme Court found that "[t]he gap between the prior art and [the applicant]'s system [wa]s simply not so great as to render the system nonobvious to one reasonably skilled in the art." *Id.* at

10

230 (footnote omitted).[4]

*KSR* involved a patent claim directed to an adjustable gas pedal with an electronic throttle control. 550 U.S. at 410–11. Notably, one prior art reference, "Asano[,] taught everything contained in the claim except using a sensor to detect the pedal's position and transmit it to a computer controlling the throttle." *Id.* at 411–13. In reversing the Federal Circuit and finding the patent claim obvious, the Supreme Court provided additional guidance with respect to the obviousness inquiry.

First, "*KSR* instructs courts to take a more 'expansive and flexible approach' in determining whether a patented invention was obvious at the time it was made." *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1238 (Fed. Cir. 2010) (Dyk, J.) (quoting *KSR*, 550 U.S. at 415). *KSR* held that "[t]he obviousness analysis cannot be confined by a formalistic conception of the words teaching, suggestion, and motivation, or by overemphasis on the importance of published articles and the explicit content of issued patents." 550 U.S. at 419. This mean that the obviousness "analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *Id.* at 418.[5]

Second, and relatedly, "*KSR* and [the Federal Circuit's] later cases establish that the legal determination of obviousness may include recourse to logic, judgment, and common sense, in lieu of expert testimony." *Wyers*, 616 F.3d at 1239 (citations omitted). *KSR* "made clear that expert

---

[4] The Supreme Court further "note[d] that banks have long segregated debits attributable to service charges," *Johnston*, 425 U.S. at 227; therefore, the Court of Customs and Patent Appeals wrongfully assumed that a skilled artisan would not have recognized that banks could create other subdivisions, like spending categories.

[5] In *In re Dembiczak*, the Federal Circuit reversed the PTO's obviousness rejection for failure to show specific teaching, suggestion, or motivation to draw an ordinary jack-o'-lantern on a generic trash bag. 175 F.3d 994 (Fed. Cir. 1999). The Supreme Court has *never* endorsed Plaintiff's and *Dembiczak*'s position that the obviousness inquiry shall be rigidly "'guided *only* by the prior art references and the then-accepted wisdom in the field.'" (Doc. 227 at 19 (quoting *Dembiczak*, 175 F.3d at 998–99) (emphasis added)). That decision has been abrogated by *KSR*, 550 U.S. at 415–21 (holding that obviousness is an "expansive and flexible" inquiry that must consider, *inter alia*, the skill, knowledge, ingenuity, curiosity, and common sense of an ordinary artisan, as well as emerging design needs and market forces); *see also Sakraida*, 425 U.S. at 281 (reiterating that courts need to be *skeptical* towards a simple invention which merely combines well-known elements); *Graham*, 383 U.S. at 18 (explaining that the obviousness inquiry "should be amenable to [] case-by-case development").

11

testimony concerning motivation to combine may be unnecessary and, even if present, will not necessarily create a genuine issue of material fact." *Id.* at 1239 (citing *KSR*, 550 U.S. at 423–24).[6]

Third, *KSR* revived the concept of "obvious to try." That is, "[w]hen there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp." *KSR*, 550 U.S. at 421. "If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense." *Id.*

### D. Claim Construction and Literal Infringement

An infringement analysis entails two steps. "The first step is determining the meaning and scope of the patent claims asserted to be infringed. The second step is comparing the properly construed claims to the device accused of infringing." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc) (internal citations omitted), *aff'd*, 517 U.S. 370 (1996). Claim construction under step one is a question of law. *Schindler Elevator Corp. v. Otis Elevator Co.*, 593 F.3d 1275, 1281 (Fed. Cir. 2010). The second step is a question of fact. *Advanced Steel Recovery, LLC v. X-Body Equip., Inc.*, 808 F.3d 1313, 1317 (Fed. Cir. 2015). "Summary judgment of noninfringement is proper when no reasonable jury could find that every limitation recited in a properly construed claim is found in the accused device either literally or under the doctrine of equivalents." *Id.* (citing *PC Connector Sols. LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1364 (Fed. Cir. 2005)).[7]

### III.    ANALYSIS

### A. Claim Construction and Literal Infringement

The Court begins with the following notes and observations. First, it is well-established

---

[6] This is partly because the motivation inquiry—that there is "a known problem for which there [i]s an obvious solution"—is merely "[o]ne of the ways in which a patent's subject matter can be proved obvious," *KSR*, 550 U.S. at 419–20; it is not the only way.

[7] "For literal infringement of a § 112(f) limitation, the accused device must perform an identical function to the one recited in the claim and must use the same structure, materials or acts found in the specification, or their equivalents. Whether an accused device 'performs the identical function with the same structure, materials, or acts described in the specification or an equivalent thereof, is a question of fact.'" *Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.*, 87 F. Supp. 3d 928, 955 (N.D. Cal. 2015) (citing and quoting *IMS Tech., Inc. v. Haas Automation, Inc.,* 206 F.3d 1422, 1430 (Fed. Cir. 2000)).

that "literal infringement requires that each and every limitation set forth in a claim" is found in an accused system. *See Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.*, 389 F.3d 1370, 1378 (Fed. Cir. 2004) (citation omitted). Second, it is undisputed that all the Asserted Claims require the use of a sensor that is associated with plant(s). Third, the parties do not dispute that Defendant's irrigation systems use some combinations of soil moisture sensors, flowmeters, and pressure indicators. (Doc. 172-1 at 20; Doc. 180-1 at 66 (undisputed fact No. 88).)

In its motion for summary judgment for noninfringement, Defendant argues, among other things, (1) that its moisture sensors are associated with land rather than plants, and (2) that its flowmeters and pressure indicators are not "sensors" within the meaning of the Asserted Claims. (*See generally* Docs. 172, 180.)

### 1. Moisture Sensors

The Court has previously explained in the claim construction order that though a sensor may be associated with a "plurality of plants," the Asserted Claims do not read on (*i.e.*, cover) systems or methods where a single sensor is associated with a "field, region, or plot of land." (Doc. 94 at 29–35.)[8] Furthermore, because the named inventor distinguished away U.S. Patent No. 4,015,366 ("Hall") to overcome an initial PTO rejection and secure an allowance, the Asserted Claims cannot read on systems or methods where a sensor is associated with a "homogeneous agricultural area," as disclosed by Hall. (*See* Doc. 217-4 at 18–19 (recognizing that the PTO dropped its Hall-based rejection because the named inventor distinguished away Hall's teaching of associating a sensor with a homogeneous agricultural area)); *Knapp v. Morss*, 150 U.S. 221, 224–25 (1893) ("It is well settled that the [] claim . . . cannot be so construed as to cover either what was rejected by the patent office, or disclosed by prior devices." (internal citations omitted)); *SpeedTrack, Inc. v. Amazon.com*, 998 F.3d 1373, 1379 (Fed. Cir. 2021) (explaining that a patent applicant's argument distinguishing away a prior art reference may constitute a disclaimer of claim scope).

As a result, the parties' principal dispute centers around whether Defendant's moisture

---

[8] Plaintiff's expert states that this claim construction is consistent with Plaintiff's position. (Doc. 177-1 at 28, ¶ 60.)

13

sensors are (a) "associated with" plants, in which case there is infringement, or (b) are "associated with" a field, a plot, or a "homogeneous agricultural area," in which case there is no infringement.[9] After reviewing the messy record and briefing, the Court managed to summarize and reorganize the parties' arguments into three categories: the size of land; the number of plants; and the requisite "association" with plants.

i.    Size of Land

To begin, the parties agree that Defendant's accused experimental vineyards "are divided into 30 meter by 30 meter (containing about 150 to 180 vines) or 15 meter by 15 meter (containing 40 or 50 vines)" "pixels." (Doc. 217 at 3–4; Doc. 180-1 at 29, 45, 61 (undisputed fact Nos. 31, 32, 53, 54, 75, 76).)

With respect to the vineyards that are divided into 30m X 30m pixels, Defendant notes that they contain no more than one soil moisture sensor for every 1700 vines—or one for every 10 pixels. (Doc. 217 at 4.) This means that Defendant uses approximately one moisture sensor for every (30m X 30m) X 10 pixels = 9000 square meters = 2.224 acres. However, Hall had already disclosed placing one sensor per acre more than 20 years before the priority date of the patents-in-suit. (Doc. 217 at 4 (citing Hall col. 15 ll. 23–26, col. 8 ll. 30–35).) Because of this, and because the named inventor deliberately distinguished away Hall during the prosecution of the patents-in-suit, (Doc. 94 at 34),[10] the Court declines to construe the Asserted Claims to encompass situations where a single moisture sensor is placed in a field of 2.224 acres. *Knapp*, 150 U.S. at 224–25 ("It is well settled that the [] claim . . . cannot be so construed as to cover either what was rejected by the patent office, or disclosed by prior devices." (internal citations omitted)); *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1324–25 (Fed. Cir. 2003) (discussing prosecution disclaimer).

---

[9] Plaintiff contends that this question of expert witness credibility is one for the jury, which is not suitable for resolution on summary judgment. (Doc. 185 at 19.) That is only partly correct because, as Defendant points out, (Doc. 228 at 4–5), the threshold question of what defines a "field," a "plot," or a "homogeneous agricultural area" is a question of claim construction for the Court to resolve.

[10] In particular, the named inventor argued during the prosecution of the patents-in-suit that Hall teaches, *inter alia*, the use of direct sensors that "are not localized to the plant level." (Doc. 70-10 at 73 (citation omitted).) Indeed, the named inventor expressly quoted portions of Hall stating that "a homogeneous agricultural area" may include, for example, a "one-acre area" or a "field." (Doc. 70-10 at 74; Doc. 94 at 34.)

Regarding the vineyards that are divided into 15m X 15m pixels, they contain no more than one moisture sensor for every 650 vines, or approximately one moisture sensor for every 14 pixels. (Doc. 217 at 4.) This means that Defendant uses one moisture sensor for every (15m X 15m) X 14 pixels = 3150 square meters = 0.7784 acres. For the following two reasons, the Court finds that the definition of a "field," a "plot" of land, or a "homogeneous agricultural area" should include a field of 0.7784 acres in size.[11]

First, Hall expressly states that a homogeneous agricultural area may include a one acre field, and that a "'homogeneous agricultural area' need not be rigid[ly]" defined in accordance with its specification; rather, it is a "variable" concept that should be defined in a way to "permit[] maximum benefits to be obtained from the computing subsystem." *See* Hall col. 15 ll. 18–31; *see also id.* at col. 22 ll. 1–3 (disclosing a possible system with "12 one-acre homogeneous areas"). As such, 0.7784 acres of land could very well fall within the meaning of a field, a plot of land, or a homogeneous agricultural area.

Second, the difference between placing one sensor per acre (Hall) and one sensor per 0.7784 acres (what Plaintiff contends to fall within the scope of the Asserted Claims) "is simply not so great as to render the [latter] nonobvious." *Johnston*, 425 U.S. at 230; *see also Sakraida*, 425 U.S. at 281 (directing federal courts to "scrutinize . . . patent claims with a care proportioned to the difficulty and improbability of finding [nonobviousness]" (quoting *Great Atl. & Pac. Tea*, 340 U.S. at 152)). Such a modest modification to Hall amounted to nothing more than "the natural development of the art[] by those skilled in it," *De Forest Radio Co. v. Gen. Elec. Co.*, 283 U.S. 664, 685 (1931), involving "the mere exercise of the skill of the calling or an advance plainly indicated by the prior art," *Altoona Publix Theatres v. Am. Tri-Ergon Corp.*, 294 U.S. 477, 486 (1935) (citing *Elec. Cable Joint Co. v. Brooklyn Edison Co.*, 292 U.S. 69, 79–80 (1934)); *see also In re Mahurkar Double Lumen Hemodialysis Catheter Pat. Litig.*, 831 F. Supp. 1354, 1374 (N.D. Ill. 1993) (Easterbrook, J., sitting by designation) ("Ordinary skill means at least the ability to understand the technology and make modest adaptations or advances."), *aff'd*,

---

[11] As mentioned, the Court previously construed the Asserted Claims to **not** encompass systems or methods where a single sensor is associated with a "field, region, or plot of land."

71 F.3d 1573 (Fed. Cir. 1995). Indeed, considering the rapid advances in computer-related technologies between 1975 (when Hall was filed) and 2000 (when the named inventor purportedly conceived the idea which undergirds the patents-in-suit, (Doc. 52 at ¶¶ 20–21)), every agricultural engineer should know that, theoretically, it may be desirable or obvious *to at least try* to define a "homogeneous agricultural area" more narrowly, which Hall suggests may be possible. *See KSR*, 550 U.S. at 421 (discussing obvious to try); *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1360 (Fed. Cir. 2007) (explaining that the obviousness inquiry asks whether an ordinarily skilled artisan "would have had reason *to attempt* to make" the same thing as the patentee (emphasis added)); *see also Smith v. Nichols*, 88 U.S. (21 Wall.) 112, 119 (1874) ("[A] mere carrying forward or new or more extended application of the original thought, a change only in form, proportions, or degree, the substitution of equivalents, doing substantially the same thing in the same way by substantially the same means with better results, is not such invention as will sustain a patent.").[12]

---

[12] The Federal Circuit's opinion in *Raytheon* is particularly instructive. That case involved a patent directed to turbofan aircraft engines, which may utilize a one-, two-, three-, four-, five-, or six-stage high-pressure turbine. *Raytheon*, 983 F.3d at 1337–40. A prior art reference, Wendus, disclosed all elements of the claims on appeal except the use of a "'at least-two-stage' high-pressure turbine." *Id.* at 1339. The Federal Circuit vacated the Patent Trial and Appeal Board's finding of nonobviousness for lack of substantial evidence. *Id.* at 1352–53.

Much like *Raytheon*, where a prior art reference's teaching of a one-stage high-pressure turbine effectively meant that a skilled artisan could only increase the stage count, an ordinarily skilled agricultural engineer viewing Hall's disclosure of placing one sensor in a whole field/region could only modify said disclosure by specifying more granular control, perhaps placing one sensor for 0.7784 acres, or one sensor for every 30m-by-30m block (0.2224 acres). This Court is not aware of any Federal Circuit precedent which held that a skilled artisan would not have found it obvious to pursue a similar kind of binary choice. *See KSR*, 550 U.S. at 417 ("If a person of ordinary skill can implement a *predictable* variation, § 103 likely bars its patentability." (emphasis added)).

Moreover, substantial parts of Dr. Greenspan's expert testimony on the question of obviousness fundamentally misapply the governing case law. For instance, according to Dr. Greenspan, "Hall teaches that 'computer control for the entire area under consideration' is desirable and efficient[]" and, therefore, "teaches away from[] the granular, variable control . . . in the Asserted Patents." (Doc. 177-1 at 29, ¶ 62.) To the extent that Hall is more "efficient," the mere existence of one benefit (*i.e.*, the cost of implementing computer control, Hall col. 15 ll. 4–9) does not weigh against a finding of obviousness, because an ordinary agricultural scientist would have been motivated by other factors, *see Raytheon*, 983 F.3d at 1351, like fruit quality and water efficiency, (*see, e.g.*, Doc. 227 at 29). At most, Hall states a "general preference" for macro level control, *see* Hall col. 15 ll. 4–31, which does not arise to the level of teaching away, *see Raytheon*, 983 F.3d at 1345–49.

Finally, to the extent Plaintiff relies on secondary objective indicia of non-obviousness, (*see* Doc. 227 at 10), it has not established the requisite "nexus"—not even close, *see Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373–74 (Fed. Cir. 2019). The Court could not find any sort of a close "nexus"

Plaintiff is correct that the Court does not have free-wheeling authority to "rewrite" the Asserted Claims just to "save" them. (Doc. 227 at 15.) That said, terms like a "field," a "homogeneous agricultural area," and a "plot of land" embody a flexible and abstract concept which may not be susceptible to a precise definition. Due to such ambiguity, there is no clear legal error in merely clarifying—in light of the prior art, Plaintiff's representation to the PTO, and the *risk* of obviousness invalidation[13]—that those terms at least encompass an area of 0.7784 acres or larger. *See Generation II Orthotics Inc. v. Med. Tech. Inc.*, 263 F.3d 1356, 1365 (Fed. Cir. 2001) ("[C]laims can only be construed to preserve their validity where the proposed claim construction is 'practicable,' is based on sound claim construction principles, and does not revise or ignore the explicit language of the claims." (quoting *Rhine v. Casio, Inc.,* 183 F.3d 1342, 1345 (Fed. Cir. 1999))).

### ii.  Number of Plants

Another way to look at the issue is through the lens of the number of plants. In particular, Defendant points out that Hall discloses that an acre of land can include 226 trees. (Doc. 217 at 4 (citing Hall col. 8 ll. 30–35, col. 15 ll. 23–26).) Though a tree is not the same as a grape vine, the Court is nonetheless hesitant to construe the Asserted Claims in a way as to read on systems which utilize merely one moisture sensor per 650 grape vines.

Moreover, the patents-in-suit and their prosecution history show that the named inventor intended to describe a system where water and nutrients are delivered to the plants at a granular, "plant level," and not a system that treats 650 vines the same way. (*See* Doc. 70-10 at 73 (distinguishing away Hall on the basis that Hall teaches the use of direct sensors that "are not localized to the plant level"); *see also id.* (arguing that the patent application is directed to a "localized approach to dispensing of materials . . . not disclosed in the prior art"); Doc. 217-4 at 63 ("As discussed above, the invention of the '834 Patent provided for fine-grain variability of control[.] . . .").) The Court shares Defendant's skepticism of Plaintiff's argument that a "plant

between Defendant's irrigation systems and the patents-in-suit, the latter of which merely state desirable goals and functions without much engineering details.

[13] Again, to be clear, the Court is not definitely resolving the obviousness question here. Rather, the Court simply declines to construe the Asserted Claims in a way that would read on a potentially obvious variation (one sensor per 0.7784 acres) of the prior art (one sensor per acre).

17

group" may be comprised of 650 grape vines, (*see* Doc. 180 at 13; *see also* Doc. 172-1 at 24 (arguing that there is no plant level of granularity)), an argument which seems to stretch the ordinary, common-sense definition of a "plant group," *see AlterWAN, Inc. v. Amazon.com, Inc.*, 63 F.4th 18, 24 (Fed. Cir. 2023) (explaining that courts are not required "to depart from common sense in claim construction" when a claim limitation is ambiguous).

Relatedly, in another effort to distinguish the prior art, Plaintiff represented to the PTO in a parallel IPR proceeding that, even when moisture sensors are placed in the "'root zone' of some trees," said sensors are not necessarily "associated with the roots or trees." (Doc. 217-4 at 60–61.) As Defendant points out, (Doc. 217 at 5; Doc. 172-1 at 23), this is in tension with Plaintiff's current position that a single moisture sensor is "associated with" 650 vines spanning over three-quarters of an acre, *see 01 Communique Lab'y, Inc. v. Citrix Sys., Inc.*, 889 F.3d 735, 743 (Fed. Cir. 2018) ("[C]laim terms must be construed the same way for both invalidity and infringement." (citations and quotation marks omitted)); *see also Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1362 (Fed. Cir. 2017) ("[S]tatements made by a patent owner during an IPR proceeding, whether before or after an institution decision, can be . . . relied upon to support a finding of prosecution disclaimer.").[14]

For these reasons, the Court finds that the "most natural[]" reading of the Asserted Claims, which is best "align[ed] with the patent[ee's] description of the invention," *see Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc) (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)), is one does not read on a system treating 650 vines the same way, (*see* Doc. 172-1 at 23 (arguing that the "density" of the moisture sensors does not show association at the plant level)).[15]

### iii. The Requisite Association with Plants

It is axiomatic that a non-moving party, like Plaintiff, "cannot defeat summary judgment

---

[14] This is especially so considering that a moisture sensor can only detect water content no more than six inches away. (Doc. 191 at 409–10, 114:1–115:18.)

[15] What defines "plant level" is context dependent—it may be difficult to define a magic number that is applicable to corn stalks, grape vines, and apple trees alike. At this time, it should suffice to say that "plant level" (or "plant group" level) is most unlikely to mean treating 100 or more plants the same way.

'with conclusory allegations, unsupported assertions, or only a scintilla of evidence.'" *Genuine Enabling Tech.*, 167 F.4th at 1202 (quoting *Traxcell Techs.*, 15 F.4th at 1127–28).

However, many of Plaintiff's arguments appear to assume that a sensor which is "associated with" a group of pixels is automatically "associated with" all the plants in all the pixels. (*See* Doc. 227 at 6; *see also* Doc. 228 at 8 (pointing out this flaw).) With respect to the parties' dispute over the experimental section of Colony 2A, for example, Plaintiff has offered little explanation as to *how* the low yield sensor station is not only associated with dozens of low yield pixels but is further "associated with [all] plants and groups of plants in 'low yield areas.'" (Doc. 227 at 5.) To borrow Plaintiff's own words in front of the PTO, Defendant's decision to irrigate a region "based on inputs from a *set of sensors somewhere in that region* does not [show] dispensing materials with sensors localized to the plant level as required by the element, 'each *sensor associated with . . . particular plants*.'" (Doc. 217-4 at 18–19 (cleaned up) (emphases modified)).

Moreover, undeterred by Defendant's argument that each of its moisture sensors is not "associated with" 650 vines, (*see* Doc. 172-1 at 19–20, 22–24), Plaintiff points to Dr. Greenspan's deposition stating that it is *possible* for "a moisture sensor to be associated with 1,000 plants." (Doc. 185 at 17; Doc. 191 at 412, 117:2–3.) What Plaintiff overlooks, however, is Dr. Greenspan's immediate clarification that, in order to "associate" a single moisture sensor with so many plants over such a large area, a skilled artisan "would have to **presume** that the soil is very similar, that the delivery system is delivering the same amount of water, and that the water content would be fairly similar throughout the area." (Doc. 191 at 413, 118:1–6 (cleaned up) (emphasis added); Doc. 180 at 14 (noting a similar defect in Dr. Greenspan's testimony).) However, an expert's mere assumptions, untethered to the allegedly infringing systems, do not create a genuine dispute of material fact. *See Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1278 (Fed. Cir. 2004) ("It is well settled that an expert's unsupported conclusion on the ultimate issue of infringement is insufficient to raise a genuine issue of material fact, and that a party may not avoid that rule simply by framing the expert's conclusion as an assertion that a particular critical claim limitation is found in the accused device." (citations omitted)). Instead of

sweeping assumptions, Dr. Greenspan "must set forth non-speculative evidence of specific facts," *Cafasso*, 637 F.3d at 1061 (citations omitted); *see also Genuine Enabling Tech.*, 167 F.4th at 1202 (similar), showing that Defendant's moisture sensors are *in fact* "associated with" 650 vines.

The Court has considered all the documentary evidence cited by Plaintiff but nonetheless agrees with Defendant that they do not provide sufficient support for Plaintiff's foregoing assumptions. (*See* Doc. 180 at 14.)

First, Plaintiff points to a graph showing "soil moisture [readings] at *1ft, 2ft, and 3ft*" deep as proof that Defendant is "associating" a moisture sensor station with all the plants in medium yield pixels. (Doc. 227 at 5–6 (capitalizations removed) (emphasis added).)[16]  But this graph merely shows soil moisture as "a function of *soil depth* . . . rather than anything associated with the . . . [plants]." (*See* Doc. 217-4 at 60–61 (citing and distinguishing away U.S. Patent No. 4,545,396 ("Miller") col. 3 ll. 31–34) (original emphasis removed); *see also* Doc. 217 at 5 (suggesting that if the soil moisture sensors in Miller are associated with soil depth, so too are Defendant's moisture sensors).) Indeed, this argument is in tension with Plaintiff's representation to the PTO that placing a moisture sensor within the "'root zone' of some trees" is associated with soil characteristics at various depth rather than associated with the trees. (*See* Doc. 217-4 at 60–61.) Plaintiff must do more than assume—or state in a conclusory manner—that a single moisture sensor station is associated with every plant in a group of pixels. (*See, e.g.*, Doc. 227 at 10–11.)

Second, Plaintiff points to an article, "Klein," which describes an irrigation experiment in one of Defendant's vineyards, and argues it shows Defendant tailoring irrigation for each 15m-by-15m pixel. (Doc. 227 at 8.)[17] A careful examination of Klein shows that while each pixel can be "irrigate[d] differentially," it is due to associating satellite images—rather than moisture sensor data—with each pixel. (Doc. 176-1 at 142–43 ("The area is monitored using satellite imagery that constitutes the input for irrigation requirement analytics.").) Plaintiff has failed to direct the Court's attention to any part of Klein that tethered *moisture sensor* data to each pixel (*i.e.*, land), let alone tethered to the plants within a pixel.

---

[16] The Court could not decipher to what the final "*Id.*" on page 5 of Doc. 227 is referring.

[17] The article appears to describe the experiment at Colony 2A.

Finally, the Court finds it helpful to wrap up the analysis here with a concrete example mentioned in Plaintiff's supplemental brief in opposition. (*See* Doc. 227 at 5.) Colony 2A is a 32-acre vineyard block dedicated to using Teleki 5C to produce Cabernet Sauvignon. (*Id.* at 30.) The experimental section of Colony 2A at issue here has three moisture sensor stations and is further subdivided into 140 15m-by-15m "pixels," totaling 31,500 square meters or 7.784 acres. (*Id.* at 41.) Each station is "associated with" high, medium, or low yield areas, (*id.* at 5; *see also id.* at 41), equivalent to approximately 2.5946 acres per sensor station.

Hall defines a "homogeneous area" as "'a section of the field in which the species of plants, soil type, . . . , and like variables are identical,'" (*id.* at 12 (quoting Hall col. 14 ll. 58–64) (alteration in original)), which may include, for example, a "one-acre area," (Doc. 70-10 at 74; Doc. 94 at 34). All of those criteria for "homogeneous area," per Hall, are met here: Defendant divides up the experimental section of Colony 2A into high, medium, and low yield areas, with a moisture sensor station for approximately every 2.5946 acres; Colony 2A uses Teleki 5C for the production of Cabernet Sauvignon; and Dr. Greenspan has assumed "that the soil is very similar, that the delivery system is delivering the same amount of water, and that the water content would be fairly similar throughout the area." (*See* Doc. 191 at 413, 118:1–6 (cleaned up); Doc. 227 at 12; Doc. 172-1 at 23 n.16.)

Therefore, taking Dr. Greenspan's assumptions as true, Defendant merely controlled "in-block variability," (*see* Doc. 227 at 12), by placing sensors in smaller homogeneous agricultural areas—*i.e.*, an area or a group of pixels with similar soil characteristics, yield, and plant type. This is also consistent with Hall's explicit disclosure of one sensor per one or more acres. These facts and assumptions put Defendant's system within the teachings of Hall (*i.e.*, associating a sensor with a homogeneous agricultural area) rather than the Asserted Claims. (*See* Doc. 172-1 at 23 n.16; Doc. 228 at 8.) Alternatively, the Court may set aside Dr. Greenspan's assumptions as speculative and conclusory, in which case Plaintiff would have little basis for establishing infringement. Either way, Plaintiff fails to prove infringement with respect to Colony 2A.

All in all, Plaintiff has failed to show a genuine factual dispute on whether each of Defendant's moisture sensors is associated with plants *and not* a field, plot, or homogeneous

21

agricultural area.

2. Flow Meters and Pressure Indicators

With respect to the flow meters and pressure indicators, Plaintiff argues that they are "sensors" within the meaning of the patents-in-suit, each of which is "associated with" a plurality of plants. According to Plaintiff, this is because "[t]hey sense and measure a growth condition of the plants—namely water delivered to their associated plants." (Doc. 185 at 18 (citation omitted).) The Court rejects such a strained reading of this claim limitation for the following three reasons.

First, the Court agrees with Defendant that pressure indicators and flow meters are in fact part of the control system. (Doc. 217 at 8.)  Claim 36 of the '810 Patent, for example, is a classic means-plus-functions claim, which includes an "emitting means," a "sensing means," and a "control system means." '810 Patent at col. 8 ll. 47–58. However, as Defendant points out, (Doc. 217 at 8), the specification of the '810 Patent confirms that flow meters are part of the control system, '810 Patent col. 4 ll. 66–69 ("*Flow control 202 includes valves and flow monitors* for letting a predetermined amount of any of the chemicals or water enter the conduit channels under control of control system 200." (emphasis added)); *accord* '834 Patent col. 4 ll. 56–58 (identical); '881 Patent col. 5 ll. 2–5 (identical).[18] Tellingly, Figure 1 of all three patents-in-suit clearly show that the "[c]ontrol [s]ystem" and the "[f]low [c]ontrol" system are distinct from the "[s]ensing" means. The "sensing means," therefore, should not be construed as to include water flow meters, which are already included in the "control means." Doing so anyway would contradict the specifications and potentially create a surplusage problem. *See ERBE Elektromedizin GmbH v. Canady Tech. LLC*, 629 F.3d 1278, 1286 (Fed. Cir. 2010); *PODS, Inc. v. Porta Stor, Inc.*, 484 F.3d 1359, 1366–67 (Fed. Cir. 2007) (Dyk, J.); *Merck & Co. v. Teva Pharms. USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003).

Similarly, claim 20 of the '810 patent is a method claim, which directs a skilled artisan to "associat[e] one or more sensors and emitters with each of the plurality of plants," "us[e] a

---

[18] Both flow meters and pressure indicators appear to fall within the meaning of "flow monitors" for purposes of the instant motion. (*See* Doc. 227 at 14 n.2.)

control system to receive signals from sensors," and then "us[e] the control system to control the emission of the material via the emitters associated with the given plant." '810 Patent col. 11 ll. 9–20. The final step is well-aligned with the specification of the '810 Patent, which confirms that the "flow control [system] includes valves and flow monitors for [disbursing] a predetermined amount of any of the chemicals or water" to the plants. *See id.* at col. 4 ll. 66–69. The "sensors" limitation in the first step, therefore, should be construed to cover something other than flowmeters, which are a part of the flow control system in the final step. Using flowmeters as "feedback inputs," as Plaintiff argues, (*see* Doc. 227 at 14), would not change what the specifications explicitly say is included in the flow control system, nor would it be illogical to treat internal "feedback" loops as a part of the flow control system. Plaintiff, not Defendant, bears the burden of articulating a strong reason to deviate from the plain text of the specifications but has failed to do so.

Second, and relatedly, many of the sensors mentioned in the specifications measure a *naturally occurring* plant/field condition, subject to some indirect human influence. For example, photodetectors and temperature sensors are related to weather conditions in the field. *See* '834 patent col. 5 ll. 38–42. Likewise, soil nutrient and moisture sensors detect local field conditions. *Id.* at col. 5 ll. 39–40. Moreover, leaf wetness detectors, *id.* at col. 4 ll. 43–44, and pH probes, *id.* at col. 8 ll. 9–11 ("Sugar accumulation in grape bunches can be determined . . . [using] pH probes."), are used to detect plant conditions.

Water flow meters and pressure indicators, however, are not analogous to the aforementioned sensors. For one, they measure the internal conditions of a wholly artificial irrigation system. (*See* Doc. 180 at 13; Doc. 217 at 10 ("[A]t most[,] flow meters and pressure sensors are 'associated with' the irrigation system.").) For another, sensors like photodetectors provide data which can be used by the control system to *make* an irrigation decision, whereas water flow meters—as a part of the "flow control" system—merely ensure the delivery of adequate water *after* an irrigation decision has been made by the control system. (Doc. 217 at 8–9.) This distinction is clearly supported by the specifications, which state that the "flow control [system] includes valves and flow monitors for letting a *predetermined* amount of . . . water" to

23

the plants. *See, e.g.*, '810 Patent col. 4 ll. 66–69 (emphasis added). Using flowmeters as "feedback inputs," as Plaintiff suggests, (Doc. 227 at 14), would not change their fundamental purpose or function—that is, ensuring the delivery of sufficient water after the irrigation decision (*e.g.*, a particular plant needs one liter of water) has been made, (*see* Doc. 176-1 at 143 ("The analytics output is transmitted to a sensor network that dispense the water accordingly.")).

Third, Plaintiff represented to the PTO that "the patents consistently teach, and their claims require, localizing the delivery of materials to one or more particular plants—where sensors are associated with the plants, so that accurate delivery of needed materials can be tied to the granular, real-time needs of the plant(s)." (Doc. 217-4 at 19 (citations omitted) (original emphasis removed).) Consequently, even accepting Plaintiff's strenuous argument that measuring the water flow rate is tantamount to measuring a "plant growth condition," (Doc. 185 at 18), a flowmeter is still incapable of detecting the actual, "real-time needs" of the plants, as Defendant correctly points out, (Doc. 180 at 13 (noting that flow meters do not actually sense plant growth); Doc. 217 at 9 (arguing that "the irrigation system is dumb as to the existence of or conditions of any plants")). Put differently, simply directing the control system to use a flowmeter to ensure the delivery of, say, one liter of water to a particular plant would not result in an irrigation process that is "*tied to*" *the actual*, "*real-time needs* of the plant," the intended objective of the Asserted Claims. Something more than the use of flowmeters is required.

In short, the Court finds that the more natural reading of the Asserted Claims—in light of the specifications and other evidence—is to classify flow meters and pressure indicators as a part of the control system limitation. Accordingly, the Court rejects Plaintiff's contention that Defendant's use of water flow meters and pressure indicators satisfy the "sensors" "associated with" plants limitation.

All in all, the Court **FINDS** that no reasonable jury could conclude that Defendant's systems infringe the Asserted Claims in light of the Court's claim construction order, the subsequent clarifications above, and the factual record presented by the parties. Accordingly, the Court **GRANTS** Defendant's motion for summary judgment for noninfringement. (Doc. 172.)

///

24

**B. Patent Eligibility**

Having considered the parties' extensive briefing, the wording of the Asserted Claims, the specifications, and the record, the Court concludes—under step one of the *Mayo/Alice* test—that the Representative Claims[19] are directed to the abstract idea of providing water, nutrients, or chemicals[20] to each plant based on (sensor and external) data, and not a specific technological improvement to irrigation systems. The Court further finds that the Asserted Claims recite nothing more than generic components and technologies arranged in a straightforward and logical manner, devoid of any "inventive concept" under *Alice* step two. As a result, Defendants are entitled to summary judgment on the issue of patent ineligibility; and neither the law of the case doctrine nor any reliance interest precludes the Court from departing from prior findings in the MTD Order.

1. Step One

"At *Alice* step one, [the Court] must determine whether the claims at issue are directed to patent-ineligible subject matter, here, an abstract idea." *Broadband iTV, Inc. v. Amazon.com*, Inc., 113 F.4th 1359, 1367 (Fed. Cir. 2024), *cert. denied*, 145 S. Ct. 1924 (2025). This Court has identified—based on Federal Circuit precedents—several interrelated, "well-settled indicators" for assessing whether the claims are "directed to" an abstract idea. *See Beteiro, LLC v. DraftKings Inc.*, 104 F.4th 1350, 1355 (Fed. Cir. 2024). As relevant here, they may include: (a) whether the claims recite generic steps for detecting, receiving, processing, managing, sending, or analyzing information, *see id.* at 1355–56; *PersonalWeb*, 8 F.4th at 1315–18; (b) whether "the

---

[19] It is well-established that "a district court 'may treat a claim as representative . . . if the patentee does not present any meaningful argument for the distinctive significance of any claim limitations not found in the representative claim or if the parties agree to treat a claim as representative.'" *Mobile Acuity Ltd. v. Blippar Ltd.*, 110 F.4th 1280, 1290 (Fed. Cir. 2024) (quoting *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018)); *see also Endo Pharms. Inc. v. Teva Pharms. USA, Inc.*, 919 F.3d 1347, 1353 n.3 (Fed. Cir. 2019) ("The parties did not argue the claims separately, so they rise or fall together with representative claim 1."). Here, Plaintiff argues claims 2, 4, 20, 22, and 36 of the '810 Patent as a group, argues claims 1, 6, 7, 10, and 15 of the '834 Patent as a group, and further argues claim 10 of the '834 Patent separately. (*See generally* Doc. 231-2.) However, Plaintiff explicitly argues that claim 2 of the '810 Patent is *not* representative. (Doc. 231 at 19.) The Court therefore designates claims 1 and 10 of the '834 Patent and claim 20 of the '810 Patent as the "Representative Claims" for purposes of § 101 analysis.

[20] For simplicity, the Court will only refer to water and omit references to nutrients and other chemicals.

*claims* are drafted using *largely* (if not entirely) result-focused functional language," "containing no specificity about how the purported invention achieves those results[,]" *Beteiro*, 104 F.4th at 1356 (emphases added); (c) whether the claims solve a technological problem through a technological solution or improvement, *Broadband iTV*, 113 F.4th at 1368–69, or through an abstract concept implemented via generic processes and machineries, *see Yu v. Apple Inc.*, 1 F.4th 1040, 1043 (Fed. Cir. 2021); (d) the breadth of the claims, *ChargePoint*, 920 F.3d at 768–69; and (e) whether the claims can be "persuasively analogize[d]" to an ordinary or long-standing human activity which can be completed without the use of modern technologies, *see Beteiro*, 104 F.4th at 1356; *In re Sturgeon*, 839 F. App'x 517, 519 (Fed. Cir. 2021) (Dyk, J.) (explaining that the abstract idea exception includes, among other things, "mental processes" and "methods of managing human activity" or behavior). "Although the specification is relevant to the construction of the claims, reliance on the specification must always yield to the claim language" when determining whether the claims are directed to an abstract idea. *Trs. of Columbia Univ. in City of New York v. Gen Digital Inc.*, 169 F.4th 1320, 1329 (Fed. Cir. 2026) (Dyk, J.) (citations and quotation marks omitted).

### i. Analogy to a Longstanding Human Activity

To begin, the Court agrees with Defendant that the Asserted Claims are directed to the abstract idea and practice of watering plants based on plant, field, and weather conditions. (*See* Doc. 221-1 at 18 (contending that the Asserted Claims "are directed to the abstract idea of providing water to plants based on data"); *id.* at 7 (similar); *id.* at 14 (noting that Gallo personnel are responsible for "reading sensors in a field in a field, considering weather data, and using their own judgment to schedule when to water an area"); Doc. 232 at 9 (pointing out that the patents-in-suit are directed to the abstract idea of "giving different amounts of water to different plants"); *see also* Doc. 180 at 6 ("For millennia, people have been checking the weather, looking at the vines, and deciding whether, when[,] and how much to water[.] . . .").) Indeed, many members of the public engage in such an activity every weekend—look at the weather, the soil, and the specific plant at issue when deciding whether to add more water or nutrients. It is called gardening. That Defendant can "persuasively analogize [the asserted] patent claims to

longstanding" "fundamental practices . . . [is a] clue that the claims may be abstract and unpatentable." *Beteiro*, 104 F.4th at 1356 (cleaned up).

The MTD Order accepted Plaintiff's argument that the patents-in-suit are directed to technological improvements because they "addressed the soil variability problems by selectively providing different amounts of water to different plants." (Doc. 31 at 16 (cleaned up); Doc. 231 at 10 (arguing the same); *see also* Doc. 70-10 at 73 (representing to the PTO that a "localized approach to dispensing of materials" at "the plant level" "is not disclosed in the prior art")).) However, the MTD Order failed to recognize that the alleged "solution" to the soil variability problem—providing different amounts of water to different plants based on data—"is the abstract idea itself." *See Yu*, 1 F.4th at 1044. This further confirms that the patents-in-suit are directed to an abstract idea.

Plaintiff points to Judge Reyna's opinion in *Broadband iTV* and argues that "the *Alice* inquiry is not a prior art search and [that] it is not enough to merely trace the invention to some real-world analogy like watering plants." (Doc. 231 at 15 (citation and quotation marks omitted).) Though an analogy is not dispositive, it is still a very useful and important "clue" in many situations. *Beteiro*, 104 F.4th at 1356. Indeed, just six days after *Broadband iTV*, Judge Reyna issued another precedential opinion explaining when it is permissible to look to real-world analogies:

> We characterized the claims in *Yu* as being "directed to the abstract idea of taking two pictures (which may be different at different exposures) and using one picture to enhance the other in some way." In *Yu*, there was no dispute that "the idea and practice of using multiple pictures to enhance each other has been known by photographers for over a century." Stated differently, in *Yu*, we took note of *a longstanding, fundamental practice* in photography, *without conducting a prior art search*.

*Contour IP Holding LLC v. GoPro, Inc.*, 113 F.4th 1373, 1380 (Fed. Cir. 2024) (internal citations omitted) (emphases added). Because the defendant in *Contour IP* did not argue that the claims-at-issue implemented a process that was analogous to "a long-known or fundamental practice" in the relevant art, the Federal Circuit rejected the argument that *Yu* controlled. *Id.* Here, however, like *Yu*, the abstract idea *is* a longstanding, fundamental practice which has been known for

centuries—and the Court need not conduct a prior art search before concluding so. As such, *Yu* is more on point here than *Broadband iTV* and *Contour IP*. The Court accordingly finds no clear reason to ignore Defendant's attempt to analogize the Asserted Claims to pre-modern farming and gardening practices.[21]

### ii. Result-Focused Functional Language and Generic Technologies

The Court now turns to the question of whether the Asserted Claims are "drafted using *largely* (if not entirely) result-focused functional language," "containing no specificity about how the purported invention achieves those results." *Beteiro*, 104 F.4th at 1356 (emphasis added); *see also Corning v. Burden*, 56 U.S. (15 How.) 252, 268 (1853) ("It is for the discovery or invention of some practical method or means of producing a beneficial result or effect, that a patent is granted, and not for the result or effect itself."). Beginning with claim 1 of the '834 Patent, it describes an apparatus comprising a "conduit" with "an outlet" for delivering water or nutrients to the vegetation; a "central controller [that] is responsive to external data for controlling material dispersing from one or more emitters;" and a sensor "associated with . . . the vegetation, wherein signals from [the] sensors are transmitted to a central control system and are used to control conveyance of the material to the vegetation." '834 Patent col. 8 l. 62–col. 9 l. 10. Claim 10 of the '834 Patent further specifies that the "external data" in claim 1 includes "evapotranspiration coefficient." *Id.* at col. 10 ll. 5–6. Claim 20 of the '810 Patent recites a "method comprising: associating one or more sensors and emitters" with plants; "using a control system to receive signals from sensors associated with a given plant;" and then "using the control system to control the emission of the material." '810 Patent col. 11 ll. 9–20.

The Court agrees with Defendant, (Doc. 221-1 at 15–16), that the claim limitations are heavily reliant on functional language, and that they do not "sufficiently describe how to achieve th[e desired] results in a non-abstract way," *Int'l Bus. Machines Corp. v. Zillow Grp., Inc.*, 50

---

[21] In *Ollnova Techs. Ltd. v. Ecobee Techs. ULC*, ___ F.4th ____, ____, No. 2025-1045, 2026 WL 1596936, at *13–14 (Fed. Cir. June 4, 2026), the Federal Circuit rejected the patent challenger's "human-driven analogy" for failure to account for the claimed technological *improvements*. For additional reasons set forth in more detail below, the Asserted Claims here are not directed to a specific, engineering improvement over an existing irrigation system. *See Gen Digital*, 169 F.4th at 1328–29; *see also Athena Diagnostics, Inc. v. Mayo Collaborative Servs., LLC*, 915 F.3d 743, 750 (Fed. Cir. 2019).

28

F.4th 1371, 1381 (Fed. Cir. 2022) (citation and quotation marks omitted); *Free Stream Media Corp. v. Alphonso Inc.*, 996 F.3d 1355, 1363 (Fed. Cir. 2021) ("[T]he claim itself must identify how that functional result is achieved by limiting the claim scope to structures specified at some level of concreteness, in the case of a product claim, or to concrete action, in the case of a method claim." (citation and quotation marks omitted)). For example, the Asserted Claims and the specifications do not provide *any* explanation or detail as to how to "associate" a plant with a sensor, the purported technological improvement. (*See* Doc. 231 at 20.) Similarly, the Asserted Claims do not include detailed steps as to *how* to "control conveyance of the material to the vegetation." Likewise, the Asserted Claims do not require a skilled artisan to process or analyze external data in a particular manner, just that the control system is *somehow* controlling water flow "in response to the external data." The result-focused functional language of the claim limitations simply "do not delineate steps through which the [relevant] technology achieves" a technological improvement, *see Recentive Analytics, Inc. v. Fox Corp.*, 134 F.4th 1205, 1213 (Fed. Cir. 2025) (Dyk, J.), nor do they provide "any clear description of how these [result-focused functional] processes are performed," *see United Servs. Auto. Ass'n v. PNC Bank N.A.*, 139 F.4th 1332, 1338 (Fed. Cir. 2025), *cert. denied sub nom. United Servs. Auto. Assn. v. PNC Bank*, No. 25-853, 2026 WL 1377174 (U.S. May 18, 2026).

The specifications "do[] not disclose any *improvement to the underlying components* to enable" a skilled artisan to achieve the desired result or function either. *See US Pat. No. 7,679,637 LLC v. Google LLC*, 164 F.4th 1373, 1378 (Fed. Cir. 2026) (emphasis added). Notably, the specifications state that "any type of control system can be used" and that "data processing and acquisition can be performed . . . and used in any manner known in the art." *E.g.*, '834 Patent col. 4 ll. 54–55, col. 5 ll. 16–19. The specifications also explain that "the system can control application of materials according to methods described in academic papers" and that "[p]ublicly available data . . . can be used to provide rules and guidelines for controlling material dispensing according to the system of the present invention." *E.g.*, *id.* at col. 5 ll. 22–35. Nor is there anything in the specifications suggesting that the sensors employed are not conventional; if anything, "the deployment of the sensors is very simple," and some of the "sensors can be

29

arbitrarily set at any point." *See, e.g.*, *id.* at col. 5 ll. 36–39; *Beteiro*, 104 F.4th at 1358 ("Where, as here, the specification 'describes the components and features listed in the claims generically,' it 'support[s] the conclusion that these components and features are conventional.'" (quoting *Weisner v. Google LLC*, 51 F.4th 1073, 1083–84 (Fed. Cir. 2022)) (alteration in original)). In fact, the named inventor explains that he did not invent a new sensor and that his invention uses "sensors of the type [he] was placing in [his] backyard." (Doc. 232-1 at 4–5 (quoting Doc. 221-5 at 13).) Plaintiff also concedes that the named inventor did not "improve things like signal transmission or emitter function." (Doc. 231 at 14.)

The Court therefore agrees with Defendant that the Asserted Claims recite little more than "run of the mill components"—*i.e.*, generic sensors, control systems, and emitters—performing their "expected" functions. (*See* Doc. 221-1 at 16; Doc. 232 8–9.) "[T]he fact that the claims recite a number of generic elements—including [a sensor, a controller, and a water emitter]—does not shift [the claims'] focus away from the core [abstract] idea" of watering each plant differently based on data. *See Weisner*, 51 F.4th at 1083. As Justice Breyer once explained, a patent claim is not directed to a patentable subject matter merely because it recites "a series of steps, *e.g.*, Step 1: gather data; Step 2: read a number; Step 3: compare the number with the norm; Step 4: act accordingly." *Lab'y Corp. of Am. Holdings v. Metabolite Lab'ys, Inc. (LabCorp)*, 548 U.S. 124, 137 (2006) (Breyer, J., dissenting from dismissal of certiorari as improvidently granted).

Plaintiff, on the other hand, argues that the Asserted Claims are "directed to a specific, non-abstract device," (*see* Doc. 231 at 14 (citation and quotation marks omitted)),[22] an argument which requires a showing that the claims embody a specific physical improvement to the relevant technology, *PowerBlock Holdings, Inc. v. iFit, Inc.*, 146 F.4th 1366, 1373 (Fed. Cir. 2025) (finding a claim to be directed to a specific, non-abstract machine because it is "sufficiently

---

[22] In *US Synthetic Corp. v. Int'l Trade Comm'n*, the Federal Circuit stated: "Rather, the claims are directed to a specific, non-abstract composition of matter—a PDC—that is defined by its constituent elements." 128 F.4th 1272, 1282 (Fed. Cir. 2025). Yet, Plaintiff states the following in its brief: "*see also US Synthetic Corp. v. Int'l Trade Comm'n*, 128 F.4th 1272, 1282 (Fed. Cir. 2025) ('directed to a specific, non-abstract' apparatus 'that is defined by its constituent elements')." (Doc. 231 at 6 (footnote and emphasis removed).) That opinion was clearly and solely about a composition of matter—the word apparatus was not mentioned once.

focused on a *specific* mechanical *improvement*" to the relevant technology (emphases added)). The Court is not persuaded.[23] For one, much like how a "do-it-on-a-computer" patent inevitably calls for the use of a processor, a memory device, a display, and an input device, *see Alice*, 573 U.S. at 226, *any* patent reciting the use of *any* sensor-driven irrigation system must use at least a sensor, a controller, a water pipe, and a water emitter at a high level of generality. Neither amounts to a sufficiently specific "device" as to survive the *Mayo/Alice* test. *See Realtime Data LLC v. Array Networks Inc.*, 537 F. Supp. 3d 591, 617 (D. Del. 2021), *aff'd*, No. 2021-2251, 2023 WL 4924814 (Fed. Cir. Aug. 2, 2023); *see also Alice*, 573 U.S. at 226 (holding that the use of generic computer components merely links the abstract idea to a particular technological environment). For another, the specifications and the Representative Claims do not explain or show how the use of a ***single*** sensor—per the conventional approach[24]—is physically, mechanically, or structurally different from, say, claim 1 of the '834 Patent, which also recites the use of "***one*** or more sensors." *See* '834 Patent col. 9 ll. 5 (emphasis added). There can be no physical improvement without a physical distinction between the Representative Claims and the prior art.[25]

     Plaintiff further contends that associating a sensor with a plant amounts to a novel,

---

[23] The MTD Order relied on the fact that the patents-in-suit "include elements of physical technology," (Doc. 31 at 18), without sufficiently scrutinizing whether "the recited physical components merely provide a generic environment in which to carry out the abstract idea," *In re TLI Commc'ns LLC Pat. Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016); *see also Solutran, Inc. v. Elavon, Inc.*, 931 F.3d 1161, 1169 (Fed. Cir. 2019) (explaining that the machine-or-transformation test is neither a necessary nor a sufficient condition for patent eligibility); *Beteiro*, 104 F.4th at 1359 (noting "many post-*Alice* cases holding that the physicality of what is claimed is not by itself enough to exempt the claims from being directed to an abstract idea" (citations and quotation marks omitted)).

[24] There is no doubt that countless prior art references teach the use of a single moisture sensor to direct irrigation accordingly.

[25] Relatedly, the Representative Claims only require the use of "one or more" emitters, *see, e.g.*, '834 Patent col. 9 ll. 3–4, which may be satisfied by using a single "dumb" sprinkler that irrigates multiple plants the exact same way. "In other words, the claims are satisfied even when there is no selective" irrigation to different plants and even when the soil variability problem is not addressed. *Gen Digital Inc.*, 169 F.4th at 1331. "It cannot be said that the claims are directed to a technological improvement when nothing in the claims *requires* [what is] *necessary*" to implement selective irrigation, the purported technological solution. *Id.* (emphases added); *see also GREE, Inc. v. Supercell Oy*, 855 F. App'x 740, 743 (Fed. Cir. 2021) ("Moreover, the claims do not recite the ability to move *multiple* objects simultaneously; rather, the claims call for moving '*one or more* of the plurality of associated objects as a group.'" (emphases modified)).

31

technological improvement to irrigation technology. (*See* Doc. 231 at 20.) Yet, the Asserted Claims and the specifications do not provide *any* explanation or detail on how to "associate" a plant with an ordinary sensor. Nor do they provide any meaningful detail regarding how to process and analyze sensor data or how to direct irrigation thereafter, except that those steps can be completed in a conventional manner. *See, e.g.*, '834 Patent col. 4 ll. 54–55, col. 5 ll. 16–35. The "only plausibl[e]" explanation is that "the patent applicant drafted the specification[s] understanding that a person of ordinary skill in the art knew what [a sensor] was, how to [associate it with a plant], and that using it for the purposes disclosed in the patent[s] was routine, conventional, and well-understood." *See Beteiro*, 104 F.4th at 1358.[26] Simply planting a generic moisture sensor right beside every tree and "associating" ordinary sensor data with the tree may not involve or reflect an engineering solution or improvement, certainly not when all the subsequent steps—including data analysis, process control, and water delivery—are completed in a conventional, generic, and logical manner.

Finally, the briefs and Plaintiff's representation to the PTO make clear that the principal difference between the state of the prior art and the Asserted Claims is that the latter require a skilled artisan to obtain and consider sensor data for each plant rather than an entire plot of land. (*See, e.g.*, Doc. 217-4 at 17–22, 60–64; Doc. 217 at 9; Doc. 70-10 at 73.) That "the claimed advance over the prior art" merely requires a skilled artisan to take a conventional sensor-driven

---

[26] Plaintiff's argument that it is impermissible to look at conventionality at *Alice* step one, (Doc. 231 at 15), is plainly incorrect. First, Plaintiff contends that "*Broadband iTV* . . . acknowledged that 'allowing a conventionality analysis at step one' was potentially problematic." (*Id.* (quoting *Broadband iTV*, 113 F.4th at 1369).) But *Broadband iTV* explicitly states that "it may be *necessary* to analyze conventionality at step one as well as step two, such as to determine whether a claim is directed to a longstanding or fundamental human practice or to determine what the patent asserts is the claimed advance over the prior art." 113 F.4th at 1369 (citations omitted) (emphasis added); *see also CareDx, Inc. v. Natera*, Inc., 40 F.4th 1371, 1379 (Fed. Cir. 2022) ("[A]s the district court recognized, we have repeatedly analyzed conventionality at step one as well." (collecting cases)). Here, the question of conventionality helps the Court to assess whether the claims are directed to a technological improvement or an abstract idea under *Alice* step one. Second, contrary to Plaintiff's brief, (Doc. 231 at 15), neither *PowerBlock* nor *Diehr* even used the word "impermissible." *PowerBlock* merely reiterated the well-established principle that courts should not *wholly* "ignore limitations . . . *merely because* they can be found in the prior art." 146 F.4th at 1373 (citation and footnote omitted) (emphasis added). That is because a combination of conventional components could, in some circumstances, give rise to a finding that a claim is directed to a specific technological improvement, as in *PowerBlock*. *See id.* ("Here, claim 1 passes muster at *Alice* step one, as it is sufficiently focused on a *specific* mechanical *improvement* to selectorized dumbbell weight stacking." (emphases added)).

32

irrigation system and *somehow* apply it on a plant-by-plant basis is another telltale sign that the Asserted Claims are directed to the abstract idea of watering each plant differently based on data. *See Contour IP*, 113 F.4th at 1379 (citations and quotation marks omitted).

In short, the Court finds that the Representative Claims and the specifications are filled with descriptions of desirable outcomes, result-focused functional language, and known irrigation concepts and technologies, all of which suggest that the claims are directed to an abstract idea rather than an engineering improvement. *See PNC Bank*, 139 F.4th at 1337 ("The addition of a handheld mobile device to carry out these routine steps does not make the claim any less abstract. The claim is drafted in a result-oriented fashion, without the requisite specificity needed to provide a non-abstract technological solution.").

### iii. Claim Scope

The broad scope of the Representative Claims—a natural consequence of result-focused functional language—further indicates that they may be directed to an abstract idea. *See ChargePoint*, 920 F.3d at 769 ("The breadth with which this claim is written further indicates that the claim is directed to the abstract idea of communication over a network for device interaction." (citation omitted)); *Constellation Designs, LLC v. LG Elecs. Inc.*, 174 F.4th 888, 902–03 (Fed. Cir. 2026) (considering the breadth of the claim); *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015) (explaining that "preemption may signal patent ineligible subject matter[] . . ."); *see also In re BRCA1- & BRCA2-Based Hereditary Cancer Test Pat. Litig.*, 774 F.3d 755, 763–64 (Fed. Cir. 2014) (Dyk, J.) (explaining that the sheer breadth of the claims raises preemption concerns). Consider, for example, *Wyeth v. Stone*, which involved a patent that described an inventor's machine for cutting ice. 30 F. Cas. 723 (C.C.D. Mass. 1840) (No. 18,107). Justice Story held that one of the claims effectively "claim[ed] an exclusive title to the art of cutting ice by means of any power, other than human power." *Id.* at 727. He reasoned that "[s]uch a claim is utterly unmaintainable" because "[i]t is a claim for an art or principle in the abstract, and not for any particular method or machinery, by which ice is to be cut." *Id.* As the Federal Circuit explained in *Interval Licensing LLC v. AOL, Inc.*, the inventor in *Wyeth* "lost a claim that encompassed all solutions for achieving a desired result" because it was "drafted in

33

such a result-oriented way that [it] amounted to encompassing the 'principle in the abstract' no matter how implemented." 896 F.3d 1335, 1343 (Fed. Cir. 2018).

Here, too, the Court agrees with Defendant, (*see* Doc. 232 at 9), that the "broad claim language covers all manners and ways of optimizing [an irrigation system] based on one of a limited number of known [methods to obtain plant-specific data]—[planting a sensor right beside a plant and somehow 'associating' it with the plant]—and one of a limited number of known [ways to obtain macro-level data]"—through an external source, *see Constellation Designs*, 174 F.4th at 902–03. The substantial risk of preemption further confirms the Court's understanding that the Representative Claims are directed to an abstract idea.

### iv.  Automation and Mental Steps

Finally, the Court turns to Defendant's argument that the Asserted Claims may not read on an employee's mental considerations of data when making irrigation-related decisions; and that the Asserted Claims are not directed to an improvement in automation because they read on Defendant's substantially manual systems. (Doc. 221-1 at 13–14, 16–17.) Plaintiff, in response, argues that an improvement in automation does not necessarily require full automation, that Defendant's systems are in fact automatic, and that the Asserted Claims recite an improvement to data analysis. (Doc. 231 at 231 at 9–10, 16–17.)

The Court finds it unnecessary to definitively resolve the question of how much mental consideration and manual labor is too much as to render the Asserted Claims ineligible under § 101, for the Federal Circuit has expressly held that claims which "focus on [the] 'mere automation of manual processes'" or mental activities in a generic manner are directed to an abstract idea. *PersonalWeb*, 8 F.4th at 1318 (quoting *Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1055 (Fed. Cir. 2017)); *see also Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1365 (Fed. Cir. 2020) (holding claims abstract where "[t]he only improvements identified in the specification are generic speed and efficiency improvements inherent in applying the use of a computer to any task"). Though the Court agrees with Plaintiff to the extent that not all Asserted Claims require a perfect level of automation, per the Court's claim construction

34

order, (Doc. 231 at 10 (citing Doc. 94 at 43–45)),[27] the specifications do not provide meaningful engineering details regarding the purported improvement to process control and automation, *WhitServe LLC v. Dropbox, Inc.*, 854 F. App'x 367, 372 (Fed. Cir. 2021) ("The specification does not, however, explain the technological processes underlying the purported technological improvement."); and any purported improvement to automation not reflected in the Asserted Claims is simply irrelevant, *see GoTV Streaming, LLC v. Netflix, Inc.*, 166 F.4th 1053, 1061 (Fed. Cir. 2026) ("[O]nly features that are claimed, not unclaimed details that appear in the specification, can supply something beyond . . . an abstract idea and sufficient to render the claim eligible. . . .").

The Court also finds no evidence of any technological improvement to data analysis; and the so-called "counterexample[]" cited and quoted by Plaintiff actually undermines its argument. (Doc. 231 at 17.) In *Adasa Inc. v. Avery Dennison Corp.*, the Federal Circuit held that claim 1 at issue there was not directed to "a mere mental process, but a hardware-based data structure focused on *improvements* to the technological *process by which that data is encoded*." 55 F.4th 900, 909 (Fed. Cir. 2022) (emphases added). In contrast, the specifications here do not recite any technological improvement to data processing. *See, e.g.*, '834 Patent col. 5 ll. 16–35 (explaining that data analysis may be performed in accordance with known methods); *Interval Licensing*, 896 F.3d at 1345 (explaining that a patent is not directed to a technological solution when it does not teach a skilled artisan how to create the improved system).[28]

---

[27] The Court finds no need to disturb that determination to resolve the instant motions for summary judgment.

[28] Nor do the Representative Claims recite a *specific action* to be performed in response to a *specific* piece of information. *See In re Zunshine*, 816 F. App'x 477, 479 (Fed. Cir. 2020) ("[T]he claims [in *Vanda Pharms. Inc. v. W.-Ward Pharms. Int'l Ltd.*,] were patent eligible because they were directed to 'a *specific* method of treatment for *specific* patients using a *specific* compound at *specific* dose to achieve a *specific* outcome.'" (quoting 887 F.3d 1117, 1121, 1136 (Fed. Cir. 2018)) (emphases in original)). Rather, the Asserted Claims merely recite the use of any control system to disburse water to any plant in an undefined manner, based on the unspecified results of some non-specific data analysis. Such a vague "act-on-the-data-accordingly" step amounts to nothing more than a "token," "purely conventional" "post-solution activity," which is insufficient to "transform an unpatentable principle into a patentable process." *See Mayo*, 566 U.S. at 82, 84 (Breyer, J.) (cleaned up); *LabCorp*, 548 U.S. at 125 (Breyer, J., dissenting from dismissal of certiorari as improvidently granted) ("Step 1: gather data; Step 2: read a number; Step 3: compare the number with the norm; Step 4: act accordingly."); *In re Bd. of Trs. of Leland Stanford Junior Univ.*, 989 F.3d 1367, 1371, 1375 (Fed. Cir. 2021) (holding that non-specific actions like "providing the determined drug in response to a request" from the computer add nothing of significance to an ineligible

35

Ultimately, the Court finds that the Asserted Claims are directed to the abstract idea of irrigating each plant differently using data. This conclusion is supported by the fact (a) that "the claims are drafted using largely (if not entirely) result-focused functional language," *Beteiro*, 104 F.4th at 1356, (b) that the claims can be persuasively analogized to a fundamental pre-modern practice, *see GoTV*, 166 F.4th at 1065, and (c) that the breadth of the claims gives rise to substantial preemption concerns, *ChargePoint*, 920 F.3d at 769; *Constellation Designs*, 174 F.4th at 902–03. This conclusion is further supported by the absence of any engineering improvement to irrigation technology: the Asserted Claims merely call for a skilled artisan to start with a conventional irrigation system, obtain more data points (*e.g.*, one data point per plant rather than per field, the crux of the abstract idea) using generic sensors, and then complete all the subsequent steps like data analysis and water delivery in a generic but non-specific manner. *See Broadband iTV*, 113 F.4th at 1367 ("The step one inquiry often turns to the question of what . . . [i]s the claimed advance over the prior art." (citing *Yu*, 1 F.4th at 1043)). For all of these reasons, the Court concludes that, under *Alice* step one, the claims are directed to the abstract idea itself rather than an engineering improvement to irrigation technology.

## 2. Step Two

At *Alice* step two, the Court undertakes "a search for an inventive concept—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [abstract idea] itself." *Alice*, 573 U.S. at 217–18 (cleaned up). This requires the Court to "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* at 217 (quoting *Mayo*, 566 U.S. at 79–80). However, the Court is mindful that the "additional elements[] . . . must be more than well-understood, routine, conventional activity." *Ollnova*, 2026 WL 1596936, at *8 (citation and quotation marks omitted); *ChargePoint*, 920 F.3d at 773 (same). The Court is also mindful that *Alice* step two "is a question of law that may be informed by underlying factual determinations, such as whether a claim limitation or combination of limitations is well-understood, routine, and

solve-an-algorithm-on-a-generic-computer claim).

36

conventional." *Beteiro*, 104 F.4th at 1357 (cleaned up).[29]

As alluded to above, the Asserted Claims merely recite ordinary irrigation technologies at a high level of generality, without a meaningful degree of particularly and "without describing how any of [the result-orientated] functions are performed." *Int'l Bus. Machines*, 50 F.4th at 1382. The specifications, too, do not suggest any "fundamental change to how any of the technology functions." *PNC Bank*, 139 F.4th at 1339; *see also Weisner*, 51 F.4th at 1083–84 ("As the district court appropriately determined, the specification describes the components and features listed in the claims generically, supporting the conclusion that these components and features are conventional, not inventive concepts in the patents."). For example, the specifications do not suggest that the sensors "associated with plants" gather a fundamentally different kind of data, nor do they suggest that the data must be analyzed or processed in a manner that is different from what is widely known in the art. That, combined with the specifications' almost-complete silence regarding *how* to "associate" a sensor with a plant, "can only plausibly mean that . . . a person of ordinary skill in the art knew . . . how to include [a sensor in an irrigation system], and that [do]ing it for the purposes disclosed in the patent[s] was routine, conventional, and well-understood." *See Beteiro*, 104 F.4th at 1358.

Nor is there "anything inventive in the ordered combination of elements[,]" for all the elements "are organized in an expected way"—place a sensor right next to a plant, receive sensor data and "associate" it with the plant, obtain external data, analyze all the data, and then use any control system to *somehow* direct irrigation accordingly. *See Trinity Info Media*, 72 F.4th at 1366; *see also LabCorp*, 548 U.S. at 125 (Breyer, J., dissenting from dismissal of certiorari as improvidently granted). "[T]he asserted claims add nothing inventive because they merely recite standard, well-known techniques in a logical combination" to implement the abstract idea. *See CareDx*, 40 F.4th at 1380.

Plaintiff, however, faults Defendant for its purported failure to "discuss whether the

---

[29] The Court agrees with Defendant, (*see, e.g.*, Doc. 232-2 at 14), that the ultimate question at *Alice* step two is whether there is "an inventive concept that renders a claim 'significantly more' than an abstract idea," which is a question of law, *Beteiro*, 104 F.4th at 1357. As such, Plaintiff's assertions of "inventive concept" do not create a dispute of fact.

inventive concept of addressing soil variability problems, by selectively providing different amounts of water to different plants or plant areas within a field or vineyard, was inventive, or whether it was 'well-understood, routine, or conventional.'" (Doc. 231 at 19 (citations omitted).) This criticism is nothing more than a red herring. For one, Defendant has repeatedly argued that giving different amounts of water to different plants based on (external and sensor) data is an abstract idea, (*see, e.g.*, Doc. 221-1 at 14, 18; Doc. 232 at 9)—and an abstract idea can *never* supply the requisite "inventive concept" under *Mayo/Alice* step two, *Simio, LLC v. FlexSim Software Prods., Inc.*, 983 F.3d 1353, 1364 (Fed. Cir. 2020); *AI Visualize, Inc. v. Nuance Commc'ns, Inc.*, 97 F.4th 1371, 1379 (Fed. Cir. 2024). For another, the Court agrees with Defendant that associating a sensor with a plant is almost a "necessary part" of the abstract idea and is "a feature that merely implements an abstract idea." (Doc. 232 at 9.) It cannot supply the requisite "inventive concept" because it is not capable of "transform[ing] the claims into something 'significantly more' than a claim on the patent-ineligible concept itself." *See Broadband iTV*, 113 F.4th at 1370 (citation and quotation marks omitted); *People.ai, Inc. v. Clari Inc.*, No. 2022-1364, 2023 WL 2820794, at *11 (Fed. Cir. Apr. 7, 2023) ("Those steps are all necessary parts of the abstract idea. . . . They cannot supply the inventive concept."); *CLS Bank Int'l v. Alice Corp. Pty.*, 717 F.3d 1269, 1283, 1287 (Fed. Cir. 2013) (en banc) (plurality) (noting that the "necessary" additional steps in *Bilski* and *Mayo* added nothing of practical significance to a patent ineligible concept), *aff'd*, 573 U.S. 208 (2014); *cf. Boom! Payments, Inc. v. Stripe, Inc.*, 839 F. App'x 528, 532–33 (Fed. Cir. 2021) ("[T]hese steps only explicate the necessary steps of an escrow arrangement and do not change the direction of the claims."). Furthermore, there is nothing inventive about watering two trees differently based on, say, soil and weather data, whether it is done in a garden, in a backyard, in a plot of land, or in a field.[30]

Plaintiff also points to Defendant's unsuccessful attempts to challenge the obviousness of

---

[30] The Court finds no indication that the Representative Claims are limited to vineyard irrigation. *See, e.g.*, '834 Patent col. 3 ll. 52–55. Regardless, a field-of-use restriction is not relevant under § 101. *GoTV*, 166 F.4th at 1064 ("[W]e have made clear that an abstract idea remains an abstract idea even when narrowed—*e.g.*, by subject matter—to a particular use or environment." (collecting cases)); *Bilski v. Kappos*, 561 U.S. 593, 612 (2010) ("*Flook* established that limiting an abstract idea to one field of use or adding token postsolution components did not make the concept patentable.").

38

the patents before the PTAB as evidence of an inventive concept. (Doc. 231 at 19.) However, this exact argument has already been rejected by the Federal Circuit because it conflates patent eligibility with obviousness. *Constellation Designs*, 174 F.4th at 904–05; *see also Intell. Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1315 (Fed. Cir. 2016) (Dyk, J.) ("Here, the jury's general finding . . . that three particular prior art references do not disclose all the limitations of or render obvious the asserted claims does not resolve the question of whether the claims embody an inventive concept at the second step of *Mayo*/*Alice*."). Relatedly, Plaintiff points to Defendant's statement praising the experimental vineyards. (Doc. 2231 at 9.) But this Court may not consider secondary objective indicia of non-obviousness under *Alice* step two. *WhitServe*, 854 F. App'x at 373 ("Objection [*sic*] indicia of nonobviousness are relevant in a § 103 inquiry, but not in a § 101 inquiry."); *Ficep Corp. v. Peddinghaus Corp.*, No. 2022-1590, 2023 WL 5346043, at *7 (Fed. Cir. Aug. 21, 2023) ("Questions of nonobviousness such as secondary considerations, however, are irrelevant when considering eligibility." (citations omitted)). Even if this Court were to "import" secondary objective indicia of non-obviousness into the patent eligibility analysis, Plaintiff has not even attempted to establish—nor could the Court find—the requisite "nexus." *See Volvo Penta of the Americas, LLC v. Brunswick Corp.*, 81 F.4th 1202, 1210–16 (Fed. Cir. 2023) (discussing objective indicia of non-obviousness and the nexus requirement).[31]

Moreover, upon further review of the MTD Order and the parties' arguments, (Doc. 221-1 at 19; Doc. 231 at 19; Doc. 232 at 10 & n.6), the Court concludes that it erred in stating that merely considering a garden variety of non-specific external data (*e.g.*, weather data and evapotranspiration coefficients, which have been known for decades) and in-field sensor data in "combination" supplies the requisite "inventive concept," (Doc. 31 at 22 n.5). This is because merely directing people to consider two broad categories of data and then make non-specific decisions based on the data falls within the meaning of an "abstract idea." *See GoTV*, 166 F.4th at

---

[31] In any event, Plaintiff's objective evidence of non-obviousness may be outweighed by objective evidence of obviousness—*i.e.*, simultaneous invention by others. *See, e.g.*, U.S. Patent No. 6,947,811 col. 1 ll. 52–60 ("The present invention provides systems and methods in which a microprocessor, disposed in an irrigation controller, is programmed to adjust an irrigation schedule according to a condition of a plant being irrigated."); Patent Cooperation Treaty Application Publication No. WO 2001/038946, at 5–6 ("In the novel irrigation control system, by directly monitoring the plant, it is possible to obtain a continuous and current record of plant water status, in real time.").

1065 ("[T]he ideas of collecting, storing, organizing, and displaying information are, without more, themselves abstract in character (involving both intangibility and fundamental longstanding practices)."); *CardioNet, LLC v. InfoBionic, Inc.*, 816 F. App'x 471, 475 (Fed. Cir. 2020) ("At step one, we conclude that the claims are directed to collecting, analyzing, and displaying data, which we have repeatedly held to be abstract concepts." (collecting cases)); *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016) ("In a similar vein, we have treated analyzing information by steps people go through in their minds, or by mathematical algorithms, without more, as essentially mental processes within the abstract-idea category." (collecting cases)). And an "abstract idea [] cannot supply the inventive concept, 'no matter how groundbreaking,'" *Trading Techs. Int'l, Inc. v. IBG LLC*, 921 F.3d 1378, 1385 (Fed. Cir. 2019) (quoting *SAP Am., Inc. v. InvestPic*, LLC, 898 F.3d 1161, 1171 (Fed. Cir. 2018)), unless it is implemented using an inventive, non-conventional technology, *AGI SureTrack LLC v. Farmers Edge Inc.*, ___ F.4th ____, ____, No. 2024-1730, 2026 WL 1542212, at *4 (Fed. Cir. June 2, 2026) ("Here, AGI's claims do not pass muster at *Alice* step two because they are directed to gathering and analyzing a particular type of data and do not disclose any specific inventive technology for performing those functions." (citing *Elec. Power Grp.*, 830 F.3d at 1354–56)). Here, however, the specifications explicitly state that data analysis can be performed in a conventional manner. *E.g.*, '834 Patent col. 5 ll. 16–35.[32]

In sum, the Asserted Claims amount to nothing more than "[s]tating an abstract idea[—*i.e.*, determine each plant's actual needs and somehow water it accordingly—] while adding the words 'apply it with [ordinary irrigation concepts].'" *See Alice*, 573 U.S. at 223. Put another way, if a random group of competent agricultural engineers were simply told to "apply" the abstract

---

[32] Moreover, because evapotranspiration coefficient is an abstract mathematical/scientific concept, it cannot supply the requisite "inventive concept" under *Alice* step two. *Optis Cellular Tech., LLC v. Apple Inc.*, 139 F.4th 1363, 1380 (Fed. Cir. 2025) ("On remand, the court must determine whether claims 6 and 7 of the '332 patent contain any inventive concept beyond the abstract idea of the claimed mathematical formula." (footnote omitted)). This has the bonus effect of avoiding difficult First Amendment-related issues by searching for an independent justification for the patent beyond the inclusion of mathematical/scientific formula, a form of protected speech. *See Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 445–553 (2d Cir. 2001) (explaining that mathematical formulas are protected speech; and discussing the intersection of the First Amendment and computer codes).

idea—*e.g.*, provide water to two apple trees based on the weather and the actual needs of each tree—using conventional technologies and nothing more, they all should be able to come up with something akin to the patents-in-suit, which are filled with nothing more than desirable functions and results, as well as ordinary irrigation-related concepts and technologies. *Cf. St Germain v. Brunswick*, 135 U.S. 227, 231 (1890) ("We think that competent knowledge and skill in his calling on the part of an intelligent mechanic would have enabled him, on request, to construct the revolving billiard-cue rack in question, without calling the inventive faculty into play."). Accordingly, the Court concludes that the Asserted Claims do not recite a patent eligible application of the abstract idea.

### 3. Law of the Case

#### i. *No Affirmative Judgment or Decision Finding Eligibility*

Beyond all the substantive issues regarding patent eligibility, Plaintiff also argues that the law of the case doctrine precludes the Court from reconsidering the MTD Order. (Doc. 231 at 11.) At least within the Ninth Circuit, "[t]he law of the case doctrine does not[] . . . bar a court from reconsidering its own orders *before judgment is entered* or the court is otherwise divested of jurisdiction over the order." *Askins*, 899 F.3d at 1042 (citations omitted) (emphasis added); *see also Pac. Coast Fed'n of Fishermen's Associations v. Raimondo*, No. 1:20-cv-00426-JLT-EPG, 2023 WL 2228173, at *16 (E.D. Cal. Feb. 24, 2023) (explaining the law of the case doctrine); *Rocky Mountain Farmers Union*, 843 F. Supp. 2d at 1060 (reconsidering the legal issue of federal preemption at the summary judgment stage).

The Court agrees with Defendant that the earlier *denial* of its *motion to dismiss* was not an affirmative judgment on the merits that the Asserted Claims are indeed patent eligible. (Doc. 232 at 5–6.) In *Aatrix Software, Inc. v. Green Shades Software, Inc.*, Judges Moore and Taranto found,[33] *inter alia*, that the plaintiff's amended complaint plausibly alleged that "the claimed invention is directed to an improvement in the computer technology itself" under *Alice* step one. 882 F.3d 1121, 1127 (Fed. Cir. 2018) (panel opinion). Judge Moore then explained in her opinion concurring in the denial of en banc rehearing: "The conclusion that the patent claims . . . survived

---

[33] Judge Reyna filed a dissenting opinion.

41

the motion to dismiss is not a holding that they are eligible." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 890 F.3d 1354, 1358 (Fed. Cir. 2018) (Moore, J., joined by Dyk, O'Malley, Taranto, and Stoll, J.J., concurring in the denial of en banc rehearing). Similarly, in *Entangled Media, LLC v. Dropbox Inc.*, the Northern District of California denied the defendant's motion to dismiss for failure to "establish[] . . . each asserted patent is directed to an abstract idea" under *Alice* step one. 716 F. Supp. 3d 819, 829 (N.D. Cal. 2024). Then, at the summary judgment stage, the district court noted that its "order denying [the defendant]'s motion to dismiss was not a final judgment." *Entangled Media, LLC v. Dropbox Inc.*, 795 F. Supp. 3d 1191, 1228 (N.D. Cal. 2025). In *CardioNet, LLC v. InfoBionic, Inc*, the District of Massachusetts granted the defendant's motion to dismiss based on patent ineligibility, a decision that was reversed by the Federal Circuit. 955 F.3d 1358, 1366, 1371–72 (Fed. Cir. 2020). The district court nonetheless "conclude[d] that the Federal Circuit's mandate did not constitute a judgment in favor of [the plaintiff] on [the defendant's] § 101 defense." *CardioNet, LLC v. InfoBionic, Inc.*, No. 1:17-cv-10445-IT, 2021 WL 1723847, at \*1–3 (D. Mass. Apr. 30, 2021). The district court explained that the "law of the case doctrine appl[ied] to the question of the sufficiency of the pleadings (the issue raised on appeal) but d[id] not bar further development of the record and adjudication on the merits." *Id.* at \*1.

Here, too, the MTD Order merely concluded that Defendant failed to demonstrate the insufficiency of the pleadings—it did not preclude further development of the record, nor did it issue a judgment in favor of Plaintiff on Defendant's invalidity defense or counterclaim. (*See* Doc. 232 at 5.)[34] Notably, the Court explained in the MTD Order that "the Asserted Patents *appear* to improve upon the prior art" in various ways and that Defendant did "not meet its burden . . . in moving to dismiss [P]laintiff's complaint." (Doc. 31 at 17–19 (emphasis added).) Such statements do not suggest that the denial of Defendant's motion to dismiss amounted to an

---

[34] Plaintiff points to a very recent decision from the Central District of California, (Doc. 233 at 2), where the court first denied the defendant's motion to dismiss under § 101and then denied the defendant's motion for reconsideration at the summary judgment stage under the law of the case doctrine, *Cranial Techs., Inc. v. Ottobock SE & Co. Kgaa*, No. 2:23-cv-02320-CBM-E, 2025 WL 4072491, 2026 WL 1719417, at \*2–3 (C.D. Cal. June 11, 2026). Respectfully, the *Cranial* decision may have overlooked the fact that, within the Ninth Circuit, the law of the case doctrine does not apply until judgment is entered or the district court is otherwise divested of jurisdiction over the order.

42

affirmative finding or judgment on patent eligibility. Accordingly, the Court is free to decide the issue of patent eligibility at the summary judgment stage.

### ii. Changed Circumstances

Even assuming, *arguendo*, that the law of the case applies, the Court finds sufficiently changed circumstances as to justify a reconsideration of the MTD Order. *See Askins*, 899 F.3d at 1043 (explaining that, even under the law of the case doctrine, a court may reconsider a prior order when there is a showing of clear error, changed law, new evidence, changed circumstances, or manifest injustice).[35]

First, the § 101 jurisprudence was confusing and difficult to apply several years ago. *CareDx, Inc. v. Natera, Inc.*, 563 F. Supp. 3d 329, 337 (D. Del. 2021) (Chief Judge Connolly stating that he is "mindful that the state of § 101 law is, to use the words of various Federal Circuit judges, 'fraught,' 'incoherent,' 'unclear, inconsistent[,] . . . and confusing,' 'and indeterminate and often lead[ing] to arbitrary results'" (footnote citations omitted) (alterations in original)), *aff'd*, 40 F.4th 1371 (Fed. Cir. 2022). While Plaintiff may be correct that there has been "no relevant change *in the basic concepts* of Federal Circuit patent eligibility" jurisprudence since the MTD Order, (*see* Doc. 231 at 6 (emphasis added)), recent opinions like *Beteiro* and *Gen Digital* have greatly clarified the relevant caselaw and have provided substantial guidance to district courts.

Second, the Court notes that the MTD Order was decided more than five years ago—it was decided without the benefit of *any* discovery and without a full understanding of the patent law and the relevant art. Now, the opposite is true.[36] Though the Court accepted Plaintiff's allegations that the patents-in-suit are directed to various technological improvements at the

---

[35] The Court notes that there appears to be some inconsistency as to whether a showing of clear error must be accompanied by a finding of manifest injustice. *Compare Wilkins v. United States*, 163 F.4th 636, 645 (9th Cir. 2025) (requiring a showing of clear error "and" manifest injustice), *with Montana Wildlife Fed'n v. Haaland*, 127 F.4th 1, 48 (9th Cir. 2025) (using "or"), *and Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024, 1034 (9th Cir. 2015) (using "or"). It is unclear whether there is an intra-circuit split or a nuanced distinction between these cases.

[36] The Federal Circuit has not foreclosed the possibility of looking outside the intrinsic record to aid the Court's understanding of the relevant technology. *See CardioNet*, 955 F.3d at 1373–74.

motion-to-dismiss stage, perhaps with insufficient scrutiny, the Court need not accept them as true at the summary judgment stage. (*See* Doc. 232 at 5–6.)

Third, Defendant drew the Court's attention to the fact that the MTD Order appears to have accepted Plaintiff's argument that the patents-in-suit are directed to an advanced irrigation system, which allegedly "provided new and unconventional ways to automatically integrate sophisticated information" related to, for example, weather and soil conditions. (Doc. 180 at 9–10 (quoting Doc. 17 at 26) (internal quotation marks omitted); *see also* Doc. 17 at 25–26, 28 (arguing that the patents-in-suit are directed to an improvement in automation).) But Plaintiff's theory of infringement does not appear to suggest that the Asserted Claims require automated information processing. (*See generally* Doc. 185 at 9–11.). The Court also became skeptical of Plaintiff's claim of unconventional data processing because it does not appear to be supported by the record.

As such, the Court finds sufficiently changed circumstances over the past five years as to warrant a reconsideration of the MTD Order.[37]

### iii.  Reliance and Prejudice

Finally, the Court finds it necessary to discuss Plaintiff's argument that overturning the MTD Order "would frustrate years of reliance, work manifest injustice, and undermine respect for the finality of this Court's decisions." (Doc. 231 at 17; *see also id.* at 6–7.) The Court would be more sympathetic to that argument if this were a breach of contract case between two private parties, or if this were a case solely focused on the issue of infringement. In such a situation, the

---

[37] However, the Court did not wish to unnecessarily confine or dictate what the parties may or should argue regarding § 101. The Court therefore permitted Defendant "to file a supplemental motion for summary judgment on *any* § 101-related issues, so long as Defendant clearly addresses any Rule 56(f) and Rule 54(b) implications, and how the Federal Circuit's recent (*i.e.*, post-January 4, 2021) § 101 opinions may inform this Court's decision." (Doc. 215 at 4 (emphasis in original).)

More than seven weeks after that order, Plaintiff belatedly informed the Court that Defendant's request for a supplemental motion for summary judgment, (Doc. 172-1 at 8 n.3), may not be in strict compliance with Local Rule 230(j), (Doc. 231 at 11). This relatively minor procedural hiccup, assuming it is one, does not justify summarily tossing all the briefing without considering the merits. In any event, the Court finds that Defendant's briefs, (Docs. 172-1, 180, 221, 232), do provide enough for the Court to decide whether to reconsider the MTD Order. Once again, in *Rocky Mountain Farmers Union*, this Court accepted the parties' use of their summary judgment briefs to re-argue a question of law that the Court had already addressed at the motion-to-dismiss stage. 843 F. Supp. 2d at 1060.

Court could—to an extent—blame Defendant for re-raising an issue too late in the litigation process. However, because patents are a form of monopoly against the public, there is substantial public interest in resolving the validity of dubious patents and clarifying the scope of the public domain which people may operate freely, especially given the lack of any fair use or independent creation defense in patent law. *See Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 815–16 (1945) (explaining that a suit in equity may need to consider both "the interests of the adverse parties" and the public's "paramount interest in seeing that patent monopolies . . . are kept within their legitimate scope"); *Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 100 (1993) (discussing "the importance to the public at large of resolving questions of patent validity"). Unless there has been a judicial final judgment on the merits, a patent owner may not be able to invoke any reliance or settled expectation on an erroneous invasion of the public domain, *see Ass'n for Molecular Pathology v. U.S. Pat. & Trademark Off.*, 689 F.3d 1303, 1358 & n.6 (Fed. Cir. 2012) (Bryson, J., concurring in part and dissenting in part) (arguing that there is no "adverse possession" theory as to what should have remained in the public domain from the very beginning), *aff'd in part, rev'd in part sub nom. Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576 (2013), beyond what is explicitly provided by law, *see, e.g.*, *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91 (2011) (holding that the presumption of validity under 35 U.S.C. § 282(a) requires a patent challenger to prove invalidity by clear and convincing evidence).

In any event, any prejudice or reliance interest is much reduced. First, the Court has already decided in Part III.A, *supra*, to grant summary judgment on the issue of non-infringement in favor of Defendant. Second, considering that Defendant repeatedly raised ineligibility defenses and counterclaims, (Doc. 32; Doc. 54), Plaintiff should have known that Defendant intends to further pursue its ineligibility-related arguments.[38]

---

[38] And maybe third, the nature of this case somewhat resembles what the Supreme Court described 153 years ago:

> It was never the object of [the patent] laws to grant a monopoly for every trifling device, every shadow of a shade of an idea, which would naturally and spontaneously occur to any skilled mechanic or operator in the ordinary progress of manufactures. Such an indiscriminate creation of exclusive privileges tends rather to obstruct than to stimulate invention. It creates a class of speculative schemers who make it their business to watch the advancing wave of improvement, and

For all the reasons stated in Part III.B, the Court **GRANTS** Defendant's Supplemental Motion for Summary Judgment and finds that claims 1, 6, 7, 10, and 15 of the '834 Patent and claims 2, 4, 20, 22, and 36 of the '810 Patent are **INVALID** for want of patentable subject matter under § 101.

### C. Indefiniteness

The parties agree that, based on the Court's claim construction order, (Docs. 94, 124), all asserted claims of the '881 Patent are invalid for indefiniteness, (Doc. 185 at 20; Doc. 172 at 25–27).[39] Accordingly, the Court **GRANTS** Defendant's Motion for Summary Judgment and finds that claims 1–3, 5–6, 8–12, 14–15, 29–34, and 36–44 of the '881 Patent are **INVALID** for indefiniteness under § 112.

### IV.   CONCLUSION

Based upon all the foregoing, the Court **ORDERS** that Defendant's Motion for Summary Judgment for Noninfringement, (Doc. 172), and Defendant's Supplemental Motion for Summary Judgment for Patent Ineligibility, (Doc. 217), are **GRANTED**.

IT IS SO ORDERED.

Dated:   July 2, 2026

_____
UNITED STATES DISTRICT JUDGE

---

gather its foam in the form of patented monopolies, which enable them to lay a heavy tax upon the industry of the country, without contributing anything to the real advancement of the art. It embarrasses the honest pursuit of business with fears and apprehensions of concealed liens and unknown liabilities to lawsuits and vexatious accountings for profits made in good faith.

*Atl. Works v. Brady*, 107 U.S. 192, 200 (1883).

[39] Plaintiff does not appear to ask the Court to reconsider its prior claim construction order even though it disagrees with certain parts of that order. (Doc. 185 at 20.)

46